IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOY SWEETING, | ) |
| Plaintiff, | ) Civil Action No. 04-368 – Erie |
| v. | ) The Honorable Sean J. McLaughlin |
| HIGHMARK, INC., | ) |
| Defendant | ) |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
HIGHMARK'S MOTION FOR SUMMARY JUDGMENT**

In support of its Motion for Summary Judgment (filed herewith), Highmark Inc. ("Highmark" or the "Company") submits the following Statement of Undisputed Material Facts pursuant to Local Rule 56.1:

1.   Highmark is a health plan corporation. Among its many business activities, Highmark engages in health promotion and disease prevention/wellness activities. Declaration of Anna L. Silberman ("Silberman Declar.") at ¶ 2.[1]

2.   In or about the early 1990's, Highmark embarked on a wellness/health promotion initiative known as HealthPLACE. Transcript of Deposition of Anna L. Silberman ("Silberman Dep.") at pp. 7-8.[2] In the HealthPLACE business model, Highmark had "bricks and mortar" locations (known as HealthPLACE centers) where

---

[1]   A copy of the Silberman Declaration (filed herewith) appears under Tab A of the Appendix in Support of Defendant's Motion for Summary Judgment ("Appendix").

[2]   These and other cited pages and exhibits from the Silberman Dep. appear under Tab B of the Appendix.

Highmark offered various classes, programs and screenings on disease prevention and wellness to members of the community. Silberman Declar. at ¶ 6.

        3.     "Wellness" means "health prevention, health promotion, trying to encourage people to live healthier lifestyles by developing certain practices, whether they be weight management, smoking cessation, stress, the osteoporosis program, whatever the program is that would help you have a better condition of health." Transcript of Deposition of Plaintiff ("Plaintiff's Dep.") at 12-13.[3]

        4.     In or about October 1994, Plaintiff was hired by Highmark to become the Administrator of the HealthPLACE center located in Erie, Pennsylvania. Plaintiff's Dep. at 27. In this non-management position, Plaintiff reported to Tina Palaggo-Toy, who in turn reported at that time to Anna Silberman, Vice President. Plaintiff's Dep. at 31-32, 64-65.

        5.     Ms. Silberman was the decisionmaker in this case. She is 51 years of age. Silberman Dep. at 4. She has been employed with Highmark (or one of Highmark's corporate predecessors or affiliates) for 16 years. Id.

        6.     At all times relevant to this case, Ms. Silberman reported to Aaron Walton, Highmark's Senior Vice President of Corporate Affairs. Mr. Walton is 58 years of age. See Defendant's Response to Interrogatory No. 7 of Plaintiffs First Set of Interrogatories.[4]

---

3     These and other cited pages and exhibits from Plaintiff's Dep. appear in the record under Tab C of the Appendix.

4     This and other cited portions of Highmark's responses to Plaintiff's interrogatories appear in the record under Tab D of the Appendix.

7. In or about 1996, Ms. Silberman approved adding a Program Assistant position to the staff in the HealthPLACE center in Erie, primarily to handle the administrative duties for that location. Silberman Declar. at ¶ 4.

8. Ms. Silberman recalled that Plaintiff needed assistance to get the administrative work done as HealthPLACE Administrator, and that the Program Assistant position was created to work with Plaintiff in the Erie region because the administrative work was not getting done when Plaintiff was working alone in that office. Silberman Dep. at 71.

9. In 2001, Rebecca Swick became the Program Assistant in the HealthPLACE center located in Erie. Transcript of Deposition of Rebecca Swick ("Swick Dep.") at 8.[5] She and Plaintiff were the only two employees in the Erie HealthPLACE. Ms. Swick also reported directly to Ms. Palaggo-Toy. Plaintiff's Dep. at 30-31.

10. In or about April 2000, Ms. Silberman assumed a new position in Highmark (President and CEO of LifeStyle Advantage) and no longer oversaw HealthPLACE.[6] Silberman Dep. at 5, 9. Ms. Silberman returned to a management role with HealthPLACE in early 2004. Silberman Dep. at 10. From April 2000 until

---

[5] These and other cited pages and exhibits from the Swick Dep. appear in the Appendix under Tab E.

[6] Lifestyle Advantage was an organization that was formed to work with other Blue Cross plans across the country to implement the Dean Ornish program for reversing heart disease. Silberman Dep. at 9. Although Ms. Silberman did not directly supervise HealthPLACE while she was President of Lifestyle Advantage, those two units "were very closely related" and Ms. Silberman remained in contact with the individuals involved with HealthPLACE and she continued to report directly to Mr. Walton. Silberman Dep. at 17.

Ms. Silberman's return, Bradley Pifalo, M.D. was the Vice President to whom HealthPLACE reported. Plaintiff's Dep. at 65.

