# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOY SWEETING,             )    Civil Action No. 04-368 - Erie

       Plaintiff,    )

                   )    The Hon. Sean J. McLaughlin

      v.              )

                   )

HIGHMARK, INC.,         )    ELECTRONIC FILING

                   )

       Defendant.    )

## APPENDIX IN SUPPORT OF HIGHMARK'S
## MOTION FOR SUMMARY JUDGMENT
## VOLUME I OF III

Martha Hartle Munsch
PA ID No. 18176
mmunsch@reedsmith.com
Shweta Gupta
PA ID No. 84388
sgupta@reedsmith.com
REED SMITH LLP
435 Sixth Avenue
Pittsburgh, PA  15219
412-288-4118/4054

Carl H. Shuman, Esq.
Highmark, Inc.
Pa. ID No. 37506
1800 Center Street
Camp Hill, PA  17089

Counsel for Defendant
Highmark, Inc.

## TABLE OF CONTENTS

| TAB | DOCUMENT | LOCATION IN APPENDIX |
|---|---|---|
| A | Declaration of Anna L. Silberman | VOLUME I |
| B | Pages from Silberman Deposition Transcript | VOLUME I |
|  | Exhibits from Silberman Deposition Transcript | VOLUME II |
| C | Pages and exhibits from Plaintiff's Deposition Transcript | VOLUME II |
| D | Portions of Highmark's Responses to Plaintiff's First Set Of Interrogatories | VOLUME II |
| E | Pages and exhibits from Swick Deposition Transcript | VOLUME III |
| F | Pages from Palaggo-Toy Deposition Transcript | VOLUME III |

# <u>TAB A</u>

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOY SWEETING, | ) |
|            Plaintiff, | ) Civil Action No. 04-368 – Erie |
| v. | ) The Hon. Sean J. McLaughlin |
| HIGHMARK, INC., | ) |
|            Defendant | ) |

## DECLARATION OF ANNA L. SILBERMAN

Anna L. Silberman hereby makes the following declaration pursuant to 28 U.S.C. § 1746:

1.     I have been employed by Highmark Inc. (or by one of its predecessors or affiliates) since April 1989. I am currently the Vice President for Preventive Health Services.

2.     Highmark is a health plan corporation. Among its many business activities, Highmark engages in health promotion and disease prevention/wellness activities.

3.     I was involved in managing the organization within Highmark known as HealthPLACE from the early 1990's until sometime in 2000, when I became President and Chief Executive Officer of Lifestyle Advantage, then a subsidiary of Highmark. In early 2004, I was again assigned responsibility for HealthPLACE.

4.    In or about 1996, I approved adding a Program Assistant position to the staff in the HealthPLACE Center located in Erie, Pennsylvania, primarily to handle the administrative duties for that location.

5.    In early 2004, I was assigned by my supervisor, Aaron Walton, to develop and implement the organizational structure for a new business model to replace HealthPLACE and Lifestyle Advantage, both of which were being dissolved.  I was also assigned to make the staffing decisions for the new organization.

6.    In the HealthPLACE business model, Highmark operated "bricks and mortar" locations (known as HealthPLACE centers) where Highmark offered various classes, programs and screenings on disease prevention and wellness to members of the community.

7.    In the new business model for Preventive Health Services, Highmark no longer operates its own facilities for health promotion, disease prevention and wellness activities.  Instead, Highmark has established regional networks of community-based organizations which have agreed to deliver programs developed and monitored by Highmark, and to collect data concerning the clinical outcomes resulting from the programming.  These outcomes are expected to reduce health risk and thereby reduce claims utilization for preventable disease and disability among Highmark subscribers.

8.    Among the new positions I created for the new business model in Preventive Health Services was the position of Community-Based Site Consultant.  In filling that job, I was not looking for someone to teach or present wellness programs. This job is not a teaching job.  To the contrary, I was looking for an administrator who is detail-oriented, someone with solid interpersonal skills who could develop and oversee a network of community sites, assure that those network sites are delivering the

specified programs according to standardized protocols, and returning solid clinical outcomes as reflected in data-driven reporting and analyses.

9.     I did not consider Joy Sweeting to be qualified for this new position of Community-Based Site Consultant.

10.    The position of Hospital-Based Site Consultant was also created for the new organization.  In addition to having all of the skills and abilities I expect of a Community-Based Site Consultant, the Hospital-Based Site Consultants must also have a healthcare clinical specialty.

11.    We did not hire a full-time Hospital-Based Site Consultant for the Erie region.

12.    I also created the position entitled Worksite-Based Site Consultant for the new organization.  The work encompassed within this job was actually being done prior to the new organization as part of Highmark's worksite wellness initiative (also referred to as HealthPLACE@work).

13.    Mr. Vickers Ward had been working for Highmark as part of the Worksite Wellness team prior to the dissolution of HealthPLACE.  In that position, he had been performing the duties of a Worksite-Based Site Consultant.

14.    In early 2004, I reviewed at least the two most recent written performance evaluations on Mr. Ward and found that he had received an overall rating of "Exceeds Expectations" in each of those years for his work on the Worksite Wellness team.

