**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOY SWEETING, | ) | Civil Action No. 04-368 - Erie |
| Plaintiff, | ) | |
| | ) | The Hon. Sean J. McLaughlin |
| v. | ) | |
| | ) | |
| HIGHMARK, INC., | ) | ELECTRONIC FILING |
| | ) | |
| Defendant. | ) | |

**APPENDIX IN SUPPORT OF HIGHMARK'S
MOTION FOR SUMMARY JUDGMENT
<u>VOLUME II OF III</u>**

Martha Hartle Munsch
PA ID No. 18176
mmunsch@reedsmith.com
Shweta Gupta
PA ID No. 84388
sgupta@reedsmith.com
REED SMITH LLP
435 Sixth Avenue
Pittsburgh, PA 15219
412-288-4118/4054

Carl H. Shuman, Esq.
Highmark, Inc.
Pa. ID No. 37506
1800 Center Street
Camp Hill, PA 17089

Counsel for Defendant
Highmark, Inc.

## TABLE OF CONTENTS

| TAB | DOCUMENT | LOCATION IN APPENDIX |
|-----|----------|----------------------|
| A | Declaration of Anna L. Silberman | VOLUME I |
| B | Pages from Silberman Deposition Transcript | VOLUME I |
|   | Exhibits from Silberman Deposition Transcript | VOLUME II |
| C | Pages and exhibits from Plaintiff's Deposition Transcript | VOLUME II |
| D | Portions of Highmark's Responses to Plaintiff's First Set Of Interrogatories | VOLUME II |
| E | Pages and exhibits from Swick Deposition Transcript | VOLUME III |
| F | Pages from Palaggo-Toy Deposition Transcript | VOLUME III |

# TAB B
# CONTINUED

# CONFIDENTIAL PERFORMANCE APPRAISAL
## AUTHORIZATION FORM

Review Date
06/07/2003

## EMPLOYEE REVIEW SHEET INFORMATION

| Company Key | Employee Number | Employee Name | Empl Status |
|---|---|---|---|
| PBS | 039764 | SWEETING, JOY H | Active |

| Organization Code & Name | Job Title | Job Code | Position # | Std Hrs |
|---|---|---|---|---|
| 2365 HEALTHPLACE NETWORK | HEALTHPLACE ADMR | 14M2OP | 60008266 | 37.50 |

| Hire Date | | Job Entry Date | Salary | | | Empl Type | Shift | Part Full | Reg Temp |
|---|---|---|---|---|---|---|---|---|---|
| Original | Rehire | | Annual | Bi-Weekly | Hourly | | | | |
| 10/17/1994 | | 09/01/1997 | $ 46,606.00 | $ 1,792.54 | $ 23.900513 | S | 1 | F | R |

| LAST MERIT REVIEW INFORMATION | | | | LAST SALARY CHANGE INFORMATION | | |
|---|---|---|---|---|---|---|
| Date | Rating | Percent | Alt. Pay Amt | Date | Reason | Percent |
| 06/08/2002 | 4 | 4.001 % | | 06/08/2002 | Pay Rt Chg | 4.001 % |

## DAYS / HOURS ABSENT FROM APRIL 18, 2002 TO APRIL 18, 2003

| Lost Time Hours | Times Late | Minutes Late |
|---|---|---|
| | 0 | 0.00 |

Received
JUN 1 9 2003
HR: Erie

## SALARY POSITION / SALARY RECOMMENDATION

| Salary Plan & Grade | Range/Market Targets | | | Compa Ratio |
|---|---|---|---|---|
| | MIN | 100% | MAX | |
| EG1 S02 | 36,818 | 47,400 | 56,880 | 98.32 |

( Check One Box )

| Performance Rating | Increase to Base Maximum Percent |
|---|---|
| 2. Does Not Meet Expectations | 0.00% |
| [X] 3. Achieves Expectations | 2.00% - 4.00% |
| 4. Exceeds Expectations | 4.00% - 5.00% |
| 5. Far Exceeds Expectations | 5.00% - 6.00% |
| 0 Defer Review | _____ Months |

<<<<  SALARY RECOMMENDATION  >>>>

Increase To Base Salary: _4_ (%)

Lump Sum Increase: _____ (%)
(Where Applicable)

SEND THIS COPY TO H.R.I.S.

Reviewed by : _Tim Plazzo_ _Director_ _June 17, 20_
Name                    Title                    Date

Approved by : _W. J. Beasley_ _V-P_ _6-17-03_
Name                    Title                    Date

## ADDITIONAL COMMENTS OR DEFERRAL REASON

EXHIBIT bw
2 Silberman
10.10.05

6.5-04
6.19.03

ISG Performance Now Numerical Rating: _____

# HIGHMARK, INC
# PERFORMANCE PLANNING & APPRAISAL FORM

| Employee Name: | Joy Sweeting | Employee #: | 039764 |
|---|---|---|---|

| Job Title: | HealthPLACE Administrator | Grade: | SO2 |
|---|---|---|---|

| Dept./Div./Area: | HealthPLACE |
|---|---|

| Performance Period Dates: | FROM: 6/2002 | TO: 6/2003 |
|---|---|---|

| Date Completed: | 6/18/03 | Performance Level: | AE |
|---|---|---|---|

---

### PERFORMANCE PLANNING & RESULTS SECTION

In this section, the supervisor and the employee discuss and document together the performance expectations and objectives for the next performance period at the beginning of the period. They also specify the priority of each objective and the type and level of observable behavior that defines Achieves Expectations (AE). The "Results" section is filled in later as each objective is completed. Performance expectations and objectives may include specific projects or ongoing accountabilities of the position. In either case, they should be clearly documented in this section. Provide a copy of the partially completed performance appraisal to the employee for reference during the performance period.

