**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOY SWEETING, | ) | Civil Action No. 04-368 - Erie |
| Plaintiff, | ) | |
| | ) | The Hon. Sean J. McLaughlin |
| v. | ) | |
| | ) | |
| HIGHMARK, INC., | ) | ELECTRONIC FILING |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF HIGHMARK'S**
**MOTION FOR SUMMARY JUDGMENT**

### I.    INTRODUCTION

Plaintiff filed this action under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), and the Pennsylvania Human Relations Act ("PHRA") claiming that Highmark Inc. ("Highmark" or "Defendant") discriminated against her on the basis of her gender and/or her age when it (i) eliminated her position as HealthPLACE Administrator when the HealthPLACE system was dissolved; and (ii) did not offer her another position in the successor organization. The undisputed material facts show that Highmark made these decisions for legitimate, non-discriminatory business reasons, and Plaintiff cannot offer any evidence to show that Highmark's stated reasons were merely a pretext for gender or age discrimination.

Highmark has filed a Motion for Summary Judgment on each of Plaintiff's claims because there is no evidence from which a reasonable trier of fact could rule in her favor. Highmark, accordingly, is entitled to summary judgment as a matter of law.

## II.    FACTUAL BACKGROUND

Pursuant to Local Rule 56.1(B)(1), Highmark has filed a separate Statement of Undisputed Material Facts ("Statement of Facts") contemporaneously with this Memorandum of Law.  The Statement of Facts is incorporated by reference.  A brief summary of the facts is as follows.

In or about the early 1990's, Highmark embarked on a wellness/health promotion initiative known as HealthPLACE.  In the HealthPLACE business model, Highmark had "bricks and mortar" locations (known as HealthPLACE centers) where Highmark offered various classes, programs and screenings on disease prevention and wellness to members of the community.  Statement of Facts at ¶ 2.

Plaintiff was hired by Highmark in 1994 to become the Administrator of the HealthPLACE center located in Erie, Pennsylvania.  Statement of Facts at ¶ 4.

In late 2003, Highmark's Senior Vice President for Corporate Affairs, Aaron Walton, determined that HealthPLACE was not a successful business model for achieving Highmark's business objectives in health promotion and wellness.  Mr. Walton decided that a new business model should be created to carry out Highmark's wellness and health promotion objectives.  He assigned Anna Silberman (Vice President of Preventive Health Services) to develop and implement an appropriate business model and organizational structure to replace HealthPLACE.  Statement of Facts at ¶ 11. [1]  Plaintiff and other employees of HealthPLACE were informed by Mr. Walton at a meeting in late 2003 or January 2004 that some of the HealthPLACE centers had already been closed and that

---

[1]    Ms. Silberman is 51 years of age.  Statement of Facts at ¶ 5.  Mr. Walton is 58 years of age.  Id. at ¶ 6.

Highmark would be closing the remaining HealthPLACE centers within the next month or so. Id. at ¶ 14.

The organization known as HealthPLACE was dissolved and all HealthPLACE Administrator jobs (including Plaintiff's) were eliminated by the end of March 2004. Statement of Facts at ¶ 15. Plaintiff was notified on March 15, 2004 that the HealthPLACE center in Erie was officially closed and that her job was eliminated. Id. at ¶ 16.

In the new business model (known as Preventive Health Services), Highmark no longer operates its own facilities for health promotion, disease prevention and wellness activities. Instead, Highmark has established regional networks of community-based organizations which have agreed to deliver programs developed and monitored by Highmark, and to collect data concerning the clinical outcomes resulting from the programming. These outcomes are expected to reduce health risk and thereby reduce claims utilization for preventable disease and disability among Highmark subscribers. Statement of Facts at ¶ 17. Likewise, in the new organizational structure, Highmark continues to work with Highmark's corporate customers to develop effective worksite wellness operating plans with the goal of improving, among other things, their employees' lifestyle behaviors, health risk status, productivity, and ultimately healthcare costs. Id. at ¶ 18.

Ms. Silberman was assigned to make the staffing decisions for the new organization. She made those decisions in the first quarter of 2004. Statement of Facts at ¶ 23. Ms. Silberman created positions known as Worksite-Based Site Consultants, Community-Based Site Consultants, and Hospital-Based Site Consultants. Id. at ¶ 19. Ms. Silberman did not offer Plaintiff a position in the new organization. As Highmark will

discuss below (and as described in detail in the Statement of Facts at ¶¶ 25-36),

Ms. Silberman's decisions were based solely on legitimate non-discriminatory business

reasons.

