**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOY SWEETING, | ) |
| Plaintiff, | ) Civil Action No. 04-368 – Erie |
| v. | ) The Honorable Sean J. McLaughlin |
| HIGHMARK INC., | ) Filed Electronically |
| Defendant | ) |

## DEFENDANT'S PRETRIAL NARRATIVE STATEMENT

### I.    INTRODUCTION

In this action, Plaintiff contends that Highmark Inc. ("Highmark" or "Defendant") discriminated against her on the basis of her gender and/or her age when it (i) eliminated her position as HealthPLACE Administrator when the HealthPLACE system was dissolved; and (ii) did not offer her another position in the successor organization.  The evidence will show, however, that Highmark made these decisions for legitimate, non-discriminatory business reasons, and Plaintiff cannot offer any evidence to show that Highmark's stated reasons were merely a pretext for gender or age discrimination.  This case should not proceed to trial because summary judgment should be entered in favor of Highmark.[1]  If there is a trial, however, Highmark will establish the following through oral testimony and exhibits.

---

[1]    Highmark filed its Motion for Summary Judgment on December 19, 2005.

## II.   BRIEF NARRATIVE STATEMENT OF FACTS TO BE OFFERED AT TRIAL

Highmark is a health plan corporation.  Among its many business activities, Highmark engages in health promotion and disease prevention/wellness activities.  In or about the early 1990's, Highmark embarked on a wellness/health promotion initiative known as HealthPLACE.  In the HealthPLACE business model, Highmark had "bricks and mortar" locations (known as HealthPLACE centers) where Highmark offered various classes, programs and screenings on disease prevention and wellness to members of the community.

In or about October 1994, Plaintiff was hired by Highmark to become the Administrator of the HealthPLACE center located in Erie, Pennsylvania.  In this non-management position, Plaintiff reported to Tina Palaggo-Toy, who in turn reported at that time to Anna Silberman, Vice President.  Ms. Silberman was the decisionmaker in this case.  She is 51 years of age.  She has been employed with Highmark (or one of Highmark's corporate predecessors or affiliates) for 16 years.[2]

In or about 1996, Ms. Silberman approved adding a Program Assistant position to the staff in the HealthPLACE center in Erie, primarily to handle the administrative duties for that location.  Ms. Silberman recalls that Plaintiff needed assistance to get the administrative work done as HealthPLACE Administrator, and that the Program Assistant position was created to work with Plaintiff in the Erie region because the administrative work was not getting done when Plaintiff was working alone in that office.  In 2001, Rebecca Swick became the Program Assistant in the HealthPLACE center located in Erie.  Ms. Swick also reported directly to Ms. Palaggo-

---

[2]     At all times relevant to this case, Ms. Silberman reported to Aaron Walton, Highmark's Senior Vice President of Corporate Affairs.  Mr. Walton is 58 years of age.

Toy.  Plaintiff and the Program Assistant were the only two employees in the Erie HealthPLACE.

In or about April 2000, Ms. Silberman assumed a new position in Highmark (President and CEO of LifeStyle Advantage) and no longer oversaw HealthPLACE.[3]  Ms. Silberman returned to a management role with HealthPLACE in early 2004.  From April 2000 until Ms. Silberman's return, Bradley Pifalo, M.D. was the Vice President to whom HealthPLACE reported.

In late 2003, Aaron Walton determined that the HealthPLACE system was not a successful business model for achieving Highmark's business objectives in health promotion and wellness.  Likewise, at or about the same time, he decided that LifeStyle Advantage should be closed.  Mr. Walton decided that a new business model should be created to carry out Highmark's wellness and health promotion objectives.  He assigned Ms. Silberman to develop and implement an appropriate business model and organizational structure to replace HealthPLACE and Lifestyle Advantage.

