IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOY SWEETING | ) | CIVIL ACTION NO. 04-0368 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| HIGHMARK, INC., | ) | Honorable Sean McLaughlin |
| | ) | |
| Defendant. | ) | Electronically Filed. |

PLAINTIFF'S COUNTERSTATEMENT OF MATERIAL FACTS

COMES NOW, the Plaintiff, JOY SWEETING, by her attorneys, SCANLON & SANSONE, and JOEL S. SANSONE, ESQUIRE, and hereby files the following Counterstatement of Material Facts, of which the following is a statement:

**PRIMA FACIE CASE**

*Qualifications*

1. Plaintiff received her Bachelor's Degree in 1959, and her Master's Degree in Education in 1972 (Excerpts of Plaintiff's Deposition ("Plaintiff's Depo.") attached to Plaintiff's Appendix ("Plaintiff's App") at Exhibit A, p. 5).

2. At the time of the Plaintiff's termination, Rebecca Swick, who was chosen for the Community Site Coordinator position over the Plaintiff, did not have her Master's Degree. She did not receive her Master's until December of 2005, nearly two years after being awarded that

position. (Excerpts of Rebecca Swick Deposition ("Swick Depo.") attached to Plaintiff's App at Exhibit C, p. 4).[1]

3.      A Master's Degree in various disciplines, including Education, was the preferred degree for the position of Community Site Coordinator. (*See* Position Description attached to Plaintiff's App at Exhibit J).

4.      Ms. Swick's duties as Community Site Consultant include:

> *       Establishing and keeping "on track" various community organizations that have adopted the Defendant's programming. (Swick Depo., p. 19).
>
> *       Mostly Administrative Tasks (*Id.*).
>
> *       Various Duties including: (*Id.*, pp. 21-22).
>
>> ∨ Choose community locations (i.e. sites to deliver the program)
>> ∨ Determine if staff is able to manage program
>> ∨ Implement training
>> ∨ Work with marketing program
>> ∨ Try to get people in the door
>> ∨ Paperwork
>> ∨ Restaffing issues
>> ∨ Basically "babysitting" the programs at each location
>> ∨ Hands on/Putting out fires
>> ∨ Keeping programs up and running
>> ∨ Making sure the word is out there
>> ∨ Insuring quality in the programs
>> ∨ Insuring respect for the guidelines

5.      With respect to each job duty described above, Plaintiff is fully qualified to perform each of those functions, and Plaintiff has more experience than Ms. Swick in all of the areas listed. In fact, in many areas of responsibility, Plaintiff trained Rebecca Swick, and was therefore

---

[1] Inexplicably, the Defendant told the E.E.O.C. that Ms. Swick had a Master's Degree at the time that she was awarded the position. (*See* Defendant's Position Statement to the E.E.O.C., Plaintiff's App, Exhibit I). The Defendant's Human Resources representative denied any attempt to enhance Ms. Swick's credentials in order to make her appear a more qualified for the position. (Mori Depo., pp. 27, 31-32) Apparently, the significance of this "accident" was lost upon her.

responsible for the majority of the experience which she had at the time she was awarded the position. (Plaintiff's Affidavit attached to Plaintiff's App at Exhibit H, para. 3).

6. With respect to the specific duties listed above, Plaintiff's experience in those areas at the time of her termination from the Defendant was as follows:

* **"Establish and keep on track community organizations that adopt Highmark programming"**

    Plaintiff's experience working with community businesses and organizations in the Erie area includes direct support and regular contact in order to "keep on track" those organizations working with Highmark programs. Plaintiff began that type of experience over 10 years prior to her termination, and personally trained Rebecca Swick in this area, and introduced her to all of her contacts in the Erie Community. For many years, Plaintiff served on the Erie County Health Education Board, whose members represented the Erie County health educators in the non-profit area, which was a significant part of the Defendant's target customer base. Ms. Swick was never a part of this organization, and did not have those, and other significant contacts in the Erie community.

* **"Mostly Administrative"**

    In Plaintiff's position as manager of HealthPlace, she was required to perform a significant amount of administrative duties, including the administration of Defendant's programs. This included contracting with various educators to teach these programs, as well as scheduling and organizing these programs, together with following up on each of the programs to assure quality. Plaintiff personally instructed Ms. Swick on how to accomplish these administrative tasks, as well as the overall importance of strong administration to the success of Defendant's programs.