11. In late 2003, Mr. Walton determined that the HealthPLACE system was not a successful business model for achieving Highmark's business objectives in health promotion and wellness. Likewise, at or about the same time, he decided that LifeStyle Advantage should be closed. Mr. Walton decided that a new business model should be created to carry out Highmark's wellness and health promotion objectives. He assigned Ms. Silberman to develop and implement an appropriate business model and organizational structure to replace HealthPLACE and Lifestyle Advantage. Silberman Dep. at 14; Silberman Declar. at ¶ 5.

12. On December 13, 2003, Mr. Walton sent a memorandum to staff announcing that he had made certain organizational changes within Corporate Affairs to enhance "the area's ability to support Highmark's mission and strategic direction through data-driven initiatives and scientifically based interventions." Plaintiff's Dep. Exhibit 1.

13. In that memorandum, Mr. Walton also announced that Ms. Silberman would assume responsibility for a new Preventive Health Services Division. He explained that this Division "will expand Highmark's capabilities for delivering customer focused health promotion and disease prevention activities throughout our 49-county service region." Further, he announced that Ms. Silberman will be responsible for the "re-positioning of services traditionally delivered through our HealthPLACE and Primary Care Centers to enhanced delivery models." Plaintiff's Dep. Exhibit 1.

14. Plaintiff and other employees of HealthPLACE were informed by Mr. Walton at a meeting in late 2003 or January 2004 that some of the HealthPLACE

- 5 -

centers had already been closed and that Highmark would be closing the remaining HealthPLACE centers within the next month or so. Plaintiff's Dep. at 78.

15. The organization known as HealthPLACE was dissolved and all HealthPLACE Administrator jobs (including Plaintiff's) were eliminated by the end of March 2004. "[Plaintiff's] position was eliminated because all HealthPLACE Centers closed." Silberman Dep. at 117.

16. Plaintiff was notified on March 15, 2004 that the HealthPLACE center in Erie was officially closed and that her job was eliminated. Plaintiff's Dep. at 89. Plaintiff admits that it was no surprise to her on March 15 that the Erie HealthPLACE center was closing. Plaintiff's Dep. at 90.

17. In the new business model for Preventive Health Services, Highmark no longer operates its own facilities for health promotion, disease prevention and wellness activities. Instead, Highmark has established regional networks of community-based organizations which have agreed to deliver programs developed and monitored by Highmark, and to collect data concerning the clinical outcomes resulting from the programming. These outcomes are expected to reduce health risk and thereby reduce claims utilization for preventable disease and disability among Highmark subscribers. Silberman Declar. at ¶ 7.

18. Likewise, in the new organizational structure, Highmark continues to work with Highmark's corporate customers to develop effective worksite wellness operating plans with the goal of improving, among other things, their employees' lifestyle behaviors, health risk status, productivity, and ultimately healthcare costs. See Highmark's Response to Interrogatory No. 6 of Plaintiff's First Set of Interrogatories.

19. For the new Preventive Health Services organization, Ms. Silberman created positions known as Worksite-Based Site Consultants, Community-Based Site Consultants, and Hospital-Based Site Consultants. Silberman Declar. at ¶¶ 8, 10 and 12.

20. In filling the job of Community-Based Site Consultant, Ms. Silberman was not looking for someone to teach or present wellness programs. This job is not a teaching job. To the contrary, Ms. Silberman was looking for an administrator who is detail-oriented with solid interpersonal skills who could develop and oversee a network of community sites and assure that those network sites are delivering the specified programs according to standardized protocols and returning solid clinical outcomes as reflected in data-driven reporting and analyses. Silberman Declar. at ¶ 8,

21. For the position of Hospital-Based Site Consultant, Ms. Silberman was looking for individuals with all of the skills and abilities expected of a Community-Based Site Consultant. In addition, a healthcare clinical specialty was required. Silberman Declar. at ¶ 10.

22. With respect to Worksite-Based Site Consultants, the work encompassed by this job was actually already being done prior to the new organization as part of Highmark's worksite wellness initiative (also referred to as HealthPLACE@work). Silberman Declar. at ¶ 12; Plaintiff's Dep. at 77-78 and 123-125.

23. Ms. Silberman was responsible for deciding who would have jobs in the new Preventive Health Services organization. Silberman Dep. at 10. She made those decisions in the first quarter of 2004. Id.

24. Ms. Silberman did not offer Plaintiff a position in the new organization. Silberman Dep. at 10. Her decision was based solely on non-discriminatory business reasons. Silberman Declar. at ¶ 18. See also paragraphs 25-35, *infra*.

25. In making her decision not to offer a position to Plaintiff in the new organization, Ms. Silberman reviewed, among other things, at least the two most recent written performance evaluations on Plaintiff. Silberman Dep. at 27, 31-32.