15.    For example, in Mr. Ward's annual evaluation dated September 25, 2003, I noticed that he was responsible for successfully launching the

HealthPLACE@work program in the central Pennsylvania region while at the same time continuing to provide a high level of service to Highmark group accounts assigned to him in western Pennsylvania and nationally.

16.    I did not hire a Worksite-Based Site Consultant for the Erie region because I determined that we did not need a full-time person dedicated to worksite wellness in Erie.  Instead, I assigned Mr. Ward to pick up worksite wellness responsibilities for the Erie region in addition to his existing worksite responsibilities in western Pennsylvania.

17.    I did not consider Joy Sweeting qualified to hold a Worksite-Based Site Consultant position.  She had received a "Does Not Meet Expectations" rating from Ms. Palaggo-Toy on the worksite wellness aspect of her job duties on her most recent written performance evaluation that I had reviewed in early 2004.

18.    Ms. Sweeting's age was not a factor in my decision not to offer Ms. Sweeting a position in the new Preventive Health Services organization.  Likewise, her gender was not a factor in my decision.  My decision was based solely on non-discriminatory business reasons.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 19, 2005.

Anna L. Silberman
Address:  120 5th Avenue, Suite 1721
Pittsburgh, PA  15222

# **<u>TAB B</u>**

1                    ANNA LISA SILBERMAN,

2                having been duly sworn,

3          was examined and testified as follows:

4                     - - - -

5                     EXAMINATION

6                     - - - -

7   BY MR. SANSONE:

8   Q.    Ms. Silberman, how old are you?

9   A.    I am 51.

10  Q.    You're currently employed by Highmark; is that

11        right?

12  A.    That's correct.

13  Q.    How long have you been employed with Highmark?

14  A.    Let me tell you in a second.

15  Q.    Okay.

16  A.    Sixteen years.

17  Q.    Your current position is vice president; is that

18        right?

19  A.    Yes.

20  Q.    Vice president of what?

21  A.    Preventive health services.

22  Q.    Is that a new title as of sometime in 2004?

23  A.    No.  I think it's a new title as of sometime

24        in -- let's see.  2004, yeah, that's right.

25  Q.    Late '03 or early '04?

1    A.    Late '03, early '04.

2    Q.    I seem to remember that Mr. Walton created this

3          new preventive health services division sometime

4          I thought in late '03 or early '04; is that

5          right?

6    A.    Correct.

7    Q.    And that's when you assumed the title of vice

8          president of that division; is that right?

9    A.    That's right.

10   Q.    Prior to that what was your title?

11   A.    President and CEO of Lifestyle Advantage.

12   Q.    In that connection did you have some

13         responsibility for the HealthPLACE vocations

14         that Highmark maintained throughout the state?

15   A.    I did not.

16   Q.    How did you happen to become involved in my

17         client's chain of command?  Why were you

18         involved in her chain of command?

19   A.    When are you talking about?

20   Q.    I don't mean in her last temporary position, but

21         in her position as a HealthPLACE administrator?

22   A.    I was involved in that prior to my work with

23         Lifestyle Advantage, so that would have been

24         prior to 2000.

25   Q.    Prior to when?

1  A.  Correct.

2  Q.  When did that name change?

3  A.  I can't tell you; I can't remember.

4  Q.  I should probably know when we stopped paying

5      our bill to Blue Cross and started paying it to

6      Highmark.  Sometime in the '90s I think.

7  A.  I think you're right.  I'm sure you're right, it

8      was in the '90s.

9  Q.  So somewhere around '91 you went to this

10     affiliate.  How long did you stay there?

11 A.  Can we go back to the chronology, that will help

12     me?

13 Q.  I thought that's what we were on was the

14     chronology?

15 A.  Right, right.  So I was working at the Health

16     Education Center, I came in there as a manager

17     of the HealthPLACE System.

18 Q.  That was in '91 or thereabouts?

19 A.  That was in '91 or thereabouts.  And then within

20     the next few years I had several promotions.  I

21     became the director of the HealthPLACE System.

22     I then became the executive director of Health

23     Education Center.

24 Q.  Is that different than HealthPLACE System?

25 A.  Yes, because HealthPLACE System was a piece of

```
 1              it.  So I then became the executive director of

 2              the Health Education Center, and at that point

 3              in time I was responsible for HealthPLACE and

 4              the other activities of the Health Education

 5              Center, and I also at that point in time became

 6              a vice president for Highmark.  So I had two

 7              titles, executive director for Health Education

 8              Center and a corporate vice president.

 9    Q.    Now, in '91 you went to an affiliate?

10    A.    Uh-huh.

11    Q.    Was this still an affiliate or was it somehow

12          rolled back into Highmark or what?

13    A.    It was still an affiliate.

14    Q.    But you were also a vice president of Highmark?

15    A.    Right.

16    Q.    So you worked both for an affiliate and also

17          Highmark at that time when you became executive

18          director?

19    A.    Yes.

20    Q.    What year roughly was that?

21    A.    Roughly -- it was probably '94 or '95 by then.

22    Q.    As I remember the facts here we have HealthPLACE

23          being eliminated in '04; is that right?

24    A.    That's correct.

25    Q.    So you were there roughly ten years as executive
```

```
 1          director of the Health Education Center and VP

 2          of Highmark, that's a rough ten-year period that

 3          you were in that position?

 4    A.    Uh-huh.  No, it would have been more like six

 5          years because it was '94 to 2000, roughly '94 or

 6          '95 to 2000.

 7    Q.    Okay.  Then in 2000 what position did you take?

 8    A.    I became the president and chief executive

 9          officer of Lifestyle Advantage.

10    Q.    What's Lifestyle Advantage?

11    A.    Lifestyle Advantage was -- and these are

12          rough -- understand that these are rough dates

13          because I don't have a resume in front of me,

14          but Lifestyle Advantage was an organization that

15          was formed to work with other Blue Cross plans

16          across the country to implement the Dean Ornish

17          program for reversing heart disease.

18    Q.    Now, at that point did you stop being executive

19          director of the Health Education Center?

20    A.    Yes.

21    Q.    Did you stop affiliating or working with the

22          HealthPLACE groups?

23    A.    Yes.

24    Q.    For how long did you serve as president and CEO

25          of Lifestyle Advantage?
```