**Performance Plan Expectations**
On the following pages, please list the specific objectives to be pursued by the employee during this performance period, how success will be measured and the relative importance (weight) of the objective as expressed by a percentage.

**Performance Plan Results**
After the performance planning session, periodic meetings should be scheduled between supervisor and employee during the year to review progress on projects, add or change assignments, discuss performance, and encourage employee in-put. Ensure that employee has the necessary resources available to accomplish objectives and seek opportunities for teaching, coaching, and leading the employee.

As each objective is reached or "achieved," the supervisor records the results in the "Results" section of the corresponding objective. The applicable rating level is then assigned for each objective.

### RATING LEVELS

FE = **Far Exceeds Expectations**
EE = **Exceeds Expectations**
AE = **Achieves Expectations**
DE = **Does Not Meet Expectations**

Note: See Performance Management Guidelines for definitions.

Objectives for June 2002 – June 2003

| No. 1 Objective | Measurement Standards | Weight |
|---|---|---|
| Continue to follow the worksite wellness business plan and improve the delivery and evaluation of the data-driven worksite wellness model (HealthPLACE @ Work) with local, regional and national accounts in the Erie region. | By December 2002, in collaboration with corporate communications, develop at least three case studies for distribution on Highmark group accounts that show positive changes in health risk as measured by health screenings and the PWP, and as a result of HealthPLACE @ Work interventions such as Strides for Health, Free and Clear, Eat Well for Life, etc. | 50% |

| RESULTS | DATE COMPLETED | RATING |
|---|---|---|
| This objective was not met. According to Joy, she had one account that had completed baseline and follow-up screenings by the end of 2002. Individual successes have been reported, however positive group changes in health risk and lifestyle changes were not quantified. | N/A | DE |

| No. 2 Objective | Measurement Standards | Weight |
|---|---|---|
| Publish successful HealthPLACE programs. | By June 2003, in collaboration with the Evaluation Analyst, Director of Health Promotion, and Corporate Communications, publish at least one HealthPLACE program in an industry trade journal or publication. | 25% |

| RESULTS | DATE COMPLETED | RATING |
|---|---|---|
| An article on Brake Parts wellness program was published in an internal newsletter that is shared among industry colleagues. Human Resource staff from Brake Parts stated they renewed their health insurance contract with Highmark because of the value-added services we provide, one of them being the HealthPLACE @ Work program. Sixteen employees stopped smoking through the Start Smart program conducted on-site by HealthPLACE instructors. | N/A | AE |

| No. 3 Objective | Measurement Standards | Weight |
|---|---|---|
| Improve communications and relationships with HealthPLACE management and colleagues to enhance team building and overall performance of the HealthPLACE staff. | Observation | 25% |

| Results: | DATE COMPLETED | RATING |
|---|---|---|
| Communication with key staff members is satisfactory. Key staff members can be defined as the Manager of HealthPLACE and the team leader of the western PA worksite team. They are critical when working strategically to achieve goals and standardize the HealthPLACE product line. | N/A | AE |

**OVERALL WEIGHT AND RATING FOR PERFORMANCE OF OBJECTIVES**     AE-     **100% Weight**

---

**COMPETENCY EXPECTATIONS & EVALUATION SECTION**

The following section is provided to evaluate how the employee exhibits key competencies needed to successfully achieve job responsibilities. Please refer to the Performance Appraisal Manager's Guide for a list of competencies and their definitions, which may be excerpted from that document and inserted in the blocks below. Although all Management should be evaluated on Management competencies, the assignment of additional functional competencies for Management and competencies for non-management positions are left to the manager's discretion based upon the specific requirements of the job. It is suggested that no more than five or six functional competencies be assigned to each non-management position, to emphasize those competencies of most importance. Similar positions should require similar competencies overall, however individuals may differ somewhat based on areas cited for improvement.

| Administrative Competency: | Results: | Weight: |
|---|---|---|
| (Data collection, program preparation, member follow-up, report generation.) | Report generation, data collection, program preparation and member follow-up is conducted as expected. Joy and Becca work as a team to complete most administrative tasks therefore, clearly achieving expectations in this area. | 40% |

FE ☐     EE ☐     AE ☒     DE ☐

| Program Development/Management: | Results: | Weight: |
|---|---|---|
| a. Assessment, planning, promotion implementation and evaluation skills to develop health education programs.<br>b. Development of educational materials to support programs. | Joy's skills in planning, promotion, and implementation are solid. She has been delivering health promotion programs for over 35 years and is well respected among health promotion colleagues in the Erie region. She has good networking skills and has the ability to attract quality professionals to deliver HealthPLACE programs. The biggest successes in 2002 were the delivery of HOPE (two cohorts in April and October) and KidSHAPE in November. HOPE outcomes were consistent and positive as they have been at other delivery sites. KidSHAPE was a new | 40% |

3

|  | program that was supposed to be delivered with a hospital partner, however that did not materialize as staff from Highmark's community affairs department anticipated. HealthPLACE staff (Joy) picked up the slack and delivered the program with contracted instructors. Attendance, teamwork among staff and participants, and feedback from participants was very positive. Joy along with Anne Marie Kuchera contributed to writing orientation materials for future programs. |
|---|---|

FE ☐    EE ☒    AE ☐    DE ☐

| Teaching and Presentation Skills | Results: | Weight: |
|---|---|---|
|  | Joy's teaching and presentation skills are excellent. She is personally and professionally passionate about the field and it's evident when she conducts presentations. She teaches many HealthPLACE programs when needed and conducts numerous presentations. She is clearly a recognizable face for health and fitness in the Erie community. | 20% |