## III.    ARGUMENT

### A.    <u>Legal Standard</u>

For Plaintiff to avoid summary judgment, she must produce sufficient

evidence from which a reasonable trier of fact can rule in her favor:

> [Summary judgment must be entered] against a party who fails to
> make a showing sufficient to establish the existence of an element
> essential to that party's case, and on which that party will bear the
> burden of proof at trial.  In such a situation, there can be "no genuine
> issue as to any material fact," since a complete failure of proof
> concerning an essential element of the nonmoving party's case
> necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Summary judgment is appropriate

if the pleadings, depositions, answers to interrogatories, admissions and affidavits on file

reveal no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The role of summary judgment as the

proper method of eliminating unfounded claims without the time and expense required by

a trial is well established.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.,* 475 U.S. 574 (1986).  Where, as here, the non-moving party bears the burden of

proof at trial, the party moving for summary judgment may meet its summary judgment

burden by establishing that the record evidence, reduced to admissible evidence, is

insufficient to satisfy the non-moving party's burden of proof at trial.  *Celotex*, 477 U.S.

at 322.  The Supreme Court has emphasized the importance of summary judgment in the

overall scheme of the Federal Rules of Civil Procedure:

> Summary judgment procedure is properly regarded not as a
> disfavored procedural shortcut, but rather as an integral part of the

> Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." . . . Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex*, 477 U.S. at 327 (citations omitted).

A defendant moving for summary judgment is not required to refute the essential elements of the plaintiff's case. The moving party need only point out the insufficiency of the plaintiff's evidence offered in support of those essential elements. *Id.* at 322-23.

Plaintiff *cannot* successfully oppose summary judgment by allusion to facts or references to the pleadings. *Id.* at 324. In *Anderson,* the Supreme Court held that, to survive a motion for summary judgment, a plaintiff must produce sufficient evidence from which the fact finder reasonably could find in his favor. The Court held:

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [for plaintiff to survive summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff.

477 U.S. at 252.

It is also well settled that summary judgment is the proper method for disposing of unfounded employment discrimination claims prior to trial.[2]

---

[2]   *See, e.g., Keller v. ORIX Credit Alliance,* 130 F.3d 1101 (3d Cir. 1997) (*en banc*) (affirming summary judgment for employer in an ADEA case); *McNemar v. Disney Store, Inc.,* 91 F.3d 610 (3d Cir. 1996) (affirming grant of summary judgment for employer in a disability discrimination case); *Fuentes v. Perskie,* 32 F.3d 759 (3d Cir. 1994) (affirming grant of summary judgment for employer in Title VII case); *Healy v. N.Y. Life Ins. Co.,* 860 F.2d 1209 (3d Cir. 1988) (affirming grant of summary judgment for employer in an age discrimination case); *Spangle v. Valley Forge Sewer Auth.,* 839 F.2d 171 (3d Cir. 1988) (affirming grant of summary
Continued on following page

**B.     Plaintiff Cannot Create A Triable Issue of Material
Fact On Either Her Age or Gender Discrimination Claims.**

In this action, Plaintiff challenges (i) Highmark's decision to eliminate her

position as HealthPLACE Administrator in Erie; and (ii) Highmark's decision not to offer

her a position in the successor Preventive Health Services organization. There is no

direct evidence of age or gender discrimination as to either of these decisions. Therefore,

to sustain her claim of age and/or gender discrimination and to withstand summary

disposition of her claims, Plaintiff must proceed under the familiar *McDonnell Douglas*

burden-shifting framework.[3]  Under this framework, if Plaintiff demonstrates a *prima facie*

case of age or gender discrimination, the burden then shifts to Highmark simply to

articulate (not prove) a non-discriminatory business reason for its decisions to eliminate

Plaintiff's position and to not offer her a position in the new organization. Plaintiff must

then prove that Highmark's stated reasons were a pretext for unlawful discrimination.