On or about December 12, 2003, Mr. Walton sent a memorandum to staff announcing that he had made certain organizational changes within Corporate Affairs to enhance "the area's ability to support Highmark's mission and strategic direction through data-driven initiatives and scientifically based interventions."  In that memorandum, Mr. Walton also announced that Ms. Silberman would assume

---

3    Lifestyle Advantage was an organization that was formed to work with other Blue Cross plans across the country to implement the Dean Ornish program for reversing heart disease.  Although Ms. Silberman did not directly supervise HealthPLACE while she was President of Lifestyle Advantage, those two units "were very closely related" and Ms. Silberman remained in contact with the individuals involved with HealthPLACE and she continued to report directly to Mr. Walton.

responsibility for a new Preventive Health Services Division.  He explained that this Division "will expand Highmark's capabilities for delivering customer focused health promotion and disease prevention activities throughout our 49-county service region." Further, he announced that Ms. Silberman will be responsible for the "re-positioning of services traditionally delivered through our HealthPLACE and Primary Care Centers to enhanced delivery models."

Plaintiff and other employees of HealthPLACE were informed by Mr. Walton at a meeting in late 2003 or January 2004 that some of the HealthPLACE centers had already been closed and that Highmark would be closing the remaining HealthPLACE centers within the next month or so.

The organization known as HealthPLACE was dissolved and all HealthPLACE Administrator jobs (including Plaintiff's) were eliminated by the end of March 2004.  Plaintiff's position was eliminated because all HealthPLACE Centers closed.  Plaintiff was notified on March 15, 2004 that the HealthPLACE center in Erie was officially closed and that her job was eliminated.  Plaintiff admits that it was no surprise to her on March 15 that the Erie HealthPLACE center was closing.

In the new business model for Preventive Health Services, Highmark no longer operates its own facilities for health promotion, disease prevention and wellness activities.  Instead, Highmark has established regional networks of community-based organizations which have agreed to deliver programs developed and monitored by Highmark, and to collect data concerning the clinical outcomes resulting from the programming.  These outcomes are expected to reduce health risk and thereby reduce claims utilization for preventable disease and disability among Highmark subscribers. Likewise, in the new organizational structure, Highmark continues to work with Highmark's corporate customers to develop effective worksite wellness operating plans

with the goal of improving, among other things, their employees' lifestyle behaviors, health risk status, productivity, and ultimately healthcare costs.

For the new Preventive Health Services organization, Ms. Silberman created positions known as Worksite-Based Site Consultants, Community-Based Site Consultants, and Hospital-Based Site Consultants. In filling the job of Community-Based Site Consultant, Ms. Silberman was not looking for someone to teach or present wellness programs. This job is not a teaching job. To the contrary, Ms. Silberman was looking for an administrator who is detail-oriented with solid interpersonal skills who could develop and oversee a network of community sites and assure that those network sites are delivering the specified programs according to standardized protocols and returning solid clinical outcomes as reflected in data-driven reporting and analyses. For the position of Hospital-Based Site Consultant, Ms. Silberman was looking for individuals with all of the skills and abilities expected of a Community-Based Site Consultant. In addition, a healthcare clinical specialty was required. With respect to Worksite-Based Site Consultants, the work encompassed by this job was actually already being done prior to the new organization as part of Highmark's worksite wellness initiative (also referred to as HealthPLACE@work).

Ms. Silberman was responsible for deciding who would have jobs in the new Preventive Health Services organization. She made those decisions in the first quarter of 2004. Ms. Silberman did not offer Plaintiff a position in the new organization. Her decision was based solely on non-discriminatory business reasons.

In making her decision not to offer a position to Plaintiff in the new organization, Ms. Silberman reviewed, among other things, at least the two most recent written performance evaluations on Plaintiff. In the most recent written performance evaluation available to Ms. Silberman (which had been prepared by Ms. Palaggo-Toy in

June 2003 and approved by Dr. Pifalo), Plaintiff had received from Ms. Palaggo-Toy a rating of "Does Not Meet Expectations" for her objective dealing with the worksite wellness initiative.

In performance year 2002-03, fifty percent of Plaintiff's performance objectives involved following the worksite wellness business plan and improving the delivery and evaluation of the data-driven worksite wellness model with local, regional and national accounts in the Erie region. After reviewing this performance evaluation of Plaintiff, Ms. Silberman "was very concerned" with Plaintiff's lack of productivity and achievement on this significant (50 percent) aspect of her job duties. Ms. Silberman noticed from the review that Plaintiff "had only one account that had completed baseline and follow-up screening; it's also a matter of productivity. One account in an area where we have a huge customer base like Erie is… not enough accomplishment, not enough achievement."