* **"Various Duties"**

    Each of the duties listed by Ms. Swick in her deposition (pp. 21-22) is a duty which Plaintiff performed for many years before Ms. Swick became Plaintiff's assistant. Plaintiff personally trained Ms. Swick in a number of these duties, including working with the marketing programs and recruiting. As to others of those duties, at the time Ms. Swick was given the position, she had little or no experience. Those duties include choosing community locations, determining staff capabilities, implementing training, restaffing, follow up (or "babysitting") for the programs, troubleshooting (putting out fires), and quality assurance.

(Plaintiff's Affidavit, para. 4).

7.    Rebecca Swick currently administers the following programs in her position as Community Site Coordinator:

    \*    Personal Nutrition
    \*    Relaxation
    \*    Osteoporosis prevention
    \*    Smoking Cessation

(Swick Depo., pp. 19-20).

8.    With respect to Personal Nutrition, Relaxation and Smoking Cessation, Plaintiff personally taught all of these programs for over 20 years. In Plaintiff's position as manager of the Erie HealthPlace, she personally administered each of these programs for 10 years. With respect to the Osteoporosis Prevention program, Plaintiff was personally responsible for the administration of that program from its inception at Highmark, including contracting for instructors to teach the course. (Plaintiff's Affidavit, paras. 5-6).

9.    At the time of Plaintiff's termination, Ms. Swick had no experience administering any of these programs. (*Id*.).

10.    Prior to working for the Defendant, the Plaintiff had ten years of experience which was directly relevant to the duties listed for the Community Site Coordinator position. (Plaintiff's App, Exhibit J). This experience includes a series of positions at Hamot Medical Center, including education specialist, priority care coordinator, consumer health coordinator, community wellness coordinator. (Plaintiff's Depo., pp. 9-16)

11.    Although the Defendant claims that the Community Site Coordinator position does not require teaching experience (Defendant's Brief, p. 12), the written position description reads

4

". . . Public speaking experience and experience mentoring, supervising and/or teaching health professionals **are required**." (Position Description, p.2, Plaintiff's App, Exhibit J). (Emphasis supplied).

12.     In her six years with the Defendant, Ms. Swick had no public speaking, mentoring, supervising or teaching experience. (Swick Depo., pp. 7-8).

13.     In addition to the experience described above in Paragraph 10, the Plaintiff had over 15 years of teaching experience at all levels from first grade through high school, as well as college. (Plaintiff's Depo., pp. 16-22).[2]

### *More Favorable Treatment of Younger People*[3]

12.     Rebecca Swick was 32 years old when she was awarded the Community Site Consultant position. (*See*, Retention List, Bates No. D-1358, Plaintiff's App, Exhibit K).

13.     The Plaintiff was 66 years old when she was fired. (Plaintiff's Affidavit, para. 1).

14.     Including Ms. Swick, who was the Plaintiff's assistant until she was awarded the Community Site Consultant position, four individuals were awarded that position. They ranged in age from 25 to 35. The Plaintiff was 31 years older than the oldest person offered the job. The Plaintiff was 41 years older than the youngest person who was offered that job.[4] (*Id.*)

15.     At the time that Plaintiff was employed as the manager of the Defendant's HealthPlace facility, she was personally aware of all of the other managers of the Defendant's HealthPlace

---

[2] Plaintiff began her teaching experience over a decade before Ms. Swick was born. (Plaintiff's Depo., p. 22; Swick Depo., p. 4)

[3] It is clear that the subject termination of the Plaintiff came as part of a reorganization that resulted in a reduction in force. (Silberman Depo., p. 14)
.
[4] According to the Defendant's website, eleven community site coordinator positions were created, and all eleven were filled by individuals who were at least ten to twenty years or more younger than the Plaintiff. (Plaintiff's Depo., pp. 127-128)

facilities. Plaintiff knew these individuals from the regular staff meetings which they attended together, as well as from other activities related to Plaintiff's job duties. Because of personal interactions with each manager, Plaintiff was generally aware of their ages, and of their tenure with the Defendant. At the time of Plaintiff's termination, she was, by far, the oldest HealthPlace manager working for the Defendant, and Plaintiff had the longest tenure in the HealthPlace manager's position of any of Defendant's employees. (Plaintiff's Affidavit, para. 2).

*REASON(S) FOR TERMINATION*

16.     Anna Silberman made the decision not to offer the position to the Plaintiff. (Excerpts of Anna Silberman Deposition ("Silberman Depo.") attached to Plaintiff's App at Exhibit B, p. 10).

17.     When first questioned in her deposition, Ms. Siblerman said that her decision was based upon three factors: Plaintiff's performance reviews, Plaintiff's personnel file in general, and input from Plaintiff's immediate supervisor.[5] (Silberman Depo., p. 24).