26. In the most recent written performance evaluation available to Ms. Silberman (which had been prepared by Ms. Palaggo-Toy in June 2003 and approved by Dr. Pifalo), Plaintiff had received from Ms. Palaggo-Toy a rating of "Does Not Meet Expectations" for her objective dealing with the worksite wellness initiative. Silberman Dep. at 61 and Exhibit 2; Silberman Declar. at ¶ 17.

27. In performance year 2002-03, fifty percent of Plaintiff's performance objectives involved following the worksite wellness business plan and improving the delivery and evaluation of the data-driven worksite wellness model with local, regional and national accounts in the Erie region. Silberman Dep. at 61; Silberman Dep. Exhibit 2.

28. After reviewing this performance evaluation of Plaintiff, Ms. Silberman "was very concerned" with Plaintiff's lack of productivity and achievement on this significant (50 percent) aspect of her job duties. Ms. Silberman noticed from the review that Plaintiff "had only one account that had completed baseline and follow-up screening; it's also a matter of productivity. One account in an area where we have a

huge customer base like Erie is… not enough accomplishment, not enough achievement." Silberman Dep. at 68.[7]

29.     Additionally, due to various events which had come to Ms. Silberman's attention over the years, Ms. Silberman had developed negative impressions of Plaintiff even before reading the aforementioned performance evaluation. Silberman at Dep. 18. Those negative impressions which Ms. Silberman recalled included having "some concerns about [Plaintiff's] interactions with the public, and we were serving the public." Silberman Dep. at 18.

30.     Ms. Silberman specifically remembered an occasion when one of Highmark's customers in Erie who was attending a program had a negative experience involving Plaintiff and wrote a letter to complain about it. "We don't get many complaints in our area, and I remember there being a significant complaint about [Plaintiff]," including a complaint that Plaintiff had been rude to the customer. Silberman Dep. at 20-21.

31.     In that written complaint, the customer (a policyholder and small business owner in Erie) complained that Plaintiff was "extremely unprofessional" and "rude":

> I have watched her be short with several other members of the Yoga class on several occasions, several people in the class have remarked on it to me and at least two people have stopped coming due to her attitude. And yesterday she turned on me…. I feel you would want to know that you have someone working for you who behaves in a rude manner in a customer service position, to your

---

7   In reviewing Plaintiff's personnel file, Ms. Silberman was "looking for performance, period." Silberman Dep. at p. 30. Ms. Silberman further explained that the "most recent performance would have been the most relevant to me. . .since I had been gone for a few years. … The most recent year or two since I had not been directly involved." Silberman Dep. at 31.

> customers who go to these classes to help alleviate stress not create more of it.

Silberman Dep. Ex. 5.

32. That complaint from a customer "stuck with" Ms. Silberman. "You know, that wasn't the entire decision, but I can say that it's so rare for us to get that type of complaint that it did stick with me." It contributed to Ms. Silberman's decision not to offer Plaintiff a job in the new Preventive Health Services organization. Silberman Dep. at 23-24. Ms. Silberman also recalled that there had been other complaints of this nature about Plaintiff, albeit not written. Silberman Dep. at 121.

33. From the time that she started at Highmark, Plaintiff had ongoing interactions with Ms. Silberman. Plaintiff's Dep. at 83.

34. Another event which contributed to Ms. Silberman's negative impression of Plaintiff involved an assignment to implement a system-wide arthritis program based on a training course Plaintiff had attended in California. Ms. Silberman "never really saw that [program] materialize to its potential." Silberman Dep. at pp. 33-34. Ms. Silberman explained further:

> "I do not recall seeing that program move to its potential,... I did not see it written up in the newspaper like a lot of our other things were of equal or of significant investment. I did not see, you know, a lot of people training in this who then were motivated to continue to deliver the program. I don't recall seeing any significant amounts of data that came out of that program or outcomes of any nature that came out of the program that were parallel to the other work that was being delivered to our customers."

Silberman Dep. at 39-40.

35. Yet another event which contributed to Ms. Silberman's negative impression of Plaintiff involved an expense report submitted by Plaintiff to Ms. Silberman that included illegitimate expenses. Silberman Dep. at 45.

Ms. Silberman recalls being "astounded by" this incident at the time it occurred. Silberman Dep. at . 46.

36. Ms. Silberman also had the general impression that Plaintiff was administratively weak. Silberman Dep. at 52-53.

37. In mapping her staff for the new Preventive Health Services organization, Ms. Silberman determined that she only needed one person based in Erie, and that would be a Community-Based Site Consultant. Silberman Declar. at ¶¶ 11, 16.

38. Ms. Silberman determined that Plaintiff was not qualified for the position of Community-Based Site Consultant. Silberman Declar. at ¶ 9. Instead she selected Rebecca Swick for that position in Erie. Silberman Dep. at 78.