1    A.    From about 2000 till 2004.

2    Q.    When in 2004?

3    A.    I think it was roughly March or April of 2000

4          to -- I don't know, it was during the first

5          quarter of 2004 sometime.

6    Q.    Well, I'm told from the answers given by the

7          company that you made the decision to terminate

8          my client or at least not offer her another

9          position at Highmark; is that accurate?

10   A.    Well, there was a transition phase, and I can't

11         tell you the exact dates as I'm saying, but

12         Lifestyle Advantage was an affiliate company of

13         Highmark.

14   Q.    Let's go back to my question, I want you to

15         focus on the question I asked you.  I am told

16         that you are the person who made the decision

17         not to offer my client continuing employment

18         with Highmark; is that accurate?

19   A.    That is accurate.

20   Q.    I understand that that decision was made in or

21         about March of 2004; is that accurate?

22   A.    I can't say whether that -- I would say it was

23         sometime during the first quarter, but I can't

24         remember the dates.

25   Q.    Let's see (reviewing documents).  I'm trying to

```
 1   A.   I can't answer that.

 2   Q.   Who chose you to make that decision?

 3   A.   It would be the person I reported to along with

 4        the person in HR.

 5   Q.   Who would those persons be by name?

 6   A.   Aaron Walton and Cindy Mori.

 7   Q.   Who was it that communicated that decision to

 8        you or how was that decision communicated to you

 9        that you were to make this decision about my

10        client?

11   A.   From my boss, Aaron Walton.

12   Q.   What did he say?

13   A.   I can't remember.

14   Q.   You're allowed to approximate what he said, I

15        can't expect you to remember.

16   A.   I can't remember a word of it.

17   Q.   Well, you must remember something about it, you

18        said he communicated to you the decision that

19        you had to --

20   A.   He gave me the directive to set up a new

21        organization.

22   Q.   I see.  And within that directive I take it you

23        were given the responsibility to decide who

24        would staff that new organization?

25   A.   Would you repeat that?
```

1   Q.   Do you remember any occasion during that
2        four-year period from 2000 to 2004 in which you
3        did observe my client's performance?
4   A.   I don't specifically remember any.
5   Q.   Would your job have given you occasion to do so?
6   A.   It could have from time to time.
7   Q.   But you have no recollection of doing so?
8   A.   No specific recollection.
9   Q.   I take it then therefore that you made no
10       observations about my client which were
11       unfavorable during that period of time?
12  A.   I can't answer that for sure because there could
13       have been occasions where, you know, we worked
14       together on the same project because our units
15       were very closely related.
16  Q.   Do you have any recollection of working with my
17       client during that period of time?
18  A.   Not specifically.
19  Q.   Do you have any recollection of any negative
20       thoughts you had about my client's performance
21       during that four-year period?
22  A.   I don't know.
23  Q.   You don't know if you have a recollection?
24  A.   Well, I --
25  Q.   My question is do you have any recollection of

1         any negative impressions about my client that

2         you developed over the four-year period?

3    A.   I don't know if it would have been during that

4         four-year period or not.

5    Q.   Okay.  Do you have any recollection of

6         developing any negative impressions of my client

7         during any period of time?

8    A.   Yes.

9    Q.   But you don't know when?

10   A.   Correct.

11   Q.   Would it likely have been prior to 2000?

12   A.   It could have been, but it also could have

13        happened after 2000.

14   Q.   What negative impression or impressions of my

15        client did you develop?

16   A.   I remember having some concerns about her

17        interactions with the public, and we were

18        serving the public.

19   Q.   Can you be more specific, please?

20   A.   It's just vague recollection of concerns about

21        the potential for her to be negative with the

22        public.

23   Q.   You have vague recollections that my client may

24        have been negative with the public from time to

25        time?

1  A.  Well, I'm remembering it being more than

2      yesterday and being more than last year.

3  Q.  Okay.

4  A.  And what I remember was that there was someone

5      who had a negative experience of some sort at

6      HealthPLACE and wrote a letter, you know, that

7      kind of thing.  We don't get many complaints in

8      our area, and I remember there being a

9      significant complaint about Joy.