FE ☐    EE ☒    AE ☐    DE ☐

## OVERALL WEIGHT AND RATING OF COMPETENCIES

**100% Weight**

| OVERALL RATING: | FE ☐ | EE ☒ | AE ☐ | DE ☐ |
|---|---|---|---|---|

## DEVELOPMENTAL OPPORTUNITIES*

Please identify areas in which the employee could enhance his/her abilities through knowledge attainment or skill development and avenues of pursuit through internal or external training or suggested personal self-development.

| Strengths: | Opportunities for Growth: |
|---|---|
| 1. Excellent networking skills<br>2. Excellent teacher<br>3. Committed to the HealthPLACE mission personally and professionally | 1. Improve evaluation with worksite wellness accounts<br>2. Develop respectable case studies on corporate customers who are conducting HealthPLACE @ Work<br>3. Increase participation in Highmark's employee wellness program, HealthPLACE @ Work, among employees from the member service unit. |

**EMPLOYEE COMMENTS:**

Employee Signature: _Jeff A. Sweeting_    Date: _June 18, 2003_

**APPROVALS**

Supervisor's Signature: _Tim Pilaggo_    Date: _June 17, 2003_

Next Level Signature: _W. J. Brawley_    Date: _6·17·03_

5

**Objectives for June 2003 – June 2004**

| No.   1   Objective | Measurement Standards | Weight |
|---|---|---|
| Improve the delivery and evaluation of HealthPLACE @ Work program models with local, regional and national accounts in the Erie region. | By December 2003, in collaboration with corporate communications, develop at least three case studies for distribution on Highmark group accounts that show positive changes in health risks as measured by health screenings and the PWP. (Examples are provided) | 45% |

| RESULTS | DATE COMPLETED | RATING |
|---|---|---|
|  |  |  |

| No.   2   Objective | Measurement Standards | Weight |
|---|---|---|
| Increase participation in Highmark's employee wellness program among member service employees. | 1. Increase participation among member service staff in the Lifestyle screenings by 10% scheduled for September 2003. (Jan Pearson can provide 2002 baseline participation number).<br>2. Work with Kevin Nauer and colleagues to implement programs to meet the specific needs of member service employees. | 35% |

| RESULTS | DATE COMPLETED | RATING |
|---|---|---|
|  |  |  |

| No.   3   Objective | Measurement Standards | Weight |
|---|---|---|
| In collaboration with Patrick McCauley, mentor Becca Swick to implement the HP @ Work program models with Highmark corporate customers. | By December 2003, Becca Swick will be working with at least three Highmark accounts under Joy and Patrick's supervision. If there are any reasons this can not be accomplished in this time frame, the expectation would be that Joy work directly with Patrick to find a resolution. | 20% |

| Results: | DATE COMPLETED | RATING |
|---|---|---|
|  |  |  |



EXHIBIT

Silberman #5

**Jan Thompson**
**Custom Electronics Company**
**1421 Selinger Avenue**
**Erie, PA 16505**
**(814) 838-7330**

July 16, 1998

HealthPlace /Highmark Blue Cross Blue Shield Division
120 Fifth Avenue - Suite 313
Pittsburgh, PA 15222
Attn: Personnel Dept.

Dear Sir/Madam:

I am a Keystone Blue policy holder, and have been taking a yoga class in Erie, PA sponsored by Highmark, for about a year. I have been impressed by your program in every way (your facility, the instructor and especially the results!). However, the woman who is in charge of the program, Joy Sweeting is extremely unprofessional. I am a small business owner and it is my opinion that anyone dealing with the public in a customer service capacity should make every attempt to be congenial and defiantly never be rude! I have watched her be short with several other members of the Yoga class on several occasions, several people in the class have remarked on it to me and at least two people have stopped coming due to her attitude. And yesterday she turned on me. I had missed three classes because I was away on vacation, when I got back I attempted to come to an earlier class (which I was told by a new male employee was the only class available) then someone named Sandy said no I was in the 5:00 class and that they weren't asking me to leave unless I thought I couldn't make it to anymore classes but when I attempted to attend the class instead of calling me outside to tell me I could no longer attend, Joy said in front of 8 class members that I would have to leave. When I confronted her out in the lobby she said I had missed my test during the first class and would have to wait until the next series began in September and walked away from me so that I was left feeling like I had done something wrong by going on vacation. The last class I took for three weeks the teacher was on vacation without any notice given to the people attending, I went to one of those taught by Joy and was forced to miss the next four sessions until the teacher returned and Joy never even mentioned my absence! I guess at this point if I didn't know for a fact that the class keeps my pain free and helps reduce stress, I would just walk away and chalk it up as an experience I can do without. But, I'm not the only person feeling uncomfortable with the way she is treated by Joy (who by the way blames Highmark's rules for everything). Even though my insurance entitles me to attend classes I cannot attend Yoga again until at least September assuming Joy won't tell me there is a waiting list. I feel you would want to know that you have someone working for you who behaves in a rude manner, in a customer service position, to your customers who go to these classes to help alleviate stress not create more of it! I am in a position where I have 13 employees who I would not recommend your classes to at this point in time due to my unfortunate experience. I look forward to your reply.

Sincerely,

Jan Thompson

# TAB C

1

**JOY SWEETING**

- - - -

1         IN THE UNITED STATES DISTRICT COURT

2       FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3

4   JOY SWEETING,                      )

5                   Plaintiff,    )   CIVIL ACTION

6       vs.                            )   No. 04-368

7   HIGHMARK, INC.,                    )

8                   Defendant.    )

9

10            **DEPOSITION OF JOY SWEETING,**

11   taken pursuant to the Federal Rules of Civil Procedure,

12   before Lisa Ann Bauer, Certified Realtime

13   Reporter-Notary Public in and for the Commonwealth of

14   Pennsylvania, on Thursday, August 4, 2005, at the

15   offices of Reed Smith LLP, 435 Sixth Avenue,

16   Pittsburgh, Pennsylvania 15219, commencing at 9:30

17   o'clock a.m.