Assuming only for purposes of Highmark's summary judgment motion that

Plaintiff could establish a *prima facie* case, her claims for age and gender discrimination

should be dismissed because the undisputed record evidence demonstrates that

Highmark's decisions were based on legitimate, non-discriminatory business reasons ***and***

Plaintiff cannot proffer any evidence to show that those reasons were a pretext for either

age or gender discrimination.

If an employer offers legitimate business reasons for its decisions, the burden

shifts back to the plaintiff. To withstand summary judgment at this stage, Plaintiff must

---

Continued from previous page

judgment for employer in an age discrimination case); *Hankins v. Temple Univ.*,
829 F.2d 437 (3d Cir. 1987) (affirming grant of summary judgment for employer in
a Title VII action).

[3]     *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973).

point to **reasonable, specific** evidence of record from which a reasonable factfinder could either (i) disbelieve Highmark's nondiscriminatory reasons for eliminating Plaintiff's position and for not selecting her for another position; or (ii) believe that an invidious discriminatory reason was more likely than not a motivating or determinative factor in those decisions. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994); *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-09 (3d Cir. 1997); *Simpson v. Kay Jewelers*, 142 F.3d 639 (3d Cir. 1998). More specifically, the plaintiff *"must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could rationally find them unworthy of credence."* *Keller*, 130 F.3d at 1108-09 (emphasis added).  Stated differently, a plaintiff's "evidence [in discrimination cases] must be enough to support a *reasonable* inference that the reasons given for the employment decisions are pretextual. *Merely reciting that [discrimination] was the reason for the decision does not make it so."* *Billet v. CIGNA Corp.*, 940 F.2d 812, 816 (3d Cir. 1991) (emphasis added).[4]

> ## 1. Plaintiff Cannot Establish A Genuine Issue of Material Fact As To Highmark's Decision To Eliminate Plaintiff's Position As HealthPLACE Administrator.

It cannot be disputed that Plaintiff's position as HealthPLACE Administrator was eliminated with the dissolution of HealthPLACE and the closing of the HealthPLACE center located in Erie, Pennsylvania.  The decision to dissolve HealthPLACE and, accordingly, to eliminate Plaintiff's position as HealthPLACE Administrator was based on legitimate, non-discriminatory business reasons.

---

[4]  The *McDonnell-Douglas* burden-shifting framework also applies to PHRA disparate treatment claims.  *See Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996); *Stewart v. Rutgers Univ.*, 120 F.3d 426, 432 (3d Cir. 1997).  Plaintiff's PHRA claim, therefore, will be treated coextensively with her Title VII and ADEA claims.

As mentioned above, Highmark had embarked on a wellness/health promotion initiative known as HealthPLACE in or about the early 1990's. In the HealthPLACE business model, Highmark had "bricks and mortar" locations (known as HealthPLACE centers) where Highmark offered programming on disease prevention and wellness to members of the community. Statement of Facts at ¶ 2.[5]

In late 2003, Mr. Walton determined that HealthPLACE was not a successful business model for achieving Highmark's business objectives in health promotion and wellness. Likewise, at or about the same time, he decided that a subsidiary venture, LifeStyle Advantage, should also be closed. Statement of Facts at ¶ 11.[6]

On December 13, 2003, Mr. Walton sent a memorandum to staff announcing that he had made certain organizational changes within Corporate Affairs to enhance the area's ability to support Highmark's mission and strategic direction through data-driven initiatives and scientifically based interventions. Statement of Facts at ¶ 12. In that memorandum, Mr. Walton also announced that Ms. Silberman would assume responsibility for a new Preventive Health Services Division. He explained that this Division "will expand Highmark's capabilities for delivering customer focused health promotion and disease prevention activities throughout our 49-county service region." Id. at ¶ 13. He further announced that Ms. Silberman would be responsible for the "re-positioning of services

---

[5]    "Wellness" means "health prevention, health promotion, trying to encourage people to live healthier lifestyles by developing certain practices, whether they be weight management, smoking cessation, stress, the osteoporosis program, whatever the program is that would help you have a better condition of health." Statement of Facts at ¶ 3.

[6]    Lifestyle Advantage was an organization that had been formed to work with other Blue Cross plans across the country to implement the Dean Ornish program for reversing heart disease. Silberman Dep. at 9. (All citations to deposition testimony appear in the Appendix filed herewith.)

traditionally delivered through our HealthPLACE and Primary Care Centers to enhanced delivery models." Id.