Additionally, due to various events which had come to Ms. Silberman's attention over the years, Ms. Silberman had developed negative impressions of Plaintiff even before reading the aforementioned performance evaluation. Those negative impressions which Ms. Silberman recalled included having "some concerns about [Plaintiff's] interactions with the public, and we were serving the public."

Ms. Silberman specifically remembered an occasion when one of Highmark's customers in Erie who was attending a program had a negative experience involving Plaintiff and wrote a letter to complain about it. "We don't get many complaints in our area, and I remember there being a significant complaint about [Plaintiff]," including a complaint that Plaintiff had been rude to the customer. In that written complaint, the customer (a policyholder and small business owner in Erie) complained that Plaintiff was "extremely unprofessional" and "rude":

> I have watched her be short with several other members of the
> Yoga class on several occasions, several people in the class have
> remarked on it to me and at least two people have stopped coming
> due to her attitude.  And yesterday she turned on me....  I feel you
> would want to know that you have someone working for you who
> behaves in a rude manner in a customer service position, to your
> customers who go to these classes to help alleviate stress not
> create more of it.

That complaint from a customer "stuck with" Ms. Silberman.  "You know,
that wasn't the entire decision, but I can say that it's so rare for us to get that type of
complaint that it did stick with me."  It contributed to Ms. Silberman's decision not to
offer Plaintiff a job in the new Preventive Health Services organization.  Ms. Silberman
also recalled that there had been other complaints of this nature about Plaintiff, albeit
not written.

From the time that she started at Highmark, Plaintiff had ongoing
interactions with Ms. Silberman.  Another event which contributed to Ms. Silberman's
negative impression of Plaintiff involved an assignment to implement a system-wide
arthritis program based on a training course Plaintiff had attended in California.
Ms. Silberman "never really saw that [program] materialize to its potential."
Ms. Silberman explained further:

> "I do not recall seeing that program move to its potential,... I did not
> see it written up in the newspaper like a lot of our other things were
> of equal or of significant investment.  I did not see, you know, a lot
> of people training in this who then were motivated to continue to
> deliver the program.  I don't recall seeing any significant amounts of
> data that came out of that program or outcomes of any nature that
> came out of the program that were parallel to the other work that
> was being delivered to our customers."

Yet another event which contributed to Ms. Silberman's negative
impression of Plaintiff involved an expense report submitted by Plaintiff to
Ms. Silberman that included illegitimate expenses.  Ms. Silberman recalls being
"astounded by" this incident at the time it occurred.

- 7 -

Ms. Silberman also had the general impression that Plaintiff was administratively weak.  She also recalls receiving negative feedback about Plaintiff from Dr. Pifalo and from a Highmark marketing executive, Deborah Rice.

In mapping her staff for the new Preventive Health Services organization, Ms. Silberman determined that she only needed one person based in Erie, and that would be a Community-Based Site Consultant.  Ms. Silberman determined that Plaintiff was not qualified for the position of Community-Based Site Consultant.   Instead she selected Rebecca Swick for that position in Erie.

Ms. Swick has a Bachelor of Arts degree in social work from the University of Pittsburgh and recently received a Master's Degree in Public Administration from Gannon University.[4]  Prior to joining Highmark in Erie as a customer service representative in 1997, Ms. Swick was a professional social worker (a case worker) in the Erie area, initially at the Area Agency on Aging and later for the Lutheran Home of Erie.

Ms. Swick worked as a customer service representative for Highmark for approximately three and one-half years until she accepted the job of Program Assistant in the HealthPLACE center in Erie in 2001.  Ms. Swick's immediate supervisor as Program Assistant for HealthPLACE was Ms. Palaggo-Toy.  Ms. Palaggo-Toy gave Ms. Swick an overall rating of Exceeds Expectations for each year that she evaluated Ms. Swick's performance, including the written evaluations of March 2003 and March 2004.