18.     When prompted by her lawyer, Ms. Silberman added that her personal recollections and observations of the Plaintiff were part of her consideration. (*Id.*, p. 25).

19.     Later, after the passage of over five weeks, upon the resumption of Ms. Silberman's deposition, Ms. Silberman requested to "supplement" her testimony regarding the reasons for her decision to fire the Plaintiff. At that time, she added that she considered the input of two other individuals, Ms. Deborah Rice and Dr. William Pifalo. (Silberman Depo., pp. 93-96).

20.     When asked what reason Ms. Silberman had given for the Plaintiff's termination, Ms. Mori, the Human Resources consultant, was told by Ms. Silberman that the reason for the termination was Plaintiff's performance evaluations. (Excerpts of Cynthia Mori Deposition ("Mori Depo.") attached to Plaintiff's App at Exhibit D, p. 37-39). Other than the appraisals,

---

[5] It is undisputed that Tina Pallago-Toy was Plaintiff's immediate supervisor.

6

Ms. Mori could not identify any other reason given by Ms. Silberman for the decision. (*Id.*) Ms. Mori told the Plaintiff that performance appraisals were the only reason given by Ms. Silberman for the termination. (Plaintiff's Depo., p. 97).

*PRETEXT*

*The Decision Maker's Qualifications to Make the Decision*

21. Ms. Silberman made the decision to not offer employment to the Plaintiff. (Silberman Depo., p. 10).

22. Ms. Silberman had not worked in HealthPlace area for four years prior to making the decision to terminate the Plaintiff. (*Id.*, p. 12).

23. For four years prior to the decision to fire the Plaintiff, Ms. Silberman played no role in managing the Plaintiff. (*Id.*, p. 16).

24. Ms. Silberman could not recall any time in those four years that she observed the Plaintiff's performance. (*Id.*, p. 17).

25. In fact, Ms. Silberman could not recall one time during that period that she even worked with the Plaintiff. (*Id.*).

*The Non-believable Reasons for Termination: All Three . . . or Six of Them*

**REASON ONE:   THE PLAINTIFF'S PERFORMANCE REVIEWS**

26. The first reason given by Ms. Silberman for the decision to terminate was a review of the Plaintiff's performance reviews. (Silberman Depo., p. 24).

27. In the nine years prior to Plaintiff learning she would be fired, she received eight performance reviews. On six of the eight, Plaintiff was rated in the category, "Exceeds

7

Expectations." On the other two, she received the rating, "Achieves Expectations." (*See* Plaintiff's Performance Evaluations, Plaintiff's App, Exhibit L).

28. Although Ms. Silberman claimed the performance reviews played a role in her decision, she had no idea how many, or which of the Plaintiff's appraisals she carefully analyzed. (*Id*., pp. 25-32).

**REASON TWO:　　THE PLAINTIFF'S PERSONNEL FILE**

29. Ms. Silberman claimed she reviewed Plaintiff's personnel file as part of the decision making process. (Silberman Depo., p. 24).

30. In the Plaintiff's personnel file, Ms. Silberman apparently discovered one complaint letter, which was approximately six years old at the time. She claims this single, six year old complaint from a customer played a role in the decision to fire the Plaintiff. (*Id*., p. 32; Correspondence at Plaintiff's App, Exhibit M).

31. There is no mention of this complaint letter in Plaintiff's performance review for that year. (*See* 1998/99 Performance Review, Plaintiff's App, Exhibit L).

32. Plaintiff received an "Exceeds Expectations" rating for the year in which this complaint was received.[6] (*Id*.).

33. Ms. Silberman signed off on the Plaintiff's review for that year. (Silberman Depo., p. 105).

---

[6] In fact, the Plaintiff's immediate supervisor made the following observation of the Plaintiff's value to the Defendant's Erie location:

> Joy is an **excellent** teacher, role model & mentor to HealthPlace staff & participants **of all ages**. She is an asset to our division and a strong contributor of HEC/HealthPlace goals. (1998 Performance Appraisal, Bates-stamped No. D-0172, Exhibit L). (Emphasis supplied).

8

34. When asked what her signature on the review meant, Ms. Silberman initially indicated that it meant she agreed with the review. (*Id.*, p. 105).

35. After Ms. Silberman realized the point of the questioning, she gave a number of different answers as to what her signature meant. At different points in the testimony, she said that her signature on the 1998/99 review meant each of the following things:

    A.    She agreed with the review;

    B.    She approved a salary increase;

    C.    She didn't strongly disagree;

    D.    She wanted to send "***an incomplete message of approval***"[7];

(*Id.*, pp. 105-107)

36. Ms. Silberman admitted that there is no evidence in this evaluation that the issues raised in the complaint letter were areas where the Plaintiff needed improvement. (*Id.*, p.112).