39. Ms. Swick has a Bachelor of Arts degree in social work from the University of Pittsburgh and recently received a Master's Degree in Public Administration from Gannon University. Swick Dep. at 4-5.[8]

40. Prior to joining Highmark in Erie as a customer service representative in 1997, Ms. Swick was a professional social worker (a case worker) in the Erie area, initially at the Area Agency on Aging and later for the Lutheran Home of Erie. Swick Dep. at 13-14.

41. Ms. Swick worked as a customer service representative for Highmark for approximately three and one-half years until she accepted the job of Program Assistant in the HealthPLACE center in Erie in 2001. Swick Dep. at 7-8.

---

8   Ms. Swick is 33 years of age. Swick Dep. at 4.

42.   Ms. Swick's immediate supervisor as Program Assistant for HealthPLACE was Ms. Palaggo-Toy. Plaintiff's Dep. at 31.

43.   Ms. Palaggo-Toy gave Ms. Swick an overall rating of Exceeds Expectations for each year that she evaluated Ms. Swick's performance, including the written evaluations of March 2003 and March 2004. See Swick Dep. Exhibits 4 and 5.

44.   Ms. Swick's duties as Program Assistant at HealthPLACE were "probably a fifty-fifty split between dealing with the public and working administratively. There was a lot of detail; a lot of paperwork . . . [Y]ou had to keep things organized and balance several things at once." Swick Dep. at 87.

45.   Ms. Swick's new job of Community Site Consultant is "mostly administrative." Swick Dep. at 21. It involves (among other things) choosing community sites to deliver the wellness programming pursuant to established criteria (e.g., a local YMCA), implement, market and monitor the programming, and generate/evaluate paperwork regarding the outcomes of the programming. Swick Dep. at 23-24.

46.   The position of Community-Based Site Consultant does not involve teaching the classes. Swick Dep. at 25.

47.   Mr. Vickers Ward had been working for Highmark as part of the Worksite Wellness team prior to the dissolution of HealthPLACE. In that position, he had been performing the duties of a Worksite-Based Site Consultant. Silberman Declar. at ¶ 13; Plaintiff's Dep. at 123-25.

48.   In early 2004, Ms. Silberman reviewed at least the two most recent written performance evaluations on Mr. Ward and found that he had received an overall rating of "Exceeds Expectations" in each of those years for his work on the Worksite

Wellness team. For example, Mr. Ward's annual evaluation dated September 25, 2003, reflects that he was responsible for successfully launching the HealthPLACE@work program in the central Pennsylvania region while at the same time continuing to provide a high level of service to Highmark group accounts assigned to him in western Pennsylvania and nationally. Silberman Declar. at ¶¶14-15.

49. Ms. Silberman did not hire a Worksite-Based Site Consultant for the Erie region because she determined that the Company did not need a full-time person dedicated to worksite wellness in Erie. Instead, she assigned Mr. Ward to pick up worksite wellness responsibilities for the Erie region in addition to his existing worksite responsibilities in western Pennsylvania. Silberman Declar. at ¶ 16.

50. In any event, Ms. Silberman did not consider Plaintiff qualified to hold a Worksite-Based Site Consultant position. She had received a "Does Not Meet Expectations" rating from Ms. Palaggo-Toy on the worksite wellness aspect of her job duties on her most recent written performance evaluation that Ms. Silberman had reviewed in early 2004. Silberman Declar. at ¶ 17.

51. After the decision had been made not to offer Plaintiff a job in the new organization, Plaintiff was given a temporary assignment for six additional months

- 13 -

to extend her service to be eligible for certain insurance benefits.  Silberman Dep. at 29-30.  Hence, Plaintiff's separation date with Highmark was mid-October 2004.

                Respectfully submitted,

                s/ Martha Hartle Munsch
                Martha Hartle Munsch
                Pa. ID No. 18176
                Shweta Gupta
                Pa. ID No. 84388
                REED SMITH LLP
                435 Sixth Avenue
                Pittsburgh, PA  15219
                412-288-4118

                Carl H. Shuman
                Highmark Inc.
                Pa. ID No. 37506
                1800 Center Street
                Camp Hill, PA  17089

                Counsel for Defendant
                Highmark Inc.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Statement Of Undisputed Facts In Support Of Highmark's Motion For Summary Judgment was served upon counsel for Plaintiff electronically and by United States mail, first class and postage prepaid, at Pittsburgh, Pennsylvania, on this 19th day of December, 2005, addressed as follows:

Joel S. Sansone
Scanlon & Sansone
2300 Lawyers Building
Pittsburgh, PA  15219
scanlon2sansone@aol.com

Counsel for Plaintiff


s/ Martha Hartle Munsch
Counsel for Defendant