10 Q.  Do you remember what the complaint was?

11 A.  No.

12 Q.  Do you remember who the customer or --

13 A.  It was someone in a class, that I remember.

14 Q.  An individual in a class?

15 A.  An individual in a class.

16 Q.  Do you remember the nature of the complaint, she

17     was rude or she was mean or something?  Do you

18     remember the nature of the complaint?

19 A.  Having to do with, you know, not being allowed

20     to participate.

21 Q.  Okay.

22 A.  And being rude to a customer.

23 Q.  Your recollection is that this individual made

24     the complaint that my client was rude to him or

25     her?

1  A.  Yes.

2  Q.  Was it a him --

3  A.  It was a her.

4  Q.  It was a her.  Was this person an employee of

5      one of your customers or somebody from the

6      general public who had signed up for a class?

7  A.  Somebody from the public.

8  Q.  Okay.  Is there any documentation of this

9      complaint that exists anywhere that you're aware

10     of?

11 A.  Well, the woman sent a letter.

12 Q.  Was that letter retained somewhere?

13 A.  I'm sure --

14 Q.  Like my client's personnel file or somewhere

15     like that?

16 A.  I'm sure it's there.

17            MS. MUNSCH:  We have it, and I think

18     I may have even used it as a deposition exhibit

19     with your client, although I'm not sure, but

20     it's part of the documents that we will produce.

21            MR. SANSONE:  I guess we'll -- since

22     we haven't had those produced yet --

23            MS. MUNSCH:  I agreed to produce

24     them, but you've not called, contacted us to

25     come --

```
 1          of about my client of the type that you've

 2          described besides the one complaint that

 3          occurred at some point in the past?

 4                    MS. MUNSCH:  That she personally is

 5          aware of?

 6   BY MR. SANSONE:

 7   Q.     Remember our rule.

 8                    MS. MUNSCH:  He wants to know just

 9          what you're personally aware of.

10   BY MR. SANSONE:

11   A.     No, that was what I knew of.

12   Q.     Okay.  Did that particular complaint, whenever

13          it had occurred, did it play any role in the

14          decision to terminate my client?

15   A.     It stuck with me.  You know, that wasn't the

16          entire decision, but I can say that it's so rare

17          for us to get that type of complaint that it did

18          stick with me.

19   Q.     I'm not sure that that answered my question.

20                    MS. MUNSCH:  I believe it did.

21   BY MR. SANSONE:

22   Q.     My question was did it play a role --

23   A.     Yes.

24   Q.     Let me finish my question because this court

25          reporter has to take down everything that we
```

1      say.

2   A.   Okay.

3   Q.   It would be important for you to wait until I'm

4        finished with the question before you answer.

5   A.   Okay.

6   Q.   Did the single incident that you have described

7        play any role in the decision to terminate my

8        client?

9   A.   Yes.

10  Q.   What role did it play?

11  A.   It contributed to the role.  I did not assign

12       percentages to exactly what went into it, but I

13       can tell you that it did leave a negative

14       impression with me.

15  Q.   When you made the decision to terminate my

16       client what input did you use?

17  A.   I used the input of her performance reviews, her

18       personnel file in general, and I also asked the

19       woman who she reported to.

20  Q.   That would be?

21  A.   Tina Palaggo-Toy.

22  Q.   You consulted with Ms. Toy?

23  A.   I did.

24  Q.   Did you rely on any other source of information

25       to make the decision as to whether or not to

```
 1        entire file.

 2                    MR. SANSONE:  Let me try it another

 3        way because this --

 4                    MS. MUNSCH:  I object.  Lack of

 5        foundation that this witness knows how many

 6        performance reviews may exist on this witness.

 7  BY MR. SANSONE:

 8  Q.    Does the company perform annual performance

 9        reviews?

10  A.    Yes.

11  Q.    Do you believe that there were more performance

12        reviews that existed than those which you

13        reviewed on my client?

14  A.    I don't know.  I don't know, and I can't

15        remember exactly, but I know I looked at at

16        least two years.

17  Q.    If two is the number or three, would it have

18        been more than three that you looked at?

19  A.    I don't know; I don't remember.

20  Q.    Do you believe that you looked at as many as

21        eight or nine?

22  A.    I don't know.

23  Q.    You don't know what you looked at?

24  A.    I don't remember looking at that many of them,

25        but I'm not sure.
```

```
 1   A.    Not really.

 2   Q.    Were you aware that she was being offered a

 3         temporary assignment --

 4   A.    Yes.

 5   Q.    -- to bridge her to ten years?

 6   A.    Yes.

 7   Q.    Then you knew that she was a ten-year -- almost

 8         a ten-year employee?

 9   A.    I didn't even know what the role was, you know,

10         how long you had to be there to -- you know, to

11         qualify.

12   Q.    Did you know why she was being given a temporary

13         assignment?

14   A.    Yes.

15   Q.    Why did you understand she was being given a

16         temporary assignment?

17   A.    For the reason that you just said.

18   Q.    To bridge her to ten years?

19   A.    Yes.

20   Q.    Then you knew she would be an almost ten-year

21         employee, is that fair to assume?

22               MS. MUNSCH:  At that point in --

23   BY MR. SANSONE:

24   A.    No, no.

25               MS. MUNSCH:  I object to the form of
```

```
 1        the question.
 2   BY MR. SANSONE:
 3   Q.    Why is that not fair to assume?
 4   A.    Because that whole decision came after.
 5   Q.    The decision to offer the temporary position
 6         came afterwards?
 7   A.    Uh-huh.
 8   Q.    You looked at her personnel file as part of what
 9         you considered in the decision to terminate my
10         client; is that right?
11   A.    That's correct.
12   Q.    And the personnel file would have told you that
13         my client was hired in 1994, is that right?
14   A.    (Pause without response.)
15   Q.    It's not a trick question I didn't think.
16   A.    Well, you know, I didn't notice the date.  I was
17         looking for performance, period.
18   Q.    Just for the two-year period?
19                   MS. MUNSCH:  I object to the form of
20         the question.  The record speaks for itself.
21         You can answer, if you understand.
22   BY MR. SANSONE:
23   Q.    What performance were you looking for, ma'am,
24         her whole performance or just some subset of
25         that performance?
```