- - -

18

19

20

21

22

23

24   **ORIGINAL**

25

**JOY SWEETING**                              12

- - - -

1    **Q.**    What did you say on education specialist?

2    **A.**    Doing management development programs and

3    employee education programs.

4    **Q.**    What do you mean by management development

5    programs?

6    **A.**    We'd have a management development week where

7    we would do, like, the quality programs.  We would

8    teach the programs to the employees and to management,

9    different -- maybe telephone courtesy or customer

10   service.

11   **Q.**    That wasn't necessarily wellness related, the

12   education specialist?

13   **A.**    No, no.

14   **Q.**    The term wellness, when you talk about wellness

15   programs, is that a term of art, at least as you

16   understand it?  For me, who is not in the health care

17   industry, how would you describe to me what the term

18   wellness means when you say you're developing wellness

19   programs?

20   **A.**    Well, it's kind of prevention, health

21   prevention, health promotion, trying to encourage

22   people to live healthier lifestyles by developing

23   certain practices, whether they be weight management,

24   smoking cessation, stress, the osteoporosis program,

25   whatever the program is that would help you have a

13

**JOY SWEETING**

- - - -

1    better condition of health.

2        **Q.**   Now, am I correct that your position or your

3    employment at Hamot ended in 1993 due to -- was it due

4    to lack of work?  Were you laid off?

5        **A.**   They downsized over 200 people.

6        **Q.**   Is Hamot a community hospital, is it a tertiary

7    hospital?  Does it still exist?

8        **A.**   Oh, yes.

9        **Q.**   Is it a large tertiary hospital, or is it just

10   a community hospital?

11       **A.**   It's one of the two largest in Erie, yes.

12       **Q.**   So they had a big downsizing in 1993?

13       **A.**   Right.

14       **Q.**   Eliminated a lot of positions?

15       **A.**   Right.

16       **Q.**   Including education specialist?

17       **A.**   Our whole department, yes.

18       **Q.**   What was the department?

19       **A.**   Education department.  Employee education.

20   There were several education departments.

21       **Q.**   So employee education was the department that

22   you were employed in at the time of the downsizing.

23            Were your other positions at Hamot also in the

24   education department, or were they in a different

25   department?

27

**JOY SWEETING**

- - - -

1    programmatic, and would it be safe to say it was

2    fledgling at that time in Erie?

3        **A.**    Correct.

4        **Q.**    So, for how long did you continue in that

5    contractor role?

6        **A.**    I believe it was about nine months.  Close to a

7    year.

8        **Q.**    And did you report to someone?  Did you report

9    in through Tina, or how did that relationship work in

10    terms of what you were doing, how you kept them

11    informed about what you were doing, how they paid you.

12    Just tell me what you recall about that.

13        **A.**    Well, I reported to Tina and I did -- whether

14    they were monthly or weekly reports, I can't recall at

15    this time, but I was in very close contact with her.

16        **Q.**    So it was primarily Tina that you worked with

17    in that role?

18        **A.**    Exactly.

19        **Q.**    And am I correct, then, in or about October of

20    1994, you were offered employment?

21        **A.**    Correct.

22        **Q.**    By Highmark as the HealthPlace administrator?

23        **A.**    Correct.

24        **Q.**    So you never really had to respond to an ad of

25    any kind, right?  This job evolved as you just

30

**JOY SWEETING**

- - - -

1    the street that the rest of Highmark -- it was Blue

2    Cross at the time and then it became Highmark -- was

3    located on different floors.

4        **Q.**    So you moved in to another Highmark building?

5        **A.**    Predominantly Highmark building, yes.  There

6    was several other businesses in the building.

7        **Q.**    But there was a dedicated space in that

8    building that was identified as the Highmark

9    HealthPlace center?

10        **A.**    Correct.

11        **Q.**    And I assume those accommodations were somewhat

12    nicer than the basement of the other building?

13        **A.**    Wonderful.

14        **Q.**    When you moved across the street into those

15    accommodations, was your HealthPlace department, did it

16    consist of only you?

17        **A.**    No.  I had an assistant.

18        **Q.**    Did you have an assistant from the very

19    beginning?

20        **A.**    Almost.  You know, I can't give you the time

21    frame on that, but it was close.

22        **Q.**    And throughout the time that you were the

23    HealthPlace administrator, did your staff consist of

24    just one assistant, or did your staff grow to the point

25    where you had more than one person reporting to you?

**JOY SWEETING**

31

- - - -

1    **A.**    I had no one reporting to me.

2    **Q.**    So the assistant didn't report to you.    The

3    assistant also reported to Tina?

4    **A.**    Correct.

5    **Q.**    Was the staff in the HealthPlace center ever

6    any larger than you and one assistant?

7    **A.**    Not the full-time staff, no.

8    **Q.**    Who was the first assistant that worked for

9    you -- or not for you.    Worked with you as the

10   assistant in the HealthPlace center?

11   **A.**    Stacey Wiley.

12   **Q.**    And when did she leave?

13   **A.**    Let's see.    Either in '99 -- maybe around '99.

14   **Q.**    And she was replaced by Rebecca Swick?

15   **A.**    Correct.

16   **Q.**    Did you hire Rebecca or did someone else hire

17   her?

18   **A.**    Personally, I couldn't hire her, but it was my

19   recommendation.