The organization known as HealthPLACE was dissolved and all HealthPLACE Administrator jobs (including Plaintiff's) were eliminated by the end of March 2004. Statement of Facts at ¶ 15. Plaintiff's position was eliminated because all HealthPLACE Centers were closed. Id.

Plaintiff can offer no evidence to create a triable issue that these stated reasons for the decision to eliminate her job as HealthPLACE Administrator were a pretext for age and/or gender discrimination. The record is devoid of *any* evidence, let alone "reasonable, specific evidence," that this decision was motivated by unlawful discriminatory animus towards Plaintiff. Hence, judgment as a matter of law should be entered on Plaintiff's claims of age and gender discrimination regarding the decision to eliminate her position as HealthPLACE Administrator.

      2.      **Highmark Articulated Non-Discriminatory Business Reasons For Its Decision Not To Offer Plaintiff A Position In The New Organization And Plaintiff Cannot Demonstrate Those Reasons Are Pretextual.**

In her Complaint, Plaintiff challenges Highmark's decisions not to offer her a position in Erie as either a Worksite-Based Site Consultant or a Community-Based Site Consultant in the new Preventive Health Services organization. She alleges that the decision not to do so was purportedly because of her gender and/or her age. Contrary to Plaintiff's allegations, Highmark's staffing decisions were based solely on non-discriminatory business reasons, as Highmark will discuss below. Further, as with the decision to eliminate Plaintiff's position as HealthPLACE Administrator, Plaintiff again cannot produce any evidence to cast doubt upon the credibility of Highmark's stated reasons for not selecting Plaintiff for either of these positions or otherwise create a triable issue on pretext.

### (a)    The Worksite-Based Site Consultant Position.

Several years prior to the dissolution of HealthPLACE, Highmark had
instituted a worksite wellness initiative with its corporate customers (also referred to as
HealthPLACE@work).  Statement of Facts at ¶ 22.  In the new Preventive Health Services
organizational structure, Highmark continued to work with its corporate customers to
develop effective worksite wellness operating plans with the goal of improving their
employee's lifestyle behaviors, health risk status, productivity, and ultimately healthcare
costs.  Id. ¶ 18.  The position created by Ms. Silberman in the new organization for carrying
out the worksite wellness initiative was entitled Worksite-Based Site Consultant, but the
work encompassed by this new job title was actually being done prior to the implementation
of the new organization as part of HealthPLACE@work.  Id. at ¶ 22.

In performance year 2002-03, fifty percent of Plaintiff's performance
objectives involved following the worksite wellness business plan and improving the
delivery and evaluation of the data-driven worksite wellness model with customer accounts
in the Erie region.  Statement of Facts at ¶ 27.  In her performance review for 2002-03,
Plaintiff received a "Does Not Meet Expectations" for this critical objective dealing with the
worksite wellness initiative.  Id. at ¶ 26.  After reviewing this performance evaluation of
Plaintiff when she was making staffing decisions for the new organization, Ms. Silberman
"was very concerned" with Plaintiff's lack of productivity and achievement on this significant
aspect of her job duties.[7]  Id. at ¶ 28.

Ms. Silberman decided not to have a Worksite-Based Site Consultant based
in Erie, however, because she determined that Highmark did not need a full-time person

---

[7]    For example, Ms. Silberman noticed from the review that Plaintiff "had only one
account that had completed baseline and follow-up screening; it's also a matter of
productivity.  One account in an area where we have a huge customer base like
Erie is…not enough accomplishment, not enough achievement."  Statement of
Facts at ¶ 28.

dedicated to worksite wellness in Erie.  Instead, she assigned Mr. Vickers Ward to pick up

worksite wellness responsibilities for the Erie region in addition to his existing worksite

responsibilities in Western Pennsylvania.  Statement of Facts at ¶ 49.  Mr. Ward had been

working for Highmark as part of the Worksite Wellness team prior to the dissolution of

HealthPLACE.   In that position, he had been performing the duties of a Worksite-Based

Site Consultant (id. at ¶ 47) and he had received an overall rating of "Exceeds

Expectations" for his work on the Worksite Wellness team.  Id. at ¶ 48[8]  For example,

Mr. Ward's annual evaluation dated September 25, 2003 reflects that he was responsible

for successfully launching the HealthPLACE@work program in the central Pennsylvania

region while at the same time continuing to provide a high level of service to Highmark

group accounts assigned to him in western Pennsylvania and nationally.  Id.