Ms. Swick's duties as Program Assistant at HealthPLACE were "probably a fifty-fifty split between dealing with the public and working administratively.  There was

---

4      Ms. Swick is 33 years of age.

a lot of detail; a lot of paperwork . . . [Y]ou had to keep things organized and balance several things at once." Ms. Swick's new job of Community Site Consultant is "mostly administrative." It involves (among other things) choosing community sites to deliver the wellness programming pursuant to established criteria (e.g., a local YMCA), implement, market and monitor the programming, and generate/evaluate paperwork regarding the outcomes of the programming. The position of Community-Based Site Consultant does not involve teaching the classes.

Mr. Vickers Ward had been working for Highmark as part of the Worksite Wellness team prior to the dissolution of HealthPLACE. In that position, he had been performing the duties of a Worksite-Based Site Consultant. In early 2004, Ms. Silberman reviewed at least the two most recent written performance evaluations on Mr. Ward and found that he had received an overall rating of "Exceeds Expectations" in each of those years for his work on the Worksite Wellness team. For example, Mr. Ward's annual evaluation dated September 25, 2003, reflects that he was responsible for successfully launching the HealthPLACE@work program in the central Pennsylvania region while at the same time continuing to provide a high level of service to Highmark group accounts assigned to him in western Pennsylvania and nationally.

Ms. Silberman did not hire a Worksite-Based Site Consultant for the Erie region because she determined that the Company did not need a full-time person dedicated to worksite wellness in Erie. Instead, she assigned Mr. Ward to pick up worksite wellness responsibilities for the Erie region in addition to his existing worksite responsibilities in western Pennsylvania.

In any event, Ms. Silberman did not consider Plaintiff qualified to hold a Worksite-Based Site Consultant position. She had received a "Does Not Meet Expectations" rating from Ms. Palaggo-Toy on the worksite wellness aspect of her job

duties on her most recent written performance evaluation that Ms. Silberman had reviewed in early 2004.

After the decision had been made not to offer Plaintiff a job in the new organization, Plaintiff was given a temporary assignment for six additional months to extend her service to be eligible for certain insurance benefits. Hence, Plaintiff's separation date with Highmark was mid-October 2004.

### III.    BRIEF STATEMENT OF HIGHMARK'S DEFENSES

In this action, Plaintiff challenges (i) Highmark's decision to eliminate her position as HealthPLACE Administrator in Erie; and (ii) Highmark's decision not to offer her a position in the successor Preventive Health Services organization. There is no direct evidence of age or gender discrimination as to either of these decisions. Therefore, to sustain her claim of age and/or gender discrimination, Plaintiff must proceed under the familiar *McDonnell Douglas* burden-shifting framework. Under this framework, if Plaintiff demonstrates a *prima facie* case of age or gender discrimination, the burden then shifts to Highmark simply to articulate (not prove) a non-discriminatory business reason for its decisions to eliminate Plaintiff's position and to not offer her a position in the next organization. Plaintiff must then prove that Highmark's stated reasons were a pretext for unlawful discrimination.

Assuming only for purposes of argument that Plaintiff could establish a *prima facie* case, her claims for age and gender discrimination are without merit because the evidence will demonstrate that Highmark's decisions were based on legitimate, non-discriminatory business reasons *and* Plaintiff cannot proffer any evidence to show that those reasons were a pretext for either age or gender discrimination.

It cannot be disputed that Plaintiff's position as HealthPLACE Administrator was eliminated with the dissolution of HealthPLACE and the closing of the HealthPLACE center located in Erie, Pennsylvania. The decision to dissolve HealthPLACE and, accordingly, to eliminate Plaintiff's position as HealthPLACE Administrator was based on legitimate, non-discriminatory business reasons, as described above. Plaintiff can offer no evidence that these stated reasons for the decision to eliminate her job as HealthPLACE Administrator were a pretext for age and/or gender discrimination. There is *no* evidence, let alone "reasonable, specific evidence," that this decision was motivated by unlawful discriminatory animus towards Plaintiff.