37. After reviewing the 1998/99 performance appraisal, Ms. Silberman said that the absence of any reference to this incident (which later allegedly contributed to the Plaintiff's firing) made the review "incomplete." (*Id.*, p. 109).

38. Ms. Silberman could have instructed Plaintiff's immediate supervisor to add or include something about this issue in the review, but has no recollection of doing so. (*Id.*, pp. 112-113).

39. Ms. Silberman never followed up with Plaintiff's supervisor on this complaint letter, nor discussed it with her, nor took any steps to determine if the letter was true or accurate. (*Id.*, p. 120).

40. Ms. Silberman claimed that the Plaintiff had been the subject of other like complaints, but could not name any complainants, nor provide any specific or general information about any

---

[7] Of all of the different meanings which Ms. Silberman ascribes to this signature, this last seems the clear winner for the obfuscation award.

9

other alleged complaints, including when such complaints were made, nor the subject of any of these alleged other complaints. (*Id*., p. 121).

**REASON THREE:   THE OPINION OF PLAINTIFF'S IMMEDIATE SUPERVISOR**

41. Ms. Silberman said she considered the opinion of the Plaintiff's immediate supervisor, Ms. Tina Pallaggo-Toy, in the decision to fire the Plaintiff. (Silberman Depo., p. 24).

42. Ms. Toy testified that, when asked whom she would choose for a position in the new organization between the Plaintiff and Ms. Swick, ***Ms. Toy testified that she would choose the Plaintiff***. (Excerpts of Tina Pallaggo-Toy Deposition ("Toy Depo.") attached to Appendix at Exhibit E, pp. 48-49).

43. Ms. Toy testified that she played no role in the decision to terminate the Plaintiff; that she was "out of the loop." (*Id*., pp. 47, 60-61).

44. Ms. Silberman conceded that Ms. Toy's opinion was important because she was Plaintiff's immediate supervisor. She further admitted that Ms. Toy's opinion of the Plaintiff was valuable because Ms. Toy was more familiar with the Plaintiff's work than anyone else. (Silberman Depo., pp. 100-101).

45. Ms. Silberman does not recall following up with Ms. Toy on the basis for her choosing the Plaintiff over Ms. Swick, nor ever speaking to Ms. Toy in person about the subject. (Silberman Depo., p. 100).

46. Ms. Toy testified that she was asked her opinion in a voice mail message, returned her recommendation in a voice mail, and never discussed her recommendation with, or heard from anyone thereafter. (Toy Depo., pp. 47-49, 57).

10

47. Ms. Silberman guessed that Ms. Toy gave her opinion about choosing the Plaintiff over Ms. Swick because Ms. Toy did not know the particulars of the job to be offered, nor the skill sets required.[8]  (Silberman Depo., p. 122).

48. Ms. Toy testified that, knowing now what job Ms. Swick was given, and the duties and responsibilities that go with it, she would still choose the Plaintiff over Ms. Swick.  (Toy Depo., pp. 49-50).

**REASON FOUR:  MS. SILBERMAN'S PERSONAL OBSERVATIONS OF THE PLAINTIFF**

49. Ms. Silberman testified, after being prompted by her lawyer, that her personal observations of the Plaintiff played a role in her decision to fire the Plaintiff.  (Silberman Depo., p. 25).

**First Personal Observation: Possible program failure possibly ten years old**

50. Ms. Silberman claimed that one personal observation she made of the Plaintiff played a role in her termination.  Although Ms. Silberman could not specifically remember, the incident involved was somewhere between four and ten years old.  Ms. Silberman claimed that, at whatever time up to ten years ago, the Plaintiff may have failed to properly implement a program which both she and Ms. Silberman learned about at a seminar which they attended together.  (Silberman Depo., p. 33).

51. Although Ms. Silberman said that she "never really saw it materialize to its potential," she admitted that:

---

[8] Obviously Ms. Silberman could not know why Ms. Toy chose the Plaintiff, since Ms. Silberman never spoke to Ms. Toy in person about this issue.