1    A.    Well, the most recent performance would have

2          been the most relevant to me and the most

3          relevant since I had been gone for a few years.

4    Q.    What do you mean by the most recent, do you mean

5          the most recent year?

6    A.    The most recent year or two since I had not been

7          directly involved.

8    Q.    Well, you hadn't been there for four, is that

9          what you told me, '00 to '04?  Why didn't you

10         look for four years?

11   A.    I may have.  I'm telling you I don't remember

12         exactly how many years.

13   Q.    You think it might be two years, but you don't

14         know that exactly?

15               MS. MUNSCH:  Objection, you're

16         badgering the witness.  Asked and answered,

17         Joel, ten times.

18               MR. SANSONE:  I certainly can badger,

19         that's not badgering.  If you'd like to see

20         badgering, I'll do badgering.

21               MS. MUNSCH:  No, you're not going to

22         badger.

23               MR. SANSONE:  No, you're right, I

24         just want to know what the lady looked at when

25         she decided to terminate my client.

1              MS. MUNSCH:  Well, it's been asked

2         and answered.

3    BY MR. SANSONE:

4    Q.   If you can tell me how many years you looked at,

5         otherwise I'm going to pry for a while.

6    A.   I can't tell you how many years.  I can't tell

7         you.

8    Q.   Is it clear to you that you didn't look at

9         performance evaluations for a nine-year span?

10   A.   It is not clear to me.

11   Q.   You might have actually looked at all of them?

12   A.   I may have.

13   Q.   But said to me approximately two years when you

14        answered that question, why is that?

15   A.   Because I was looking for recent performance.

16   Q.   What else in the personnel file did you look at

17        besides performance reviews?

18   A.   I think I looked at that letter, but I'm not 100

19        percent sure.

20   Q.   This letter you talked about from somebody from

21        some time ago?

22   A.   Yes.

23   Q.   Anything else in the personnel file that you may

24        have looked at?

25   A.   Not that I remember.

1   Q.   I'm going to skip the conversation you had with

2        Tina Palaggo-Toy for a moment and go to your

3        observations, which is the fourth component you

4        said that you relied upon in making this

5        decision.  What observations of my client are

6        you referring to?

7   A.   I remember, you know, a few assignments, one in

8        particular was to implement a system-wide

9        arthritis program based on a seminar that your

10       client attended in California, and the

11       assignment was to go to that seminar.

12  Q.   Can you tell me when this was, can you place it

13       in time?

14  A.   No, I can't.

15  Q.   Was it before your work in the Lifestyle

16       Advantage program?

17  A.   Yes.

18  Q.   So sometime prior to 2000?

19  A.   Correct.

20  Q.   Somewhere between '94 and 2000?

21  A.   Correct.

22  Q.   Can you be more specific than that or is that as

23       specific?

24  A.   That's as specific as I can be regarding the

25       date.  I can be more specific regarding the

1    assignment, and that was to attend this seminar,

2    this training course and then come back and

3    implement the program in a system-wide fashion

4    the way we had done with several programs before

5    that.    I never really saw that materialize to it

6    potential.

7  Q.    What observation of my client is relevant to

8    this answer?    What did you observe about my

9    client?

10            MS. MUNSCH:    Other than what she's

11    already described I assume?    You don't have to

12    repeat what you just said.

13  BY MR. SANSONE:

14  A.    Well, that would certainly -- that would

15    certainly relate to her skill level for taking

16    this information, transferring it, implementing

17    a program and then evaluating the results of

18    that program.

19  Q.    What was your reason for observing my client's

20    conduct and the implementation of this program?

21  A.    Because I was responsible for, number one, the

22    resources that it took to obtain the information

23    and deliver the program and, number two,

24    delivering health promotion services that are

25    relevant to our marketplace.

```
 1 | BY MR. SANSONE:
 2 | A.    Okay, I --
 3 |               THE COURT REPORTER:  One at a time or
 4 |       I can't take it down.
 5 |               MS. MUNSCH:  I'm going to object to
 6 |       the form of the question and ask you, Joel, to
 7 |       make sure that -- to explain to her how you're
 8 |       defining the word observe, what do you mean by
 9 |       observe.
10 | BY MR. SANSONE:
11 | Q.    Well, see, really, contrary to your lawyer's
12 |       perception, it isn't my job to define anything,
13 |       it's yours.
14 |               MS. MUNSCH:  No, I think it is your
15 |       job to tell her what -- to give her a clear
16 |       question she can understand.  Do you mean by
17 |       observe, Joel, visual observation?
18 | BY MR. SANSONE:
19 | Q.    Ma'am, you used the word observation, you said
20 |       that a fourth component of your decision was
21 |       your observation of my client, and I'm asking
22 |       you to tell me when and under what circumstances
23 |       you observed my client.
24 | A.    Okay.  I'm going to go back to that first
25 |       example that I gave you, and the way I see
```