20   **Q.**    So you were involved in the process, but

21   management made the decision to hire?

22   **A.**    Correct.

23   **Q.**    Am I correct, your position as HealthPlace

24   administrator was not a management or supervisory

25   position with Highmark?

**JOY SWEETING**

32

- - - -

1    **A.**    Correct.

2    **Q.**    Were you an exempt employee?

3    **A.**    Correct.

4    **Q.**    And am I correct that your employment with

5    Highmark, beginning from October, mid October of 1994

6    until the elimination of the HealthPlace administrator

7    position in March of 2004, that your job throughout

8    that entire period with Highmark was HealthPlace

9    administrator?

10    **A.**    That's correct.  That was my title.

11    **Q.**    And for the six-month period from March of --

12    approximately six-month period from mid March through

13    mid October of 2004, you had a different position,

14    which we'll talk about a little bit later.  But other

15    than that, your job for your entire period of time with

16    Highmark was HealthPlace administrator?

17    **A.**    Correct.

18    **Q.**    Did your job duties and responsibilities as the

19    HealthPlace administrator change in any material way

20    from the time that you began in late '94 until the time

21    that the job was eliminated in March of 2004?

22    **A.**    What does "material way" mean?

23    **Q.**    You know what?  Let me eliminate that phrase

24    and just ask you, did it change?

25    **A.**    Yes.

64

**JOY SWEETING**

- - - -

1    time that you were doing this job, or at least from the

2    year 2000 to the time that the job was eliminated, you

3    didn't have a sense of whether that universe was ten

4    employer accounts or a thousand?

5       **A.**   I had a sense, but I don't know an exact

6    number.

7       **Q.**   I'm not asking for an exact number.  I just

8    want to know what your sense was.

9       **A.**   My sense was under 200.

10       **Q.**   And was your sense that even though it was

11    under 200, it was closer to 200 than it was to 20?

12    Because under 200 is a pretty big universe.  Does that

13    mean that your sense was that it was about 200?

14       **A.**   No.  I'd say under 200, but not close to 20.

15       **Q.**   150?

16       **A.**   Closer to that, yes.

17       **Q.**   So somewhere between 150 and 200?

18       **A.**   Maybe more closer to 150.

19       **Q.**   Throughout your entire period as the

20    HealthPlace administrator, did you report directly to

21    Tina?

22       **A.**   Correct.

23       **Q.**   And to whom did she report, if you know?

24       **A.**   There were different people.

25       **Q.**   You can tell me who that was over the ten-year

**JOY SWEETING**

65

- - - -

1   period that you were in that job.

2      **A.**   Wow.  I think she started reporting to Anna.

3      **Q.**   Anna Silberman?

4      **A.**   Yes.  And then for a time, she reported to Brad

5   Pifalo, and then I believe she ended up reporting to

6   Anna.

7      **Q.**   And was the next level of supervision Aaron

8   Walton?

9      **A.**   Yes.

10     **Q.**   And he was the vice president over this area?

11     **A.**   Correct.

12     **Q.**   And what was that, the corporate affairs

13  division?  Was that what the larger area was of which

14  your job was a part?

15     **A.**   I believe so, right.

16     **Q.**   Had you ever met Aaron Walton?

17     **A.**   Several times.

18     **Q.**   Have you had meetings with Mr. Walton?

19     **A.**   Not individual, no.

20     **Q.**   In group meetings where he presented --

21     **A.**   Correct.

22     **Q.**   -- is that where you encountered him?

23     **A.**   (Nodding head affirmatively.)

24     **Q.**   How often did you interact with other

25  HealthPlace administrators?

77

**JOY SWEETING**

- - - -

1    Q.    And who all was in attendance at that?

2    A.    Everyone in our department.

3    Q.    So at least as far as you could tell from

4    people you recognized, these were all your counterparts

5    and the other HealthPlace administrators?

6    A.    Yes, and work site people.

7    Q.    And their assistants?  Was Rebecca at this

8    meeting?

9    A.    Yes, I believe she was.

10    Q.    When you say workplace people, there was not at

11    that time a job title known as work site consultant,

12    was there?

13    A.    Well, they weren't HealthPlace administrators.

14    Q.    Are you referring to folks like Vicars Ward?

15    A.    Right.

16    Q.    You didn't know what his job title was at the

17    time?

18    A.    No, no.

19    Q.    But you saw him as being a workplace consultant

20    individual?

21    A.    Uh-huh, uh-huh.  Yes.

22    Q.    Were there others that you saw that you felt

23    had that role?

24    A.    Yes.

25    Q.    Who were the others that you felt had that

78

**JOY SWEETING**

- - - -

1    role?

2       **A.**   I don't remember their names right now.

3       **Q.**   Were there any documents distributed at that

4    meeting that you remember?

5       **A.**   I don't recall.

6       **Q.**   Tell me what you can recall about the

7    presentation.  What did Mr. Walton announce?

8       **A.**   He mentioned that a couple of HealthPlaces had

9    already been closed and they would be closing the

10    remaining HealthPlaces within the next month or so.

11       **Q.**   And was that the first inkling you had that the

12    HealthPlaces were going to close?

13       **A.**   It was the first official.

14       **Q.**   I'm not talking about official.  Had you heard

15    rumors that something was in the works?

16       **A.**   Probably, yes.

17       **Q.**   What do you recall hearing?  I guess what I'm

18    trying to get a sense of is when you were sitting in

19    this meeting and Mr. Walton made that announcement,

20    were you shocked, like, oh, my goodness, where did this

21    come from, or was that something that you had sort of

22    anticipated because you had heard previously that this

23    was coming?

24       **A.**   I have to tell you, it was a combination.