Ms. Silberman did not consider Plaintiff qualified to hold a Worksite-Based

Site Consultant position, especially since Plaintiff had received a "Does Not Meet

Expectations" rating on the worksite wellness aspect of her job duties on her most recent

written performance evaluation that Ms. Silberman had reviewed in early 2004.  Statement

of Facts at ¶ 50.  Moreover, Plaintiff admitted in her deposition that she was not necessarily

more qualified than Mr. Ward for the position of Worksite-Based Site Consultant.  Plaintiff's

Dep. at 124-25.

In short, Plaintiff can offer no evidence whatsoever to discredit

Ms. Silberman's reasons for not selecting Plaintiff for the position of Worksite-Based Site

Consultant in the new organization nor can she otherwise show that these reasons are a

pretext for gender or age discrimination.   Hence, summary judgment should be entered in

---

[8]     Plaintiff admitted that she viewed Mr. Ward as having worked in the role of a
         workplace consultant even prior to the new organization.  Plaintiff's Dep. at 123-25.

favor of Highmark as to Plaintiff's claim with respect to the Worksite-Based Site
Consultant position.

### (b)    The Community-Based Site Consultant Position.

Plaintiff, likewise, cannot create a triable issue regarding Highmark's stated
reasons for not offering her the position of Community-Based Site Consultant in Erie.
Contrary to Plaintiff's conclusory allegations, Ms. Silberman's decision to offer that
position to Rebecca Swick rather than to Plaintiff was not based on age. Rather,
Ms. Silberman determined that Plaintiff was <u>not</u> qualified for that job, period. Statement of
Facts at ¶ 38. Furthermore, Ms. Silberman considered Ms. Swick to be well qualified for
the position of Community-Based Site Consultant.

In filling the job of Community-Based Site Consultant, Ms. Silberman was
not looking for someone to teach or present wellness programs. The Community Site
Consultant job is not a teaching job. To the contrary, Ms. Silberman was looking for an
administrator who is detail-oriented with solid interpersonal skills who could develop and
oversee a network of community sites and assure that those network sites are delivering
the specified programs according to standardized protocols and returning solid clinical
outcomes as reflected in data-driven reporting and analyses. Statement of Facts at ¶ 20.[9]

In making her decision not to offer this position to Plaintiff, Ms. Silberman
had reviewed, among other things, at least the two most recent written performance
evaluations on Plaintiff. Statement of Facts at ¶ 25. As mentioned above, in the most

---

[9]      For the position of Hospital-Based Site Consultant, Ms Silberman was looking for
individuals with all of the skills and abilities expected of a Community-Based Site
Consultant. In addition, a healthcare clinical specialty was required. Statement of
Facts at ¶ 21. Ms. Silberman determined that she did not need a Hospital-Based
Site Consultant based in Erie, and Plaintiff is not claiming that she should have
been offered such a position. <u>Id</u>. at ¶ 36.

recent written performance evaluation available to Ms. Silberman, Plaintiff had received a rating of "Does Not Meet Expectations" for her objective dealing with the worksite wellness initiative (which had been 50% of her overall objectives for performance year 2002-03). *See* Brief supra at p. 10. Ms. Silberman understood the importance of the administrative aspects of the worksite wellness responsibilities assigned to Plaintiff and she could see from Plaintiff's evaluation that Plaintiff was deficient in those key administrative areas:

> "Well, I'm talking about administrative work, okay, and quantifying data, okay, and analyzing that data is a piece of that, a very important part of health promotion, okay, and that was lacking."

Silberman Dep. at 72.[10]

Additionally, due to various events which had come to Ms. Silberman's attention over the years, Ms. Silberman had developed negative impressions of Plaintiff even before reading the aforementioned performance evaluation. Those negative impressions which Ms. Silberman recalled included having "some concerns about [Plaintiff's] interactions with the public, and we were serving the public." Statement of Facts at ¶ 29. Ms. Silberman specifically remembered an occasion when one of Highmark's customers in Erie who was attending a program at the HealthPLACE center had a negative experience involving Plaintiff and wrote a letter to complain about it. "We don't get many complaints in our area, and I remember there being a significant complaint about [Plaintiff]," including a complaint that Plaintiff had been rude to the customer. Id. at ¶ 30.