Plaintiff also challenges Highmark's decisions not to offer her a position in Erie as either a Worksite-Based Site Consultant or a Community-Based Site Consultant in the new Preventive Health Services organization. She alleges that the decision not to do so was purportedly because of her gender and/or her age. Contrary to Plaintiff's allegations, Highmark's staffing decisions were based solely on non-discriminatory business reasons, again as described above. Further, as with the decision to eliminate Plaintiff's position as HealthPLACE Administrator, Plaintiff again cannot produce any evidence to cast doubt upon the credibility of Highmark's stated reasons for not selecting Plaintiff for either of these positions.

Ms. Silberman did not consider Plaintiff qualified to hold a Worksite-Based Site Consultant position, especially since Plaintiff had received a "Does Not Meet Expectations" rating on the worksite wellness aspect of her job duties on her most recent written performance evaluation that Ms. Silberman had reviewed in early 2004. Moreover, Plaintiff admitted in her deposition that she was not necessarily more qualified that Mr. Ward for the position of Worksite-Based Site Consultant. In short, Plaintiff can offer no evidence whatsoever to discredit Ms. Silberman's reasons for not

selecting Plaintiff for the position of Worksite-Based Site Consultant in the new organization nor can she otherwise show that these reasons are a pretext for gender or age discrimination.

Plaintiff, likewise, can offer no evidence that Highmark's stated reasons for not offering her the position of Community-Based Site Consultant in Erie were pretextual.  Contrary to Plaintiff's conclusory allegations, Ms. Silberman's decision to offer that position to Rebecca Swick rather than to Plaintiff was not based on age.  Rather, Ms. Silberman determined that Plaintiff was not qualified for that job, period.  Furthermore, Ms. Silberman considered Ms. Swick to be well qualified for the position of Community-Based Site Consultant.[5]

Plaintiff can offer no evidence whatsoever that Ms. Silberman's decision not to select her for the Community-Based Site Consultant job in Erie was motivated by age.  Other than the respective ages of herself and Ms. Swick, the "evidence" Plaintiff offers to support her claim is simply her own unsubstantiated belief that the decision was based on age.  Her subjective belief, however, is insufficient to sustain Plaintiff's burden.

Plaintiff's own unsubstantiated beliefs, without more, cannot demonstrate pretext.  *See Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 414 (3d Cir. 1999) (affirming summary judgment on plaintiff's race discrimination claim because plaintiff lacked evidence of pretext; court noted that many of plaintiff's allegations were

---

[5]    For the position of Hospital-Based Site Consultant, Ms. Silberman was looking for individuals with all of the skills and abilities expected of a Community-Based site Consultant.  In addition, a healthcare clinical specialty was required.  Ms. Silberman determined that she did not need a Hospital-Based Site Consultant based in Erie, and Plaintiff is not claiming that she should have been offered such a position.

"predicate[d] on nothing more than his beliefs without having actual knowledge of them. In fact, a careful analysis of the record demonstrates that many of his allegations simply are not supported"); *Geiger v. AT&T Corp.*, 962 F. Supp. 637, 646 (E.D. Pa. 1997) (granting summary judgment because plaintiff lacked evidence of pretext and noting that plaintiff "has presented no direct or circumstantial evidence of pretext. His subjective belief that AT&T was discriminating against him is insufficient to create a jury issue of pretext.").

As the Third Circuit repeatedly has emphasized, the plaintiff must support a claim of pretext by offering reasonable *specific* record evidence. Plaintiff's general feelings – particularly those that are wholly unsupported by the record – simply lack the requisite specificity and are insufficient to rebut Highmark's legitimate business reasons. In essence, Plaintiff merely asserts that discrimination must have been the reason behind Highmark's decision, but as the Third Circuit has opined, "[m]erely reciting that age was the reason for the decision does not make it so." *Billet*, 940 F.2d at 816.