11

* she played no role in supervising the program's implementation;

* she does not remember Tina Toy's position on the Plaintiff's implementation of this program, nor whether the Plaintiff was reprimanded for this "failure";

* she does not know if she suggested a reprimand for this. No writing evidences this failure;

* she does not remember what role the Plaintiff played in the failure of the program, nor why it failed, but still believes that this failure was the Plaintiff's fault[9];

* Plaintiff suffered no discipline or other adverse consequence for this alleged failure of an allegedly important program;

* she made no personal observations of the Plaintiff during the implementation of this program;

* she does not know why the program failed, and does not remember any steps she may have taken to find out why;

* she put nothing in writing regarding the reason for failure of program. She can not remember why she did not write anything down, even though this was an important program.

(Silberman Depo., pp. 35-44).

**Second Personal Observation: A ten year old expense report**

52.     At some point at least four and as many as ten years prior to being fired, Plaintiff may have submitted an improper expense report. (Silberman Depo., p. 44).

53.     Even though this "failure" played a role in the Plaintiff's termination, Ms. Silberman **could not**:

* say when the problem occurred;

* specify the expense policy supposedly violated;

* remember what type of expense was involved;

---

[9] Ms. Silberman later contradicted herself and said that she did not know whether or not the failure of this program was the Plaintiff's fault. (*Cf.* Silberman Depo., pp. 36 and 44).

12

    \*    tell why the expense was illegitimate, just that it was;

    \*    say that Plaintiff deliberately falsified an expense report, and, rather, had conceded that this probably constituted an accident;

    \*    tell whether the mistake was deliberate or accidental. Accordingly, she claims to have given the Plaintiff the benefit of the doubt.[10]

(*Id.*).


**REASON FIVE:    DR. PIFALO EITHER DID, OR DID NOT ADVISE MS. SILBERMAN TO FIRE THE PLAINTIFF**

54.    After five weeks reflection (but over a year and a half after the decision), Ms. Silberman asked to "supplement" her testimony regarding the reason(s) for firing the Plaintiff. Ms. Silberman claimed that Dr. Pifalo, who was then Vice President and Medical Director of Defendant's HealthPlace initiative, told her that the Plaintiff "has to go." (Silberman Depo., pp. 93-95).

55.    Dr. Pifalo denied ever making that statement. He further denied having any such conversation with anyone, and stated that he played no role in the decision to terminate the Plaintiff. (Excerpts of Dr. Pifalo Deposition ("Pifalo Depo.") attached to Plaintiff's App at Exhibit F, pp. 20-22)

**REASON SIX:    MS. RICE EITHER DID, OR DID NOT RECOMMEND PLAINTIFF'S TERMINATION**

56.    Again over five weeks after her initial deposition, Ms. Silberman sought to "supplement" her original sworn answers. She stated that Ms. Deborah Rice, Sr. V.P. of Regional Markets, had given the opinion that the Plaintiff should not be retained, and that was what caused Ms. Silberman, in part, to fire the Plaintiff. (Silberman Depo., pp. 95-96).

---

[10] Even though she later used the possibly ten year old incident as part of the justification for firing the Plaintiff.

57.     Ms. Rice testified that she played no role in the decision to terminate the Plaintiff, and was not asked her opinion on that subject. She further stated that she never gave Ms. Silberman her opinion on the Plaintiff as a candidate, and that she had no knowledge of Plaintiff's performance, and had no supervisory authority over the Plaintiff, and, hence, had no opinion to offer.[11] (Excerpts of Deborah Rice Deposition ("Rice Depo.") are attached to Plaintiff's App at Exhibit G, pp. 12-25).

WHEREFORE, the Plaintiff, JOY SWEETING, hereby incorporates the foregoing factual assertions into her Brief in Opposition to Defendant's Motion for Summary Judgment filed of equal date herewith.

Respectfully submitted,

SCANLON & SANSONE

s/Joel S. Sansone
Joel S. Sansone, Esquire
PA ID No. 41008
2300 Lawyers Building
Pittsburgh, Pennsylvania 15219
412.281.9194

Dated:  January 24, 2006

---

[11] A review of the actual comments made by Ms. Rice show that Ms. Silberman gave misleading testimony about what Ms. Rice said to her. Ms. Rice, had, upon an unrelated occasion, told Ms. Silberman that she needed someone to accompany her on a particular sales call. At that time, Ms. Rice told Ms. Silberman "anybody but Joy," because her direct report did not wish to use the Plaintiff on this call. Ms. Rice could not even recall why the Plaintiff was not wanted on this particular call. In any event, Ms. Rice made it clear that she did not make this remark in the context of the decision to terminate the Plaintiff. (Rice Depo, pp. 19-22). It is therefore all the more perplexing that, in her second deposition session, Ms. Silberman claimed to have confirmed with Ms. Rice that the aforementioned comment was made in the context of discussing the Plaintiff's termination. (Silberman Depo, p. 97).