 1      observations -- the way I define observations in

 2      this context would be that I do not recall

 3      seeing that project move to its potential, that

 4      I did not see it written up in the newspaper

 5      like a lot of our other things were of equal

 6      investment or of significant investment.  I did

 7      not see, you know, a lot of people trained in

 8      this who then were motivated to continue to

 9      deliver the program.  I don't recall seeing any

10      significant amounts of data that came out of

11      that program or outcomes of any nature that came

12      out of the program that were parallel to the

13      other work that was being delivered to our

14      customers.

15  Q.  So your first example is essentially a lack of

16      observation?

17  A.  Exactly, it's a lack of observation.  I did not

18      see the results that you would expect to see

19      from a highly developed, expensive piece of

20      work.

21  Q.  And what sources did you seek besides I guess

22      the company newspaper or newsletter?

23              MS. MUNSCH:  I object to the form,

24      and the record will speak for itself.

25  BY MR. SANSONE:

1   Q. Please?

2   A. I remember -- as I mentioned before, she did not

3     report directly to me.  In the absence of her

4     direct supervisor I received an expense report.

5   Q. When would this have been?

6   A. Sometime before 2000.

7   Q. You received an expense report from whom?

8   A. From your client.

9   Q. Do you mean a monthly expense report or

10    something?

11  A. An expense report.

12  Q. I don't know how it works at Highmark.  Are they

13    filled out on a monthly basis or an ad hoc basis

14    or what?

15  A. I can't remember at that time what the policy

16    was.

17  Q. This was an expense report relating to what?

18  A. Related to her expenses.

19  Q. With regard to any specific --

20  A. I can't remember.

21  Q. What was it about this expense report that made

22    the list?

23  A. Included in the expense report were illegitimate

24    expenses.

25  Q. What do you mean by illegitimate expenses?

1    A.    Not expenses that would be covered under the

2          policy of expenses that could legitimately be

3          incurred in travel that would be reimbursed.

4    Q.    Can you give me the specifics of what

5          illegitimate expenses you're talking about?

6    A.    I can't remember.

7    Q.    You have no idea what they were about?

8    A.    No.

9    Q.    How were they not allowable under the --

10   A.    I can't remember, but I do remember that they

11         were not allowable.

12   Q.    How much was involved?

13   A.    I don't remember.

14   Q.    Do you remember whether it was a significant

15         amounted of money?

16   A.    I don't remember.

17   Q.    This played a role too, did it, in the decision?

18   A.    Yes.

19   Q.    You don't remember what the expenses were, why

20         they were illegitimate or whether they were a

21         significant amount, but that played a role in

22         the decision not to --

23   A.    What I remember is that I was astounded by it.

24   Q.    Astounded?

25   A.    Uh-huh.  But I don't remember specifically what

1       anything seriously wrong, is that your

2       testimony?

3   A.  I wanted to give her the benefit of the doubt,

4       period, and give her the opportunity to resubmit

5       it.

6   Q.  Well, do you have any reason to believe it was

7       anything more than just an administrative error

8       as you sit here today?

9   A.  At that point in time I did not.

10  Q.  I said as you sit here today, not at that point

11      in time, but today, do you have any reason to

12      believe that it was anything more than an

13      administrative error?

14  A.  No.

15  Q.  Then why did it play a role in your decision not

16      to hire my client?

17  A.  Well, even if it was an administrative error,

18      the job is heavily administrative, and we could

19      not afford to make those kinds of errors because

20      the job is heavily administrative.

21  Q.  How many other such administrative errors are

22      you aware of my client engaging in or committing

23      besides this one some four or five years or more

24      before?  Any others besides this one?

25  A.  I had the impression that she was

1        administratively weak.

2    Q.  What was that impression derived from?

3    A.  Just a lack of results reported, a lack of

4        outcomes reported, a lack of the kind of

5        reporting that was necessary to function in the

6        data -- in the world of data that this field

7        resolves around.

8    Q.  You had an impression you said, is that right --

9    A.  Uh-huh.

10   Q.  -- that my client's reporting skills were not

11       where they needed to be?

12   A.  That's correct.

13   Q.  What was that impression based upon?

14   A.  I can give --

15   Q.  This one incident or some other incident?

16   A.  No, there were other things.  I remember that

17       early in the history of the HealthPLACE for

18       which your client was responsible for there was

19       one requirement to submit monthly reports, and

20       those monthly reports were either -- were

21       oftentimes either delinquent or not submitted at

22       all.

23   Q.  That was you say early on?

24   A.  Uh-huh.

25   Q.  When would that have been?

1          helpful.