25       **Q.**   Well, what had you heard in the way of prior to

**JOY SWEETING**

- - - -

1  correct?

2      **A.**    Correct.

3      **Q.**    From the time that you started with Highmark

4  when she brought you to Highmark, did you have any

5  ongoing interactions with Anna after that, or not?

6      **A.**    Yes.

7      **Q.**    What was the nature of your interactions with

8  Anna and over what period of time after you started

9  with the company?

10      **A.**    The most interaction was probably dealing with

11  the Dean Ornish program.

12      **Q.**    Any other interaction with Anna?

13      **A.**    Other than seeing her at occasional meetings

14  and informally meeting her, maybe just running in to

15  her, always pleasantries, whatever.

16      **Q.**    How about the other individuals on this memo?

17  Did you work with them?  Did you work with Brad Pifalo?

18      **A.**    Yes, I did work with Brad.

19      **Q.**    And what were the -- you worked with him in

20  person?

21      **A.**    No.  He was our vice president.

22      **Q.**    Was he Tina's boss?

23      **A.**    Yes.

24      **Q.**    I thought Aaron Walton was the vice president.

25      **A.**    Well, then whatever Brad.  Brad was Tina's

89

**JOY SWEETING**

- - - -

1    A.    I was told that our HealthPlace, of course, was

2    officially closed and my job was eliminated.

3    Q.    Go on.

4    A.    And I could pack up my things and leave.

5    Q.    And who did the talking in that meeting?

6    A.    Cindy did most of it.

7    Q.    When you say she said that the HealthPlace

8    center was officially closed, when did it close, or was

9    she telling you it's officially closed as of today?

10    A.    That's fuzzy for me.  I'm sorry.  I think it

11    was made official that day, but I'm not sure if I heard

12    it a day or two before, but I think that was the day.

13    I'm sorry.  I don't remember.

14    Q.    Up to March 15, did you still have programming

15    going on in the HealthPlace center?

16    A.    We had programming through the end of February,

17    I believe.

18    Q.    But nothing in the first couple weeks of March?

19    A.    Correct.

20    Q.    So there was some anticipation on your part

21    that this was going to happen, so you weren't

22    scheduling programming into March?

23    A.    That's correct.

24    Q.    And was that anticipation based upon what Aaron

25    Walton had announced in the meeting that you had

90

**JOY SWEETING**

- - - -

1  attended?

2     **A.**    Right.

3     **Q.**    So it was no surprise to you on March 15 that

4  the Erie HealthPlace center was closing, correct?

5     **A.**    Correct.

6     **Q.**    Because Aaron Walton had already told you that

7  in the meeting earlier?

8     **A.**    That's correct.

9     **Q.**    But you just didn't know what date it was going

10  to occur; is that correct?

11     **A.**    Correct.

12     **Q.**    So was the new news that you got on March 15

13  that your employment with Highmark was terminating?

14     **A.**    Correct.

15     **Q.**    What else do you recall transpiring in that

16  meeting?  Anything they said to you or that you asked

17  them or that you said to them?

18     **A.**    I believe I asked if Rebecca was going to be

19  staying or if she was leaving, and they said she would

20  be staying.

21     **Q.**    And who said that, Tina or Cindy?

22     **A.**    I think Tina said it.

23     **Q.**    And what else?  Anything you can remember that

24  you said or that they said?

25     **A.**    They said I could take my time, but I should

**BAUER COURT REPORTING, INC.**
**(724) 444-1080**

**JOY SWEETING**

- - - -

1    **A.**    The person that replaced me, Rebecca Swick.

2    **Q.**    Any others?

3    **A.**    Well, Vic Ward would be the male employee.

4    **Q.**    Anyone else?

5    **A.**    No.

6    **Q.**    Now, when you say Rebecca Swick replaced you,

7    you're not contending that the job of HealthPlace

8    administrator continued, are you?

9    **A.**    No, no.  That was poor wording.

10    **Q.**    So what is your contention as to what it is

11    that Rebecca Swick was kept on to do?

12    **A.**    For this new position that I felt I was more

13    qualified for than she was.

14    **Q.**    That's the community site consultant?

15    **A.**    Correct.

16    **Q.**    Now, why do you believe that you are more

17    qualified than Rebecca Swick for that position?

18    **A.**    Well, from all the experiences that you have

19    seen that I have already had by looking at my résumé

20    and knowing that Rebecca Swick has just been my

21    assistant for the past three years doing office type

22    work, for the most part, and not really a professional.

23    **Q.**    Why do you say she is not really a

24    professional?

25    **A.**    Not a professional health educator.  Excuse me.

**JOY SWEETING**

- - - -

123

1    be a teacher.

2        **Q.**    Go on.

3        **A.**    I don't know.  That pretty much hits the high

4    points as far as I'm concerned, and I haven't noticed

5    where her experience lies in being able to be more

6    qualified for this position than I was.

7        **Q.**    I think we talked about before lunch that you

8    didn't know who was involved or who made the decision

9    to eliminate your position, but do you know who made

10   the decision to retain or hire Rebecca Swick for the

11   community site consultant position rather than you?

12       **A.**    I'm not sure anyone told me.  I think I heard

13   Anna did, but I could not quote you or quote whoever

14   did it.

15       **Q.**    So you don't really have any firsthand

16   knowledge about that?

17       **A.**    Right, correct.

18       **Q.**    Are there any other reasons other than what

19   you've already testified to why you believe you are

20   more qualified and more experienced than Rebecca Swick

21   for the community site consultant position?

22       **A.**    I think I pretty much stated.

23       **Q.**    Now, what about Vic Ward?  What position are

24   you referring to here that he had that you're

25   contending you were more qualified for?