---

[10]    A goal of the worksite wellness initiative was to quantify the outcomes of a worksite wellness data-driven model. Silberman Dep. at 73. Those same goals (in a community-based setting rather than a workplace setting) were embodied in the Community-Based Site Consultant position. Statement of Facts at ¶ 20.

In that written complaint, the customer (a policyholder and small business owner in Erie) complained that Plaintiff was "extremely unprofessional" and "rude":

> I have watched her be short with several other members of the Yoga class on several occasions, several people in the class have remarked on it to me and at least two people have stopped coming due to her attitude.  And yesterday she turned on me.... I feel you would want to know that you have someone working for you who behaves in a rude manner in a customer service position, to your customers who go to these classes to help alleviate stress not create more of it.

Statement of Facts at ¶ 31.  That customer complaint "stuck with" Ms. Silberman.  "You know, that wasn't the entire decision [not to select Plaintiff], but I can say that it's so rare for us to get that type of complaint that it did stick with me."[11]  It contributed to Ms. Silberman's decision not to select Plaintiff for the Community-Based Site Consultant position.  Id. at ¶ 32.

Another event which contributed to Ms. Silberman's negative impression of Plaintiff involved an assignment to implement a system-wide arthritis program based on a training course Plaintiff had attended in California.  Ms. Silberman "never really saw that [program] materialize to its potential."  Statement of Facts at ¶ 34.  Ms. Silberman explained further:

> "I do not recall seeing that program move to its potential,... I did not see it written up in the newspaper like a lot of our other things were of equal or of significant investment.  I did not see, you know, a lot of people training in this who then were motivated to continue to deliver the program.  I don't recall seeing any significant amounts of data that came out of that program or outcomes of any nature that came out of the program that were parallel to the other work that was being delivered to our customers."

---

[11]    Ms. Silberman also recalled that there had been other complaints of this nature about Plaintiff.  Statement of Facts at ¶ 32.

Id. Yet another event which contributed to Ms. Silberman's negative impression of Plaintiff involved an expense report submitted by Plaintiff to Ms. Silberman that included illegitimate expenses. Id. at ¶ 35. Ms. Silberman recalls being "astounded by" this incident at the time it occurred. Id.

Ms. Silberman also had the general impression that Plaintiff was administratively weak. Statement of Facts at ¶ 36. In fact, Ms. Silberman recalled that Plaintiff needed assistance to get the administrative work done as HealthPLACE Administrator, and that the Program Assistant position was created to work with Plaintiff in the Erie region because the administrative work was not getting done when Plaintiff was working alone in that office. Id. at ¶ 8. As discussed above, Plaintiff's administrative deficiencies were of particular concern to Ms. Silberman since the job of Community-Based Site Consultant was heavily administrative.

Hence, Ms. Silberman determined that Plaintiff was not qualified for the position of Community-Based Site Consultant. Instead, she selected Rebecca Swick for that position in Erie. Statement of Facts at ¶ 38.[12]

Ms. Swick has a Bachelor of Arts degree in social work from the University of Pittsburgh and recently received a Master's Degree in Public Administration from Gannon University. Statement of Facts at ¶ 39.[13] Prior to joining Highmark in Erie as a

---

[12] In response to a question from Ms. Silberman, Ms. Palaggo-Toy left a voicemail message for Ms. Silberman stating that she (Ms. Palaggo-Toy) would stick with Plaintiff in Erie. Ms. Palaggo-Toy admitted, however, that she did not know what Ms. Silberman was looking for in the new organization and that her opinion was based on "emotion." She and Plaintiff were "very close". See Deposition of Tina Palaggo-Toy at pp. 49, 53-54, 64, 66. (These pages from the Palaggo-Toy Deposition appear in the record under Tab F of the Appendix.) See also Silberman Dep. at 122 ("I [Ms. Silberman] don't think Tina understood the skill set that would be required of a Community Site Consultant.")