Moreover, nothing in the ADEA or the PHRA required Highmark to offer Plaintiff another position in its organization after it eliminated her position as HealthPLACE Administrator. Likewise, neither the ADEA nor the PHRA required Highmark to favor Plaintiff for a position over a younger, qualified individual. *E.g., Haimovitz v. U.S. Dep't of Justice*, 720 F. Supp. 516, 528 (W.D. Pa. 1989), *aff'd mem*, 902 F.2d 1560 (3d Cir. 1990) (rejecting plaintiff's argument that older employees should have been given preferential treatment and noting that "in the absence of a preponderance of evidence that age is a determinative factor, an employer who is forced to choose between equally qualified candidates cannot be liable for age discrimination"); *Solt v. Alpo Petfoods, Inc.*, 837 F. Supp. 681, 685 (E.D. Pa. 1993) ("Courts have repeatedly held that ADEA shall not be construed to suggest that employees are entitled to a preference for age"), *aff'd mem*, 30 F.3d 1488 (3d Cir.

1994); *Sovacool v. Gen'l Tire, Inc.*, 108 F.3d 1377, 1997 WL 94690, at *4 (6th Cir. Mar.

4, 1997) (rejecting claim that retention of a less qualified and less experienced individual

was evidence of pretext, reasoning that "[u]nder the ADEA, however, when an employer

reduces its work force for economic reasons, it has no duty to permit an employee

whose job has been eliminated to transfer to another position or to displace workers

with less seniority."); *Smith v. Cook County*, 74 F.3d 829, 832-33 (7th Cir. 1996)

(rejecting inference of discrimination in the context of a reduction in force because "[f]irst

of all, under the ADEA, 'an employer incurs no duty to transfer an employee to another

position . . . .'"); *EEOC v. MCI Int'l, Inc.*, 829 F. Supp. 1438, 1458 (D. N.J. 1993)

(granting summary judgment to employer and stating that "[a] mere recitation by plaintiff

of the fact that younger employees were retained does not begin to show pretext;

indeed, to accept plaintiff's argument would be to say that older workers should be

treated more favorably than younger workers . . . and that, of course, is not the law.").

Plaintiff's only other purported "evidence" of age discrimination is her own

subjective belief that she was more qualified for the Community-Based Site Consultant

job than Ms. Swick.  She so believes because Ms. Swick was "only her assistant" and

"not really a professional."  Pl's Dep at 118.  Once again Plaintiff's subjective beliefs are

irrelevant and cannot be used to demonstrate pretext.  *See Texas Dep't of Community

Affairs v. Burdine,* 430 U.S. 248, 259 (1981); *Billet*, 940 F.2d at 825 (plaintiff's "view of

his performance is not at issue; what matters is the perception of the decisionmaker.

The fact that an employee disagrees with an employer's evaluation of him does not

prove pretext.") (citations omitted); *Healy v. New York Life Ins. Co.*, 860 F.2d 1209,

1220 (3d Cir. 1988) (explaining plaintiff's effort to compare his qualifications to those of

other employees is legally insufficient to cast doubt on an employer's legitimate,

articulated reason for its employment decision); *Farahmand v. Cohen*, No. Civ. A. 97

7952, 1999 WL 672926, at *4 (E.D. Pa. Aug. 24, 1999) (concluding that "plaintiff's own

view of his performance, or the view of the Court, is not a relevant issue in a discrimination case), *aff'd mem.*, 275 F.3d 34 (3d Cir. 2001); see also *Beall v. Abbott Laboratories*, 130 F.3d 614, 620 (4th Cir. 1997) ("'[I]t is the perception of the decision maker which is relevant' not the self-assessment of the plaintiff").

Plaintiff must do more than show that an employer's decision is unfair or mistaken. "'The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination].'" *Keller*, 130 F.3d at 1109. In short, as the Third Circuit has emphasized, managerial decisions should not be second-guessed under the cover of employment discrimination laws in the absence of evidence indicating that an employer acted with specific discriminatory intent. Fuentes, 32 F.3d at 765; *see also Ezold v. Wolf, Block, Schorr & Solis Cohen*, 983 F.2d 509, 531, 533 (3d Cir. 1992); *Gray v. York Newspapers*, 957 F.2d 1070 (3d Cir. 1992).