2    A.    This is Exhibit Number 2.

3    Q.    Okay, in Exhibit 2 --

4    A.    Performance year 2002 to 2003, 50 percent of

5          your client's job objective was to follow the

6          worksite wellness business plan and improve the

7          delivery and evaluation of the data-driven

8          worksite wellness model with local regional and

9          national accounts in the Erie region.

10         Measurement standards, by December 2002, in

11         collaboration with corporate communications,

12         develop at least three case studies for

13         distribution on Highmark group accounts that

14         show positive changes in health risk as measured

15         by health screenings and the PWP, which is a

16         health risk assessment, and as a result of

17         HealthPLACE at work interventions, such as

18         Stride for Health, Free and Clear, Eat Well for

19         Life, et cetera.

20                 The result is this objective was not

21         met.  According to Joy she had one account that

22         had completed baseline and follow-up screenings

23         by the end of 2002.  Individual successes have

24         been reported, however, positive group changes

25         in health risk and lifestyle changes were not

1              MS. MUNSCH:  She's answering it,

2       Joel.  Let her answer the question and then if

3       you have a follow-up, you can ask the follow-up.

4       She's going to explain to you her understanding

5       of the significance of when she read that what

6       it meant to her.

7  BY MR. SANSONE:

8  A.   The significance is that Becca worked with Joy

9       to submit the paperwork.  The other piece that I

10      must point out about this objective where we do

11      not have -- where she did not meet the

12      expectation is that she had one account that had

13      completed baseline and follow-up screening, it's

14      also a matter of productivity.  One account in

15      an area where we have a huge customer base like

16      Erie is, you know, not enough accomplishment,

17      not enough achievement.  So I was, of course,

18      very concerned with the lack of achievement here

19      as well.

20  Q.   But that's a different question.

21  A.   It is a different question, I just wanted you to

22      know that.

23  Q.   Thank you for pointing that out to me, but my

24      question was what was it about this performance

25      review that made you believe that she was not

1    and answer.  I need to put those on the record,

2    Anna, just to preserve them.

3  BY MR. SANSONE:

4  A.   Okay.  The reason -- one of the -- another

5       contributing factor was that Joy needed

6       assistance to get the administrative work done

7       from the beginning, another position was created

8       to work with your client in one of the -- in the

9       Erie region, and one of the reasons was that the

10      administrative work was not getting done when

11      your client was working alone out of that

12      office.

13 Q.   When was the position created?

14 A.   I can't remember exactly.

15 Q.   How do you know why this position was created?

16      Did you play a role in it, in the creation of

17      this position?

18 A.   Well, I had to approve the creation of a second

19      position there.

20 Q.   And at the time that the position was created

21      what was my client's rating in the

22      administrative competency?

23 A.   That, I don't know.

24 Q.   What was her overall rating?

25 A.   I don't know.

```
 1   Q.   Let's go back to your original testimony, which

 2        was that somewhere in this document you found

 3        reason to believe that my client's reporting

 4        skills were still not what they ought to have

 5        been.  Where is it again that you say that that

 6        is evident?

 7                  MS. MUNSCH:  Asked and answered.  If

 8        you want her to read that section for you again,

 9        Joel --

10   BY MR. SANSONE:

11   Q.   Just tell me.

12                  MS. MUNSCH:  -- we'll be here all

13        day.  She's already answered the question.

14   BY MS. MUNSCH:

15   Q.   Do you stand by your answer that this

16        Objective 1 evidences an improper reporting

17        skill on my client; is that right?

18   A.   It goes deeper than reporting skill, okay.

19   Q.   I'm asking about reporting skill.

20   A.   Well, I'm talking about administrative work.

21        I'm talking about administrative work, okay, and

22        quantifying data, okay, and analyzing that data

23        is a piece of that, a very important part of

24        health promotion, okay, and that was lacking.

25   Q.   Where in the report is that evident?  Is it
```

```
 1           evident in the administrative competencies

 2           portion related to report writing on Page 3?

 3                         - - - -

 4           (The witness reviewed the documents.)

 5                         - - - -

 6   BY MR. SANSONE:

 7   Q.    I see you're changing documents, but I was

 8         referring to the most recent performance review.

 9                    MS. MUNSCH:   Objection as to form,

10         compound question.

11   BY MR. SANSONE:

12   A.    The goal was to quantify the outcomes of a

13         worksite wellness data-driven model.

14   Q.    For three separate companies; right?

15   A.    This objective was not met.

16   Q.    Because she only had one out of the three;

17         right?

18                    MS. MUNSCH:   I object to the form of

19         the question.  If you're to probe, you can feel

20         free to probe what she specifically knows about

21         it other than what's written on the form.

22   BY MR. SANSONE:

23   Q.    I was trying to stick with what you said,

24         following what you said.  Earlier I had asked

25         you where on this Exhibit 2 is it evident that
```

```
 1       is four lines down, the end of the fourth line

 2       that begins while, this says while a Highmark

 3       employee, Ms. Swick completed graduate school,

 4       receiving an MBA with a concentration in

 5       marketing.

 6                    As of July 26th, 2004 do you know

 7       whether that was accurate or not, that's

 8       accurate or not?

 9  A.    I thought that she just had her bachelor's

10       degree.

11  Q.    We do too, that's why I'm asking.

12                    MS. MUNSCH:  This witness -- you

13       didn't prepare this document; correct?

14                    THE WITNESS:  No, I did not.

15  BY MR. SANSONE:

16  Q.    Well, at the time you made the decision in 2004,

17       I think it was somewhere around March 15th or

18       thereabouts of 2004, were you aware of the

19       relative education levels of my client and

20       Ms. Swick?

21  A.    I can't remember.

22  Q.    Okay.  What educational level do you believe

23       Ms. Swick had achieved at that point?

24                    MS. MUNSCH:  I think she's already

25       answered that, but go ahead and answer again.
```

```
 1   BY MR. SANSONE:

 2   A.   I can't remember, although I did -- I did think

 3        she was in graduate school.

 4   Q.   Okay.

 5   A.   I think I thought that.  I think I thought that.

 6   Q.   What was the name of the position that she was

 7        awarded in the new organization?

 8   A.   Who?

 9   Q.   Ms. Swick.

10   A.   Community site consultant.

11   Q.   Did that particular position have any specific

12        educational requirements?

13   A.   A bachelor's degree I think.  I'm not positive.

14   Q.   Would you have known at the time?  Would you

15        have known at the time?

16   A.   Probably.  I'm not positive.

17   Q.   Were you familiar with the requirements of the

18        job which were given to Ms. Swick?

19   A.   Well, I was recruiting for a number of

20        positions, so I can't say for sure.

21   Q.   I'm sorry, maybe I'm not being clear.  When you

22        gave Ms. Swick this position did you know what

23        the requirements for the position were?

24             MS. MUNSCH:  Which requirements,

25        skills, abilities or are you asking for simply
```