**JOY SWEETING**

- - - -

1    **A.**    Well, he was a work site consultant.  That was

2    his only job to do, and so that was all he did.  I was

3    just getting into the work site area in Erie, not in

4    Pittsburgh where they had the resources, I felt, more

5    than I had in Erie to do a good job with work site.  So

6    I was not only running a HealthPlace with all these

7    other programs and an assistant, whereas he was only

8    doing work site programs.

9    **Q.**    And why do you believe you were more qualified

10    and more experienced to be a work site consultant than

11    Vic Ward?

12    **A.**    I guess I'm not convinced that I'm more

13    experienced to be a work site consultant, but I don't

14    feel I had the chance to prove it, because I had other

15    obligations that he did not have.

16    **Q.**    What kind of interaction did you have with

17    Mr. Ward when you were working at Highmark in terms of

18    working together?  Did you work at all together?

19    **A.**    Not really.  We would be together at meetings,

20    but we wouldn't be working together, necessarily,

21    because he had his own accounts.

22    **Q.**    So other than seeing him in meetings, you

23    wouldn't have any firsthand knowledge of what he was

24    doing on a day-to-day basis, with whom he was doing it,

25    or how he was doing it, correct?

**JOY SWEETING**

125

- - - -

1    **A.**    Exactly.  And like I said, I'm not sure that I

2    am more experienced in that area.  I just don't feel I

3    might have been given the opportunity, because I had

4    other obligations, also.

5    **Q.**    Now, in paragraph 11, you allege that Rebecca

6    Swick was not terminated, was promoted two levels above

7    you and given a salary greater than what plaintiff had

8    been earning and that you were more qualified for this

9    position.

10        Ms. Sweeting, am I correct that in paragraph

11    11, the allegations here pertain to what you've

12    already discussed with me regarding Rebecca Swick?

13    **A.**    That's correct.

14    **Q.**    And would you agree that the position of

15    community site consultant did not exist, at least not

16    in Erie, prior to March 15th, 2004?

17    **A.**    To my knowledge.

18    **Q.**    It was a newly created position as part of the

19    reorganization?

20    **A.**    To the best of my knowledge, yes.

21    **Q.**    So am I correct that you're not really

22    challenging in this lawsuit the decision to eliminate

23    the HealthPlace administrator, but, rather, you're

24    challenging the decision to select Rebecca Swick rather

25    than you to be the community site consultant, along



Aaron Walton/GBU/Highmark
Sent by: Diane Fenus

12/12/2003 03:37 PM

To   Staff A - Highmark Only, Staff B - Highmark - Pittsburgh
Only, Staff B - Highmark - Camp Hill Only, Staff C - Highmark
Only

cc

bcc

Subject   Corporate Affairs - Organizational Announcement

---

**To:**      Staff List A, B and C                    **Date:**  December 12, 2003

**From:**    Aaron Walton, Senior Vice President
             Corporate Affairs

**Subject:** Organizational Changes

I have made several organizational changes within Corporate Affairs that will enhance the area's ability to support Highmark's mission and strategic direction through data driven initiatives and scientifically based interventions.

**Anna L. Silberman, Vice President, Preventive Health Services** will assume responsibility for the Preventive Health Services Division. This division will expand Highmark's capabilities for delivering customer focused health promotion and disease prevention activities throughout our 49-county service region. Anna's organizational accountability will include the re-positioning of services traditionally delivered through our HealthPLACE, and Primary Care Centers to enhanced delivery models. She will also oversee the operation of worksite wellness programs.

Additionally, Anna will manage the dissolution of Lifestyle Advantage as a national business venture through her continuing role as CEO through the first quarter of 2004. Anna will then integrate the administration of the Dean Ornish Program in the 28 provider sites located in Pennsylvania, West Virginia, Illinois and Minnesota, within the Corporate Affairs Preventive Health services Division.

**W. Bradley Pifalo, M.D., Vice President, Corporate & Community Wellness** will assume responsibility for clinical efficacy of all Corporate Affairs health related initiatives. The initiatives will include oversight of the medical directors in the 28 Ornish sites, clinically based lifestyle interventions, and corporate priorities, such as obesity, community health and vulnerable children activities associated with the Western PA Caring Foundation. Additionally, Dr. Pifalo will be responsible for the development and management of corporate fitness activities in all Highmark locations.

Dr. Pifalo's clinical expertise will continue to be utilized in Western and Central PA for sales and account retention presentations to increase customer commitment to employee health promotion and wellness. Additionally, Brad will market the Highmark employee fitness and wellness

DEPOSITION EXHIBIT

Sweeting 1
8/4/05

program model to large Highmark accounts.

Finally, Dr. Pifalo will work with the medical community to increase physician awareness and referrals to the health promotion/disease prevention opportunities available to Highmark members.

Other areas within Corporate Affairs are:

**Yvonne Cook, Vice President Community and Health Initiatives,** continues to be responsible for Community Affairs, the Highmark Foundation, employee community involvement, and the identification and development of strategic initiatives that address defined needs in the communities we serve. This area is also accountable for evaluating and assessing program impact, including quality and clinical/financial outcome analysis and reporting for all Corporate Affairs initiatives.

**Charlie LaVallee, Vice President & Executive Director of the Caring Foundation** continues to have responsibility for the Caring Place and Grieving Centers, as well as the management of the CHIP and adultBasic programs in Highmark's service area. Charlie also oversees the Community Health Department, (resulting from the integration of HEC into the Caring Foundation) whose purpose is to identify and address unmet public health, as well as the needs of the uninsured and underinsured.

Your ongoing support of the Corporate Affairs area is critical for Highmark to achieve its social mission objectives.