[13] Highmark's position statement to the EEOC in this matter mistakenly stated that Ms. Swick had a Masters Degree at the time of her selection as Community-Based

Continued on following page

customer service representative in 1997, Ms. Swick worked as a professional social worker (a case worker) in the Erie area, initially at the Area Agency on Aging and later for the Lutheran Home of Erie. Statement of Facts at ¶ 40. Ms. Swick worked as a customer service representative for Highmark for approximately three and one-half years until she accepted the job of Program Assistant in the HealthPLACE center in Erie in 2001. Id. at ¶ 41. Ms. Swick's duties as Program Assistant at HealthPLACE were "probably a fifty-fifty split between dealing with the public and working administratively. There was a lot of detail; a lot of paperwork. . . [Y]ou had to keep things organized and balance several things at once." Id. at ¶ 44. In that job of Program Assistant, Ms. Swick reported directly to Ms. Palaggo-Toy, who gave Ms. Swick an overall rating of Exceeds Expectations for each year that she evaluated Ms. Swick's performance, including the written evaluations of March 2003 and March 2004. Id. at ¶¶ 42-43.

Plaintiff can offer no evidence whatsoever that Ms. Silberman's decision not to select her for the Community-Based Site Consultant job in Erie was motivated by age. Other than the respective ages of herself and Ms. Swick,[14] the "evidence" Plaintiff offers to support her claim is simply her own unsubstantiated belief that the decision was based on age. Her subjective belief, however, is insufficient to sustain Plaintiff's burden on summary judgment.

---

Continued from previous page

Site Consultant. Ms. Silberman did not prepare that document and did not select Ms. Swick because of a mistaken belief about her having a Masters degree. Ms. Silberman correctly understood that Ms. Swick had a bachelor's degree and was working on a Masters degree at the time Ms. Silberman made the decision to offer Ms. Swick the position of Community Site Consultant. See Silberman Dep. at 77-78.

[14]    Ms. Swick is 33 years of age. Statement of Facts at note 8. Plaintiff is 65 years of age.

Plaintiff's own unsubstantiated beliefs, without more, cannot demonstrate pretext. *See Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 414 (3d Cir. 1999) (affirming summary judgment on plaintiff's race discrimination claim because plaintiff lacked evidence of pretext; court noted that many of plaintiff's allegations were "predicate[d] on nothing more than his beliefs without having actual knowledge of them. In fact, a careful analysis of the record demonstrates that many of his allegations simply are not supported"); *Geiger v. AT&T Corp.*, 962 F. Supp. 637, 646 (E.D. Pa. 1997) (granting summary judgment because plaintiff lacked evidence of pretext and noting that plaintiff "has presented no direct or circumstantial evidence of pretext. His subjective belief that AT&T was discriminating against him is insufficient to create a jury issue of pretext.").

As the Third Circuit repeatedly has emphasized, the plaintiff must support a claim of pretext by offering reasonable ***specific*** record evidence. Plaintiff's general feelings – particularly those that are wholly unsupported by the record – simply lack the requisite specificity and are insufficient to rebut Highmark's legitimate business reasons. In essence, Plaintiff merely asserts that discrimination must have been the reason behind Highmark's decision, but as the Third Circuit has opined, "[m]erely reciting that age was the reason for the decision does not make it so." *Billet*, 940 F.2d at 816.

Moreover, nothing in the ADEA or the PHRA required Highmark to offer Plaintiff another position in its organization after it eliminated her position as HealthPLACE Administrator. Likewise, neither the ADEA nor the PHRA required Highmark to favor Plaintiff for a position over a younger, qualified individual. *E.g., Haimovitz v. U.S. Dep't of Justice*, 720 F. Supp. 516, 528 (W.D. Pa. 1989), *aff'd mem*, 902 F.2d 1560 (3d Cir. 1990) (rejecting plaintiff's argument that older employees should have been given preferential treatment and noting that "in the absence of a preponderance of evidence that age is a determinative factor, an employer who is forced to choose between equally qualified candidates cannot be liable for age discrimination"); *Solt v. Alpo Petfoods, Inc.*, 837 F.