In sum, Plaintiff can proffer no evidence whatsoever to demonstrate that age or gender played any role in Highmark's decisions to eliminate Plaintiff's position or not to offer Plaintiff another position in the new organization. Indeed, Plaintiff's "evidence" simply amounts to her unsubstantiated belief that age or gender played a role – "evidence" that is clearly insufficient under well-established precedent.

## IV.    THE FACTS DO NOT SUPPORT PLAINTIFF'S DAMAGE CLAIMS

Highmark is not liable to Plaintiff for any of the lost wages, counsel fees, costs and/or other relief which Plaintiff seeks in this suit because Highmark did not engage in any unlawful treatment of Plaintiff. On the contrary, Highmark's actions and decisions regarding Plaintiff were lawful. Thus, Highmark is not liable to Plaintiff in any way or for any of the relief she seeks.

Highmark will call witnesses and/or introduce exhibits at trial to rebut the relief claimed by Plaintiff, if necessary.  Among other things, the calculation of Plaintiff's alleged damages is excessive and highly speculative.  Plaintiff also has failed to mitigate her alleged damages.

## V.    LEGAL ISSUES WHICH MIGHT BE DISPUTED

The following legal issues might be contested prior to or at trial.

1.    What constitutes the order and burdens of proof with respect to Plaintiff's claims under Title VII, the ADEA and the PHRA?

2.    There may be certain legal issues concerning admissibility of evidence at trial which Highmark would address at that time or via appropriate motions in limine prior to trial.

## VI.    EXPERT REPORTS

None.

## VII.    WITNESSES

Highmark reserves the right to call at trial any of the persons listed as witnesses in Plaintiff's Pretrial Statement and any person whose testimony is required for purposes of rebuttal or impeachment.  In addition, Highmark lists the following persons as witnesses:

## A.    Liability

1.    Anna L. Silberman
      Highmark Inc.
      120 Fifth Avenue
      Pittsburgh, PA  15222

2.    Aaron Walton
      Highmark Inc.
      120 Fifth Avenue
      Pittsburgh, PA  15222

3.    Tina Palaggo-Toy
      Highmark Inc.
      120 Fifth Avenue
      Pittsburgh, PA  15222

4.    Cynthia Mori
      Highmark Inc.
      120 Fifth Avenue
      Pittsburgh, PA  15222

5.    Rebecca Swick
      Preventive Health Services
      Highmark Inc.
      510 Cranberry Street
      Erie, PA  16507

6.    Patrick McCauley
      Highmark Inc.
      120 Fifth Avenue
      Pittsburgh, PA  15222

7.    Vickers Ward
      Highmark Inc.
      120 Fifth Avenue
      Pittsburgh, PA  15222

8.    Deborah Rice
      Highmark Inc.
      120 Fifth Avenue
      Pittsburgh, PA  15222

9.    W. Bradley Pifalo, M.D.
      Highmark Inc.
      120 Fifth Avenue
      Pittsburgh, PA  15222

10.   All liability witnesses listed by Plaintiff in her Pretrial Statement.

11.   All witnesses needed for rebuttal or impeachment

**B.    Damages**

1.    Cynthia Mori
      Highmark Inc.
      120 Fifth Avenue
      Pittsburgh, PA  15222

2.    Anna L. Silberman
      Highmark Inc.
      120 Fifth Avenue
      Pittsburgh, PA  15222

3.    All damages witnesses listed by Plaintiff in her Pretrial Statement

4.    All witnesses needed for rebuttal or impeachment

## VIII.    <u>EXHIBITS</u>

Highmark reserves the right to offer into evidence any exhibits listed by Plaintiff in her Pretrial Statement and any exhibits needed for purposes of rebuttal or impeachment.  In addition, Highmark lists the following as exhibits:

| <u>Identifying Mark</u> | <u>Description</u> |
|---|---|
| A | Memorandum dated December 12, 2003 from Aaron Walton to Staff List A, B and C |
| B | Memorandum dated March 16, 2004 from Aaron Walton to Staff A, B and C |
| C | Plaintiff's written performance evaluation for 6/12/99 to 6/2/2000 |
| D | Plaintiff's written performance evaluation for 6/2000 to 6/2001 |
| E | Plaintiff's written performance evaluation for 6/2001 to 6/2002 |
| F | Plaintiff's written performance evaluation for 6/2002 to 6/2003 |
| G | Plaintiff's written performance evaluation for 6/2003 to 3/2004 |
| H | Letter of complaint regarding Plaintiff from Jan Thompson dated July 16, 1998 |
| I | Rebecca Swick's written performance evaluation for August 6, 2000 to March 2001 |
| J | Ms. Swick's written performance evaluation for March 2001 to March 2002 |
| K | Ms. Swick's written performance evaluation for March 2002 to March 2003 |

| | |
|---|---|
| L | Ms. Swick's written performance evaluation for March 2003 to March 2004 |
| M | Vickers Ward's written performance evaluation for August 2001 to August 2002 |
| N | Mr. Ward's written performance evaluation for August 2002 to August 2003 |
| O | Two-page memo entitled Performance Review 2003 |
| P | Undated memo from Joy to Tina, with handwritten note at bottom dated 7/2003 |
| Q | Handwritten notes (Bates D-0110) |
| R | Typed list of employees by name, Id number, job title, etc. (Bates No. D-0416) |
| S | Position description dated 3/24/04 for Community Site Consultant |
| T | Position description for Worksite Based Site Consultant |
| U | Position description for Hospital Based Site Consultant |
| V | Plaintiff's memo to Tina dated March 12, 2004 |
| W | Plaintiff's memo to Patrick McCauley and Tina Pallago Toy dated March 2004 |
| X | Plaintiff's handwritten notes dated 3/3 |
| Y | Plaintiff's lists of worksite accounts |
| Z | Plaintiff's memo dated March 15, 2004 |
| AA | Highmark's equal employment opportunity policy statement |
| BB | Plaintiff's income tax returns and other records of earnings since her departure from Highmark |
| CC | Plaintiff's list of positions applied for since 3-15-05 |
| DD | Plaintiff's resume (single page, produced in discovery by Plaintiff) |
| EE | EEOC's Dismissal Notice regarding Plaintiff's EEOC charge |

Defendant's counsel will indicate agreement or disagreement as to the authenticity and admissibility of Plaintiff's exhibits after Defendant's counsel ahs had an opportunity to review them following an exhibit exchange.

Highmark will seek leave of Court to file an Amended Pretrial Statement, if necessary, should additional information come to the attention of Highmark which warrants an amendment of Highmark's Pretrial Narrative, Highmark's list of witnesses, or Highmark's list of exhibits.

## IX.   DEPOSITIONS

Highmark does not presently anticipate that any deponent will be unavailable to testify in person at trial.  As such, Highmark intends to use deposition testimony when necessary to rebut or impeach the testimony offered by Plaintiff at trial. If, however, any deponent is not available to testify in person at the time of trial, Highmark reserves the right to read the deposition testimony (or part thereof) of that deponent into the trial record.

## X.   TRIAL TIME

Highmark estimates that it may take approximately 2 days to present its case-in-chief.

## XI.    <u>CONCLUSION</u>

In conclusion, Highmark respectfully submits that judgment should be entered in its favor and that Highmark should be awarded its attorneys' fees and costs for the defense of this action.

Respectfully submitted,

s/ Martha Hartle Munsch
Martha Hartle Munsch
Pa. ID No. 18176
Shweta Gupta
Pa. ID No. 84388
REED SMITH LLP
435 Sixth Avenue
Pittsburgh, PA  15219
412-288-4118

Counsel for Defendant
Highmark Inc.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Defendant's Pretrial Narrative Statement was served upon counsel for Plaintiff electronically and by United States mail, first class and postage prepaid, at Pittsburgh, Pennsylvania, on this 9th day of January, 2006, addressed as follows:

> Joel S. Sansone
> Scanlon & Sansone
> 2300 Lawyers Building
> Pittsburgh, PA  15219
> scanlon2sansone@aol.com
>
> Counsel for Plaintiff

s/ Martha Hartle Munsch
Counsel for Defendant