117

1    Q.    What we mean by termination is you don't get

2    paid anymore, you don't work there anymore, and you

3    don't get paid anymore.  For whatever the reason, the

4    termination occurred, we say termination.  We

5    understand in this case that she was not selected for

6    the new organization and given a bridge through

7    October of '04.  And that's what I refer to when I say

8    decided to terminate her.

9    A.    Her position was eliminated.  Let's get very

10   clear about that.  Her position was eliminated because

11   all Healthplace Centers closed.

12   Q.    Yeah.

13   A.    Bottom line and foundational to all of this.

14   Q.    But that was understand I think by

15   everybody.  My question to you was:  At the time you

16   made the decision not to offer her a place in the new

17   organization, did you disagree with any portion of the

18   second sentence here?  And you said, yes.  And I said,

19   which portion, and you were going to answer that.

20   A.    The part that says, Joy is an asset, because

21   that was not always 100 percent true.  If you look at

22   that letter I would not consider the person described

23   in that letter to be an asset at that time.

24   Q.    Provided the letter was true?

25   A.    Provided the letter was true.

121

1          A.    No.

2          Q.    Did you think it was unusual that it was the

3    only letter of such a kind in the whole file?

4          A.    I didn't look at the content of the letter

5    and I didn't see anything that said it wasn't true.

6          Q.    Do you know what an anomaly is?

7          A.    Yes.

8          Q.    Did it strike you as an anomaly?

9          A.    No.

10         Q.    Why not?

11         A.    Because I had heard other complaints.

12         Q.    From?

13         A.    Over time.  And I'm sure Tina when I

14   instructed her to dealt with your client on those

15   complaints.

16         Q.    Can you name any other person who was the

17   author of such a complaint besides this Jan Thompson?

18         A.    No, I can't.

19         Q.    Can you give me any specifics about any such

20   complaint with respect to date, time or place?

21         A.    No.  As I said many times before, Joel, I

22   did not directly supervise your client.  I was

23   distanced from her by another supervisor and I am not

24   not a micromanager.

25              MR. SANSONE:  That's all I have.

122

```
1                            -----

2                         EXAMINATION

3    BY MS. MUNSCH:

4         Q.   I just have one quick question for Ms.

5    Silberman.

6         A.   Yes.

7         Q.   Maybe it's two.  Directing your attention to

8    the voice mail exchange that you had with Tina

9    Palaggo-Toy in 2004.

10        A.   Yes.

11        Q.   At the time that you asked for the input

12   from Tina regarding whether she would choose Becca or

13   Ms. Sweeting, had you informed Ms. Palaggo-Toy what

14   you were looking for in a community site consultant?

15        A.   I don't believe I had.

16        Q.   And did you tell her what the duties and

17   responsibilities, specifically the specific duties and

18   responsibilities of a community site consultant would

19   be?

20        A.   No, I don't -- I don't think Tina understood

21   the skill set that would be required of a community

22   site consultant.

23             MS. MUNSCH:  I have nothing further.

24                            -----

25                         EXAMINATION
```

QUALITY COURT REPORTING
412-833-3434

# CONTINUED TO APPENDIX VOLUME II

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Appendix In Support Of Highmark's Motion For Summary Judgment (Volume I of III) was served upon counsel for Plaintiff electronically and by United States mail, first class and postage prepaid, at Pittsburgh, Pennsylvania, on this 19th day of December, 2005, addressed as follows:

Joel S. Sansone
Scanlon & Sansone
2300 Lawyers Building
Pittsburgh, PA  15219
scanlon2sansone@aol.com

Counsel for Plaintiff


s/ Martha Hartle Munsch
Counsel for Defendant