Aaron A. Walton, Sr. Vice President
Corporate Affairs
Highmark
Fifth Avenue Place, 120 Fifth Avenue, Suite 3110
Pittsburgh, PA   15222-3099
412-544-5439
412-544-8054 - FAX
aaron.walton@highmark.com

NOTE: The information contained in this message may be privileged/confidential and protected from disclosure. If you are not the intended recipient, or agent responsible for delivering this message to the intended recipient, you are hereby notified dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by replying to this message and deleting it from your computer. Thank you for your assistance.

# **TAB D**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JOY SWEETING,               )
                                 )
      Plaintiff,          )    Civil Action No. 04-368 – Erie
                                 )
v.                            )    Judge Sean J. McLaughlin
                                 )
HIGHMARK, INC.,          )
                                 )
      Defendant       )

**HIGHMARK INC.'S RESPONSES TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES AND**
**FIRST REQUEST FOR PRODUCTION OF DOCUMENTS**

Defendant Highmark Inc. ("Highmark" or "Defendant") hereby responds, pursuant to Rules 26, 33 and 34 of the Federal Rules of Civil Procedure, to Plaintiff's First Set Of Interrogatories And First Request For Production of Documents (hereinafter referred to as "Plaintiff's First Requests").

**GENERAL OBJECTIONS**

Each of Defendant's responses to Plaintiff's First Requests shall be deemed to incorporate each of the following General Objections, regardless of whether the General Objection is specifically referenced in the response. Any specific objection set forth in a response to a particular interrogatory does not constitute a waiver, in whole or in part, of any of the following General Objections and Limitations.

1.      Defendant objects to Plaintiff's First Requests because they violate the limitation on number of interrogatories set forth in Fed. R. Civ. P. 33 which states that a party may serve written interrogatories "not exceeding 25 in number **including all discrete subparts**." (Emphasis added).

INTERROGATORY NO. 6:

If you contend the Plaintiff was not replaced, but her responsibilities were assumed or performed by another employee or employees, please describe which part of Plaintiff's responsibilities were assumed or performed by other individual(s). If another employee(s) assumed or performed some or all of the responsibilities of the position described in Interrogatory No. 2, state the following:

      a.     name(s) of person(s) assuming and/or performing Plaintiff's job responsibilities and duties;

      b.     complete description of the duty(s) and/or responsibility(s) assumed by this individual(s);

      c.     age; and

      d.     sex.

ANSWER TO INTERROGATORY NO. 6:

In response to this Interrogatory, be advised that many of the responsibilities of the HealthPLACE Administrator in Erie disappeared with the elimination of HealthPLACE. The primary responsibilities which were assumed by another employee were responsibilities pertaining to the Work Site aspect of the HealthPLACE Administrator position. Those responsibilities were not substantial enough to warrant a full-time position in Erie so they were assigned to a Worksite Based Site Consultant located in the Pittsburgh area, Mr. Vickers Ward  (DOB:  10-28-61). The responsibilities include developing worksite wellness operating plans; increasing enrollments in on-site interventions; engaging worksites in providing Highmark interventions; increasing numbers of programs and participants at current sites; improving health risk status of employees participating in comprehensive Worksite wellness programs; increasing enrollment of Highmark corporate customers who are implementing comprehensive

Worksite wellness programs that can improve lifestyle behaviors, health risk status, productivity, customer satisfaction, retention and ultimately health care costs.

INTERROGATORY NO. 7:

Identify all persons of whom the Defendant has knowledge who may have information which is any way relevant to the allegations made in the Complaint in this case. This answer should include information regarding individuals who are currently employed by the Defendant, who are former employees of the Defendant, or any other individual who may have any knowledge at all which is relevant and/or discoverable by the Plaintiff in this action. For each such person, please state the following:

a.    name, address and home telephone number;

b.    date of birth;

c.    what information such individual has regarding this case; and

d.    if such person has knowledge which may form the basis of expert testimony in this case, please state the following:

  (i)    the basis or grounds for such individual's expertise;

  (ii)    the substance of the expert knowledge possessed by such individual; and

  (iii)    whether or not any report has been prepared by such individual, or whether the Defendant have requested such a report in which an expert opinion is sought by the Defendant.

ANSWER TO INTERROGATORY NO. 7:

Defendant objects to this Interrogatory because it is unduly overbroad and improperly imposes a burden on Defendant to determine what information may (or may not) be relevant to the allegations in Plaintiff's Complaint (which is calling for a legal conclusion). Without waiving these objections, see the information on pages 1-2 of Highmark's Rule 26(a)(1) Disclosure Statement which is incorporated herein by reference as if set forth in full. In addition to the individuals listed on the Disclosure Statement, Aaron Walton (DOB: 1-27-47) has information regarding the decision to close the HealthPLACE organization (*i.e.*, he made the decision), and he was consulted

in connection with the decisions concerning the establishment of the new organization (Preventive Health Services) and the termination of Plaintiff's employment.

Further, be advised that Anna Silberman's date of birth is 2-12-54; Tina Palaggo-Toy's date of birth is 9-27-58; and Cynthia Mori's date of birth is 11-27-52.

# CONTINUED TO
# APPENDIX VOLUME III

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Appendix In Support Of Highmark's Motion For Summary Judgment (Volume II of III) was served upon counsel for Plaintiff electronically and by United States mail, first class and postage prepaid, at Pittsburgh, Pennsylvania, on this 19th day of December, 2005, addressed as follows:

        Joel S. Sansone
        Scanlon & Sansone
        2300 Lawyers Building
        Pittsburgh, PA  15219
        scanlon2sansone@aol.com

        Counsel for Plaintiff

        s/ Martha Hartle Munsch
        Counsel for Defendant