Supp. 681, 685 (E.D. Pa. 1993) ("Courts have repeatedly held that ADEA shall not be
construed to suggest that employees are entitled to a preference for age"), aff'd mem, 30
F.3d 1488 (3d Cir. 1994); Sovacool v. Gen'l Tire, Inc., 108 F.3d 1377, 1997 WL 94690, at
*4 (6th Cir. Mar. 4, 1997) (rejecting claim that retention of a less qualified and less
experienced individual was evidence of pretext, reasoning that "[u]nder the ADEA,
however, when an employer reduces its work force for economic reasons, it has no duty to
permit an employee whose job has been eliminated to transfer to another position or to
displace workers with less seniority."); Smith v. Cook County, 74 F.3d 829, 832-33 (7th Cir.
1996) (rejecting inference of discrimination in the context of a reduction in force because
"[f]irst of all, under the ADEA, 'an employer incurs no duty to transfer an employee to
another position . . . .'"); EEOC v. MCI Int'l, Inc., 829 F. Supp. 1438, 1458 (D. N.J. 1993)
(granting summary judgment to employer and stating that "[a] mere recitation by plaintiff of
the fact that younger employees were retained does not begin to show pretext; indeed, to
accept plaintiff's argument would be to say that older workers should be treated more
favorably than younger workers . . . and that, of course, is not the law.").

        Plaintiff's only other purported "evidence" of age discrimination is her own
subjective belief that she was more qualified for the Community-Based Site Consultant job
than Ms. Swick.  She so believes because Ms. Swick was "only her assistant" and "not
really a professional."  Pl's Dep at 118.  Once again Plaintiff's subjective beliefs are
irrelevant and cannot be used to demonstrate pretext.  See Texas Dep't of Community
Affairs v. Burdine, 430 U.S. 248, 259 (1981); Billet, 940 F.2d at 825 (plaintiff's "view of his
performance is not at issue; what matters is the perception of the decisionmaker.  The fact
that an employee disagrees with an employer's evaluation of him does not prove pretext.")
(citations omitted); Healy v. New York Life Ins. Co., 860 F.2d 1209, 1220 (3d Cir. 1988)
(explaining plaintiff's effort to compare his qualifications to those of other employees is
legally insufficient to cast doubt on an employer's legitimate, articulated reason for its

employment decision); *Farahmand v. Cohen*, No. Civ. A. 97-7952, 1999 WL 672926, at *4 (E.D. Pa. Aug. 24, 1999) (concluding that "plaintiff's own view of his performance, or the view of the Court, is not a relevant issue in a discrimination case), *aff'd mem.*, 275 F.3d 34 (3d Cir. 2001); *see also Beall v. Abbott Laboratories*, 130 F.3d 614, 620 (4th Cir. 1997) ("'[I]t is the perception of the decision maker which is relevant' not the self-assessment of the plaintiff").

Plaintiff must do more than show that an employer's decision is unfair or mistaken. "'The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination].'" *Keller*, 130 F.3d at 1109. In short, as the Third Circuit has emphasized, managerial decisions should not be second-guessed under the cover of employment discrimination laws in the absence of evidence indicating that an employer acted with specific discriminatory intent. *Fuentes*, 32 F.3d at 765; *see also Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531, 533 (3d Cir. 1992); *Gray v. York Newspapers*, 957 F.2d 1070 (3d Cir. 1992).

## IV.    CONCLUSION

Plaintiff can proffer *no* evidence whatsoever to demonstrate that age or gender played *any* role in Highmark's decisions to eliminate Plaintiff's position or not to offer Plaintiff another position in the new organization. Indeed, Plaintiff's "evidence" simply amounts to her unsubstantiated belief that age or gender played a role – "evidence" that is clearly insufficient under well-established precedent. Highmark, therefore, is entitled to summary judgment as a matter of law as to the Complaint in its entirety.

Respectfully submitted,


s/ Martha Hartle Munsch
Martha Hartle Munsch
Pa. ID No. 18176
Shweta Gupta
Pa. ID No. 84388
REED SMITH LLP
435 Sixth Avenue
Pittsburgh, PA  15219
412-288-4118


Carl H. Shuman
Highmark Inc.
Pa. ID No. 37506
1800 Center Street
Camp Hill, PA  17089


Counsel for Defendant
Highmark, Inc.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Memorandum Of Law

In Support Of Highmark's  Motion For Summary Judgment was served upon counsel for

Plaintiff electronically and by United States mail, first class and postage prepaid, at

Pittsburgh, Pennsylvania, on this 19th day of December, 2005, addressed as follows:


Joel S. Sansone
Scanlon & Sansone
2300 Lawyers Building
Pittsburgh, PA  15219
scanlon2sansone@aol.com

Counsel for Plaintiff


s/ Martha Hartle Munsch
Counsel for Defendant