**JOY SWEETING**
- - - -

PAGE 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3

 4   JOY SWEETING,                    )

 5                   Plaintiff,       )  CIVIL ACTION

 6      vs.                           )  No. 04-368

 7   HIGHMARK, INC.,                  )

 8                   Defendant.       )

 9

10            DEPOSITION OF JOY SWEETING,

11   taken pursuant to the Federal Rules of Civil Procedure,

12   before Lisa Ann Bauer, Certified Realtime

13   Reporter-Notary Public in and for the Commonwealth of

14   Pennsylvania, on Thursday, August 4, 2005, at the

15   offices of Reed Smith LLP, 435 Sixth Avenue,

16   Pittsburgh, Pennsylvania 15219, commencing at 9:30

17   o'clock a.m.

18                        - - -

19

20

21

22

23

24

25
```

PLAINTIFF'S
EXHIBIT
A

PENGAD 800-631-6989

COPY

**BAUER COURT REPORTING, INC.**
**(724) 444-1080**

# JOY SWEETING
- - - -

**PAGE 2**

APPEARANCES
- - -

On behalf of the Plaintiff:
Joel S. Sansone, Esquire
Scanlon & Sansone
2300 Lawyers Building
428 Forbes Avenue
Pittsburgh, PA 15219

On behalf of the Defendant:
Martha Hartle Munsch, Esquire
Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA 15219

Also present:
Carl H. Shuman, Esquire - Highmark, Inc.
Cindy Mori - Highmark, Inc.

- - -

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| JOY SWEETING | Ms. Munsch | 4 |

**PAGE 3**

MARKED FOR
EXHIBITS          IDENTIFICATION

| | |
|---|---|
| Sweeting Deposition Exhibit 1 | 81 |
| Sweeting Deposition Exhibit 2 | 102 |
| Sweeting Deposition Exhibit 3 | 103 |
| Sweeting Deposition Exhibit 4 | 107 |
| Sweeting Deposition Exhibit 5 | 120 |
| Sweeting Deposition Exhibit 6 | 157 |
| Sweeting Deposition Exhibit 7 | 157 |
| Sweeting Deposition Exhibit 8 | 159 |
| Sweeting Deposition Exhibit 9 | 161 |
| Sweeting Deposition Exhibit 10 | 162 |

- - -

**PAGE 4**

PROCEEDINGS
(9:47 o'clock a.m.)
JOY SWEETING,
the witness, having been first duly sworn, was deposed and testified as follows:
MS. MUNSCH: For the record, this is the deposition taken of Joy Sweeting, the plaintiff in this civil action pursuant to a notice of deposition served on Ms. Sweeting's counsel.
EXAMINATION
BY MS. MUNSCH:
Q. Ms. Sweeting, my name is Martha Munsch, and I am the outside counsel for Highmark in this case, and I will be the one asking you the questions here today. And also present to my right, who you've met earlier, are Carl Shuman and Cindy Mori from Highmark.
If, during the course of my questioning this morning, you don't understand any of my questions, please feel free to tell me and I will try to ask a clearer question. And if, at some point, you feel that there was an answer that you had given earlier in the deposition that was not correct or was not complete and you would like to go back and supplement it or change it, just, again, so indicate, because what I want to do is just get a full, complete

**PAGE 5**

response from you to the best of your recollection to my questions.
And if you need to take a break at any time, just feel free to let us know and we can take a break.
And without further adieu, are you ready to proceed?
A. Yes, I guess I am.
Q. Ms. Sweeting, just a few quick questions about your background, just to make sure I have this correct.
You reside in Erie?
A. Correct.
Q. How long have you resided in Erie?
A. Since 1963.
Q. And you have a Bachelor's degree from Bowling Green University?
A. Correct.
Q. That was in what year?
A. '59.
Q. And am I correct, your Bachelor's degree was in health and physical education?
A. And biology.
Q. And you have a Master's degree in education from the University of Illinois?
A. That's correct.
Q. From 1972?

**2 (PAGES 2 TO 5)**

# JOY SWEETING
- - - -

**PAGE 6**

1    A.  (Nodding head affirmatively.)
2    Q.  I also saw on your résumé that you have 12
3  credits from Gannon.  What are those credits?
4    A.  It's a gerontology certification program.
5        MR. SANSONE:  What I'd like you to do is
6  make sure that Martha finishes her question completely
7  and then respond.
8        THE WITNESS:  Sure.
9        MS. MUNSCH:  That will help the court
10  reporter, too.  She is the one that has got the hard
11  job here today, because she has to take down
12  everything I say and everything you say, so we can't
13  be talking over each other.
14  BY MS. MUNSCH:
15    Q.  Now, other than the studies that you mentioned
16  at Bowling Green, Gannon, and the University of
17  Illinois, do you have any other formal education or
18  training?
19    A.  No.
20    Q.  Are you married, Ms. Sweeting?
21    A.  No.
22    Q.  Have you ever been married?
23    A.  Yes.
24    Q.  Do you have any children?
25    A.  Yes.

**PAGE 7**

1    Q.  And would you just give me the names and ages
2  of your children and where they are presently residing?
3    A.  Okay.  Stephen is 43, New York City; Greg is
4  41, Portland, Oregon; and Sue is 36, and she lives in
5  Raleigh-Durham, North Carolina.
6    Q.  And your ex-husband, what is his name and where
7  does he reside?
8    A.  Roger.
9    Q.  Is that Roger Sweeting?
10    A.  Yes.  Phoenix, Arizona.
11    Q.  And what is your maiden name?
12    A.  Hennage, H-e-n-n-a-g-e.
13    Q.  H-e-n-n-a-g-e?
14    A.  Correct.
15    Q.  And for how long have you been going by the
16  name of Joy Sweeting, as opposed to Joy Hennage?
17    A.  Since 1959.
18    Q.  Are you currently employed?
19    A.  No.
20    Q.  When is the last time you have been employed?
21    A.  My last working day was May 20th of this
22  year.
23    Q.  And where was that?
24    A.  I was working for a mayoral candidate in Erie.
25    Q.  For how long did you work for that mayoral

**PAGE 8**

1  candidate and in what capacity?
2    A.  From March 1st until May 20th as his
3  volunteer coordinator.
4    Q.  Was that a paid position?
5    A.  Yes.
6    Q.  Do you have some records that would reflect
7  your earnings from that?
8    A.  Not on me.  In my possession.
9    Q.  I can sort of shortcut the questioning.  If you
10  have records somewhere in your possession at home that
11  would reflect that, then I don't have to ask you
12  questions about it.
13        MS. MUNSCH:  Joel, I would assume
14  somewhere she would have pay stubs.
15  BY MS. MUNSCH:
16    Q.  You don't?
17    A.  No.  I could get them from the person who paid
18  me.  He just wrote a check every week.
19    Q.  Do you have an idea of what your total gross
20  earnings were on that assignment?
21    A.  It was $300 a week for maybe about 12 weeks.
22  Close to 12 weeks.
23    Q.  And I assume there were no benefits associated
24  with that?
25    A.  That's correct.

**PAGE 9**

1    Q.  Other than that engagement, what was the last
2  time that you were employed?
3    A.  At Highmark.
4    Q.  So am I correct, then, that from the time you
5  left Highmark in mid October 2004 until today, the only
6  earned income that you have is the income from your
7  working as the volunteer coordinator for the mayoral
8  candidate in Erie?
9    A.  That's correct.
10    Q.  What was his name, his or her name?
11    A.  Barry Grossman.
12    Q.  Did he win?
13    A.  No.  It was close, though.
14    Q.  Now, in terms of I just want to spend a little
15  bit of time reviewing your background prior to joining
16  Highmark.
17        Am I correct that for the period of 1982
18  through 1993, you worked for the Hamot Medical Center
19  in Erie?
20    A.  That's correct.
21    Q.  And you held a series of positions there,
22  correct?
23    A.  Yes.
24    Q.  And those positions were education specialist?
25    A.  That was one of them.

**3 (PAGES 6 TO 9)**

## BAUER COURT REPORTING, INC.
### (724) 444-1080

## JOY SWEETING

- - - -

**PAGE 10**

1  Q. Was that your first position?
2  A. No.
3  Q. Let me read these and tell me if these are
4  correct or incorrect, and then I'll have some follow-up
5  questions.
6      I have that your positions at Hamot were
7  education specialist, priority care coordinator,
8  consumer health coordinator, community wellness
9  coordinator.
10  A. Correct.
11  Q. Am I missing any?
12  A. No.
13  Q. And which was the position that you had when
14  you left Hamot?
15  A. Education specialist.
16  Q. So I read them to you in order of the most
17  recent backwards?
18  A. Correct.
19  Q. What were you earning -- if you can recall,
20  what was your annual salary with Hamot when you left
21  there in 1993?
22  A. I think it was about 34,000.
23  Q. And were those positions that you held with
24  Hamot, those several positions, were each of them, did
25  each of those represent a promotion for you?

**PAGE 11**

1  A. Not necessarily.
2  Q. So they were a series of what may have been
3  lateral moves?
4  A. Correct.
5  Q. Can you summarize for me what your primary
6  duties and responsibilities entailed in those positions
7  with Hamot? And if it's easier to take them one at a
8  time, certainly you can do it that way, or if they
9  involve similar duties and responsibilities, you can
10  just summarize them in a lump.
11  A. Well, wellness coordinator, I was planning
12  programs, developing programs, wellness programs, and
13  implementing them. When I was with the public affairs,
14  I was doing more -- that was the community -- what did
15  you say the title was?
16  Q. I have a community wellness coordinator,
17  consumer health coordinator, priority care coordinator,
18  and education specialist.
19  A. Consumer health coordinator, I was doing an
20  in-house publication, as well as organizing and running
21  special events. With priority care, that was more of
22  an opportunity to market Hamot to seniors, and that was
23  a lot of public speaking and doing screening programs.
24  And then education specialist was doing management
25  development and a lot of employee education programs.

**PAGE 12**

1  Q. What did you say on education specialist?
2  A. Doing management development programs and
3  employee education programs.
4  Q. What do you mean by management development
5  programs?
6  A. We'd have a management development week where
7  we would do, like, the quality programs. We would
8  teach the programs to the employees and to management,
9  different -- maybe telephone courtesy or customer
10  service.
11  Q. That wasn't necessarily wellness related, the
12  education specialist?
13  A. No, no.
14  Q. The term wellness, when you talk about wellness
15  programs, is that a term of art, at least as you
16  understand it? For me, who is not in the health care
17  industry, how would you describe to me what the term
18  wellness means when you say you're developing wellness
19  programs?
20  A. Well, it's kind of prevention, health
21  prevention, health promotion, trying to encourage
22  people to live healthier lifestyles by developing
23  certain practices, whether they be weight management,
24  smoking cessation, stress, the osteoporosis program,
25  whatever the program is that would help you have a

**PAGE 13**

1  better condition of health.
2  Q. Now, am I correct that your position or your
3  employment at Hamot ended in 1993 due to -- was it due
4  to lack of work? Were you laid off?
5  A. They downsized over 200 people.
6  Q. Is Hamot a community hospital, is it a tertiary
7  hospital? Does it still exist?
8  A. Oh, yes.
9  Q. Is it a large tertiary hospital, or is it just
10  a community hospital?
11  A. It's one of the two largest in Erie, yes.
12  Q. So they had a big downsizing in 1993?
13  A. Right.
14  Q. Eliminated a lot of positions?
15  A. Right.
16  Q. Including education specialist?
17  A. Our whole department, yes.
18  Q. What was the department?
19  A. Education department. Employee education.
20  There were several education departments.
21  Q. So employee education was the department that
22  you were employed in at the time of the downsizing.
23      Were your other positions at Hamot also in the
24  education department, or were they in a different
25  department?

**4 (PAGES 10 TO 13)**

**JOY SWEETING**
- - - -

PAGE 14

1    A.  No.  They were all different.
2    Q.  Were all of those prior positions eliminated as
3   well at the time of the downsizing, do you know?
4    A.  I don't know that.  I don't know the answer.
5    Q.  In other words, do you recall who replaced you?
6   When you left priority care coordinator to become
7   education specialist at Hamot, did somebody replace
8   you?
9    A.  No.  They didn't have the program anymore.
10   Q.  So they eliminated that program at the time
11  that you left the position.  In fact, did they
12  eliminate the position and then you got the education
13  specialist job?
14   A.  Yes.
15   Q.  How about consumer health coordinator?  When
16  you left that position to become priority care
17  coordinator, did somebody replace you in that?
18   A.  Yes.
19   Q.  Do you know if, at the time of the downsizing
20  in '93, the person who was consumer health coordinator
21  continued to have a job at Hamot?  Not the person.
22  Whether that position continued to exist at Hamot,
23  consumer health coordinator?
24   A.  I'm not sure, but I believe it was continued.
25   Q.  Prior to becoming employed at Hamot, am I

PAGE 15

1   correct you worked for -- or, actually, this wouldn't
2   have been prior.  It would have been during the period
3   of time you were employed by something called Resources
4   for Prevention, Inc.?
5    A.  Right.
6    Q.  What was that?
7    A.  A cardiac rehab program that I taught sometimes
8   once a week, sometimes twice a week for about eight or
9   ten years, I believe, after work.
10   Q.  So this was, for want of a better term, a
11  part-time moonlighting position?
12   A.  Absolutely, yes.
13   Q.  And was this a non-profit organization,
14  for-profit organization?
15   A.  Yes, non.
16   Q.  Why did you cease lecturing for them in 1993?
17  Strike that.
18       I guess my question is, is it purely
19  coincidental that your part-time work for them ceased
20  in the same year that your position with Hamot ceased?
21  Were they linked in some way?
22   A.  Not in any way.  It was an exercise program, so
23  I just chose -- I had enough to do.
24   Q.  It was an exercise program?
25   A.  Uh-huh.

PAGE 16

1    Q.  And you got paid, what, by the hour?
2    A.  Yes.
3    Q.  Does that still exist, that program?
4    A.  Yes, it does.  Yes, it does.
5    Q.  Then I also saw on -- I think this was on your
6   résumé, something called instructor/consultant to a
7   cardiac fitness club?
8    A.  That's what it was.
9    Q.  That's a description of what you did for the
10  Resources for Prevention, Inc.?
11   A.  Correct.
12   Q.  And then you had worked at Gannon University
13  for a couple of years as director of student services
14  and women's athletics?
15   A.  Correct.
16   Q.  That was from 1974 to 1976?
17   A.  Correct.
18   Q.  Were you employed between 1976 and 1984?
19       MR. SANSONE:  '82, you mean?
20       MS. MUNSCH:  Yes.
21  BY MS. MUNSCH:
22   Q.  You went to Hamot in '82.  What were you doing
23  in that period?
24   A.  I ran a summer camp for overweight girls for
25  four consecutive summers, and in the winter, I

PAGE 17

1   substitute taught.
2    Q.  I'm just trying to get a time line here of your
3   employment background.
4    A.  Sure.
5    Q.  So in the I guess it would be six-year period
6   between the time that you left Gannon and went to
7   Hamot, you were doing substitute teaching during the
8   school year?
9    A.  Yes.
10   Q.  And then in the summer, you were running a
11  summer camp for overweight girls?  Were you running it
12  or were you teaching there?
13   A.  I was the director.
14   Q.  So you were an employee?
15   A.  Yes.
16   Q.  What was the name of the organization that you
17  worked for?
18   A.  Sports World.
19   Q.  They ran those camps?
20   A.  Yes.
21   Q.  And what were you teaching when you were a
22  substitute teacher, what subjects, phys ed?
23   A.  Every subject.
24   Q.  So it wasn't limited to health and phys ed and
25  biology?

**BAUER COURT REPORTING, INC.**
**(724) 444-1080**

## JOY SWEETING
- - - -

**PAGE 18**

1   **A. No, no.**
2   Q. Was it one or two particular schools, or were
3 you substituting anywhere in the Erie School District?
4   **A. The Millcreek School District.**
5   Q. Is that a suburban Erie system?
6   **A. Yes. Yes, it is. One more place I did not put**
7 **down in there was I did work at the Behrend College**
8 **library for a year, but I felt it wasn't terribly**
9 **significant to put in my résumé.**
10   Q. Was that in the '76 --
11   **A. Yes, it was in that time period, maybe closer**
12 **to 1980.**
13     MR. SANSONE: Let me give you another
14 warning. You're, once again, anticipating Martha's
15 questions without her finishing them. Make sure you
16 hear her whole question and even pause to make sure
17 that she is through.
18     THE WITNESS: Okay.
19 BY MS. MUNSCH:
20   Q. That's Penn State's Behrend campus?
21   **A. Yes.**
22   Q. So you worked in their library for a period of
23 time?
24   **A. Yes.**
25   Q. As a part-time employee, or was that full time?

**PAGE 19**

1   **A. You know, I can't remember. I think it was**
2 **full time, but it was just for one year.**
3   Q. Why did you leave Gannon?
4   **A. For a variety of personal reasons.**
5   Q. Was your employment terminated?
6   **A. Not really.**
7   Q. Did you leave voluntarily or involuntarily?
8   **A. Voluntarily.**
9   Q. What were the reasons?
10   **A. Well, I had a husband that was the athletic**
11 **director at Behrend, and it was just kind of a**
12 **conflict.**
13   Q. Did Gannon see it as a potential conflict or as
14 an actual conflict?
15   **A. I don't think so.**
16   Q. But you saw it as a conflict, you being the AD
17 at Gannon and he being the AD at Behrend?
18   **A. (Nodding head affirmatively.) Yes.**
19   Q. And am I correct that after '76 when you left
20 Gannon, you have not gotten back into athletic
21 administration after that?
22   **A. Correct.**
23   Q. Now, just quickly, I wanted to just confirm
24 that prior to you going to Gannon, you had a series of
25 positions in K through 12 education? You taught -- or,

**PAGE 20**

1 actually, you taught a year in physical ed in Edinboro
2 University, so that was a year in higher education. I
3 assume that was a non-tenure track position?
4   **A. Correct.**
5   Q. Was that just a fill-in for one year?
6   **A. Someone went on sabbatical.**
7   Q. So you had one year of teaching physical
8 education at Edinboro. Prior to that, you had two
9 years teaching elementary physical education?
10   **A. Correct.**
11   Q. When you were working on your Master's at
12 Illinois, you taught health and physical education
13 where, at the university?
14   **A. Correct.**
15   Q. In a, again, non-tenure track position?
16   **A. Correct.**
17   Q. Was that affiliated with the Master's program?
18 Was that something you had to do as part of the
19 Master's program?
20   **A. No.**
21   Q. How did you happen to get the teaching position
22 at Illinois?
23   **A. They needed part-time work.**
24   Q. It was part time?
25   **A. Oh, yes.**

**PAGE 21**

1   Q. Why did you leave that position?
2   **A. We graduated.**
3   Q. So it was part-time teaching that you did while
4 you were getting your degree. It wasn't a full-time
5 position?
6   **A. Correct.**
7   Q. And it was only available to you because you
8 were in a Master's program?
9   **A. No, not really.**
10   Q. So what did your graduation have to do with why
11 you left that position?
12   **A. Came back to Pennsylvania.**
13   Q. So after you got your degree, you made a
14 decision to come back to the Erie area?
15   **A. That's correct.**
16   Q. Was that you and your husband?
17   **A. Yes.**
18   Q. Was he in a program at Illinois at the same
19 time?
20   **A. Yes.**
21   Q. And prior to that, you had spent four years
22 teaching high school physical education at
23 St. Benedict's Academy, correct?
24   **A. Correct.**
25   Q. Have I missed any jobs that you've held since

**6 (PAGES 18 TO 21)**

**JOY SWEETING**

- - - -

**PAGE 22**

1    graduation from college? And I'm not talking about a
2    summer job while you were in college waiting tables, if
3    you did anything like that, but have I missed any
4    regular, full-time or regular part-time jobs that
5    you've had in your professional career?
6    **A.  In 1960, I taught health and phys ed in New**
7    **Jersey for two years. Actually, let me clarify that.**
8    **For one year, I taught first grade and for the second**
9    **year I taught health and phys ed at the high school.**
10    Q.  So that was even before the St. Benedict's
11    Academy?
12    **A.  That's correct. And after that, I taught**
13    **part-time at State College High School for a year.**
14    Q.  Was your husband in athletics administration?
15    **A.  Yes.**
16    Q.  Did he move around in those positions? Is that
17    why you sort of moved around a bit?
18    **A.  Only graduate school moving.**
19    Q.  What took you to State College?
20    **A.  Master's degree for him.**
21    Q.  At Penn State?
22    **A.  Right.**
23    Q.  When did you separate from your husband?
24    **A.  In '88.**
25    Q.  Did he leave the Erie area at that time?

**PAGE 23**

1    **A.  No.**
2    Q.  When did he relocate to Phoenix?
3    **A.  About five years ago.**
4    Q.  Did he continue to be the athletics director at
5    Behrend for a period of time?
6    **A.  For a period of time, but not up through his**
7    **tenure of work.**
8    Q.  What was he doing when he left Erie?
9    **A.  Teaching.**
10    Q.  In a high school or college?
11    **A.  At Behrend, Penn State.**
12    Q.  Now, tell me how it came to pass that you
13    became employed with Highmark.
14    **A.  I was looking for a position and I think I had**
15    **asked Dana Lundquist, who had been the head of -- the**
16    **CEO, whatever, of Hamot prior to when I worked there,**
17    **who was presently at that time then working for**
18    **Highmark, and he was in Pittsburgh and I had asked him**
19    **if there were any opportunities, and he led me to this**
20    **possible opportunity in the health education**
21    **department.**
22    Q.  To whom did he direct you?
23    **A.  Anna Silberman and Tina Palaggo-Toy.**
24    Q.  Now, had you known either Anna or Tina prior to
25    that?

**PAGE 24**

1    **A.  No.**
2    Q.  Had you ever met them?
3    **A.  No.**
4    Q.  In the work that you did at Hamot for that
5    almost approximately ten-year period, did you have any
6    interactions with any of the folks at Highmark?
7    **A.  None.**
8    Q.  So, really, your first introduction to Highmark
9    and/or the people of Highmark was after you lost your
10    job at Hamot and you went in to the job market and
11    Mr. Lundquist pointed you in the direction of Anna
12    Silberman and Tina Toy for a possible opportunity in
13    health education with Highmark?
14    **A.  That's correct.**
15    Q.  So, just reconstruct for me again
16    chronologically, as best you can reconstruct, who did
17    you talk to first, was it Anna or Tina or both of them
18    together and what did they tell you about possible
19    opportunities?
20    **A.  Well, I recall having lunch with both of them,**
21    **so I met them both at the same time.**
22    Q.  Together?
23    **A.  At the same time, uh-huh. You know, they**
24    **asked, of course, about my background and told me of**
25    **the HealthPlace concept.**

**PAGE 25**

1    Q.  Go on.
2    **A.  And thought that this might be a good fit for**
3    **my interests and for their needs.**
4    Q.  At that time, was it your understanding or
5    belief that the HealthPlace concept was something that
6    was new at Highmark that they were in the process of
7    developing and implementing?
8    **A.  Well, they already had implemented it in**
9    **Pittsburgh at Fifth Avenue Place, so, you know, it was**
10    **already established.**
11    Q.  But as far as the position that they were maybe
12    talking to you about, am I correct, there was not at
13    that time a HealthPlace in place in Erie, correct?
14    **A.  There was a part-time contracted person doing**
15    **some programming. It's my understanding they were not**
16    **pleased with his performance and, therefore, encouraged**
17    **me to try this.**
18    Q.  Who was that, if you recall the name?
19    **A.  Curt Salmon (phonetic).**
20    Q.  Your sense was he was not an employee. He was
21    a consultant or a contractor?
22    **A.  Contracted.**
23    Q.  So how did it evolve or what kind of time
24    passed from the time you had this initial lunch with
25    them until they offered you a position?

**BAUER COURT REPORTING, INC.**
**(724) 444-1080**

## JOY SWEETING

- - - -

**PAGE 94**

1    Q.   And was she a friend of yours, or you just knew
2    her from work?
3        A.   A friend at work.
4        Q.   Was her office in the same building as the
5    HealthPlace center had been?
6        A.   Yes.
7        Q.   Just on a different floor?
8        A.   Yes.
9        Q.   So you reported to her on April 1st, and then
10   what did you do for the period from April 1 through mid
11   October?
12       **A.   Tried to coordinate some special events for**
13   **customer service. One thing she had wanted was to try**
14   **to have some incentives for their employees so there**
15   **would be just a little more life in customer service.**
16   **And so I went out and got incentives, like things from**
17   **Borders Book Stores, I got coupons for them to get**
18   **discounts, bagel place, getting a free bagel. Similar**
19   **things like that.**
20       Q.   So these were things that were going to be used
21   as incentives for Doris' employees in customer service
22   for, what, if they performed or maybe made an
23   attendance incentive or a performance incentive or
24   something like that?
25       **A.   No. Just a monthly fun thing to have.**

**PAGE 95**

1    Q.   For everybody?
2        **A.   Right.**
3        Q.   And so one of the things you did was to call
4    upon vendors in the community to see if they would
5    contribute freebies towards something like that?
6        **A.   Correct.**
7        Q.   What else did you do for Doris Conley in that
8    period?
9        **A.   Organize the Walk for the Cure, I believe it**
10   **is.**
11       Q.   Was Highmark a sponsor of that?
12       **A.   I don't believe they were. It just was me to**
13   **get participation from customer service people to**
14   **organize the event.**
15       Q.   Organize their participation in the event, to
16   encourage employees in the customer service department
17   to participate in the event?
18       **A.   Correct.**
19       Q.   How large, by the way, was the customer service
20   department in Erie? I assume this is customer service
21   in Erie?
22       **A.   Uh-huh. I think there were close to a hundred.**
23       Q.   And when you say customer service, are these
24   people who take calls from members about claims?
25       **A.   And walk-in, correct.**

**PAGE 96**

1    Q.   What else did you do for Doris Conley?
2        **A.   You know, I can't recall some of the events,**
3    **but she had me doing special events for them.**
4        Q.   Organizing the Walk for the Cure, you would
5    consider that to be a special event?
6        **A.   Exactly.**
7        Q.   Did you have any more interactions with Cindy
8    between the time of the phone call on March 16 and your
9    departure in mid October 2004?
10       **A.   Yes.**
11       Q.   Tell me about those.
12       **A.   You know, I don't recall. I know I talked to**
13   **her two or three times, at least.**
14       Q.   On the phone?
15       **A.   Yes.**
16       Q.   About what sorts of things?
17       **A.   They may have been about benefits. You know, I**
18   **don't recall, exactly.**
19       Q.   But it was about those sorts of things, not
20   about -- strike that.
21           Did you have any discussions with her at that
22   time or at any time between March 15 and your
23   departure about the reason for the decision?
24       **A.   Yes, I do believe I did ask her that.**
25       Q.   Tell me about those, any discussions of that

**PAGE 97**

1    nature that you recall.
2        **A.   That I asked her if she could tell me why I was**
3    **eliminated.**
4        Q.   And what was her reply?
5        **A.   And Rebecca was kept. She didn't get back to**
6    **me, and I believe she said it was due to Rebecca's**
7    **performance appraisals, as opposed to mine.**
8        Q.   Anything else that you can recall?
9        **A.   To tell you the truth, I cannot.**
10       Q.   Did you know who made the decision?
11       **A.   I believe I was told that Anna did, but that's**
12   **what I was told.**
13       Q.   You have no personal knowledge of who made the
14   decision or who was involved in the decision?
15       **A.   No.**
16       Q.   Did you ever talk to Tina about the decision?
17       **A.   No.**
18       Q.   Did you ever speak with Aaron Walton about the
19   decision?
20       **A.   No.**
21       Q.   Or attempt to speak with Anna about the
22   decision?
23       **A.   No.**
24       Q.   And am I correct that you didn't talk to or
25   discuss that decision with Doris?

**25 (PAGES 94 TO 97)**

## JOY SWEETING
- - - -

**PAGE 126**

1 with the Vic Ward.
2     But in terms of what happened with Rebecca
3 Swick, what you're contesting and challenging is the
4 decision to retain Rebecca Swick in the role of
5 community site consultant in the Erie market, rather
6 than you?
7 **A.  That's correct.**
8 Q.  So it's more in the nature of a hiring claim
9 than a termination claim?
10     MR. SANSONE:  You're probably asking her
11 for some legal conclusions within that question.  I'll
12 let her answer what she can answer about that.
13     MS. MUNSCH:  I just want to clarify that
14 that's really the decision you're challenging.
15     MR. SANSONE:  Retention, I think, is a
16 better word than hiring.
17 BY MS. MUNSCH:
18 Q.  Retaining Rebecca Swick and placing her in the
19 newly created position of community site consultant
20 rather than yourself?
21 **A.  Correct.**
22 Q.  You're alleging in this case, as I understand
23 it, that the decision to select Ms. Swick rather than
24 yourself to become the community site consultant was
25 based upon your age, correct?

**PAGE 127**

1 **A.  I have to feel that way, yes, correct.**
2 Q.  Tell me each and every bit of information that
3 leads you to believe that the decision was based on
4 your age.  You don't need to repeat what you've already
5 said, but if there is any information other than what
6 you've already talked about today concerning your
7 relative qualifications, that's what I'm inquiring
8 about, information that leads you to believe that the
9 decision was due to your age.
10 **A.  Well, I happened to see the list of 11 people**
11 **that were employed as community site coordinators, and**
12 **I don't think any of them was within the 10- to 15-year**
13 **range of my age, maybe 20.  I'm guessing.  I don't know**
14 **exactly.**
15 Q.  Go on.
16 **A.  I think that's pretty apparent.  I guess --**
17     MR. SANSONE:  You only have to give what
18 you understand to be the reasons and what someone
19 draws from that is their business.
20 BY MS. MUNSCH:
21 Q.  Is there anything else?
22 **A.  Not really.  You know my age, you know her age,**
23 **so...**
24 Q.  The list that you're referring to, you said
25 there were a list of 11 people who got the jobs of

**PAGE 128**

1 community site consultants?
2 **A.  Uh-huh.**
3 Q.  Where was that list?
4 **A.  It was on the internet.  It was on Highmark's**
5 **website, I should say.**
6 Q.  And when was that?
7 **A.  Probably in April or May.**
8 Q.  Of 2004?
9 **A.  Yes.**
10 Q.  And this was a list of the names and ages?
11 **A.  No, the ages are not there, but, you know,**
12 **having worked with these people, I have a rough idea of**
13 **their age.**
14 Q.  So you're saying there were 11 community site
15 consultant positions that were created in the new
16 organization for the department?
17 **A.  Correct.**
18 Q.  And your belief is that the 11 individuals
19 selected for those positions were all substantially
20 younger than you?
21 **A.  Correct.**
22 Q.  Do you know who any of those -- did you know
23 any of those individuals?
24 **A.  I knew almost all of them.**
25 Q.  And I just want to clarify.  Is your

**PAGE 129**

1 contention that the decisions to select all of those
2 people were -- you're challenging them all in this
3 case, or just the decision to pick Rebecca Swick?
4 **A.  The decision to pick Rebecca.**
5     MR. SANSONE:  I might have to object to
6 the form of that question.  She's obviously
7 challenging the decision to let her go, and to the
8 extent that discovery proves that individuals who were
9 retained were less qualified and were retained in any
10 case and were significantly younger, they will become
11 part of that claim.
12     MS. MUNSCH:  I can probe with her.
13 BY MS. MUNSCH:
14 Q.  Do you believe that any of the other ten were
15 less qualified to be a community site consultant than
16 you?
17 **A.  Clearly.  I am the one with the most experience**
18 **and I think that I was probably most qualified.  I**
19 **can't go by individual person, but I would say for the**
20 **most part, yes, I was more qualified.**
21 Q.  Your belief was that if you lined up the 11
22 people who got those jobs and you, that you could
23 consider yourself to be more qualified than any of
24 those other 11?
25 **A.  I would say I'd be in the top five.**

**33 (PAGES 126 TO 129)**

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

- - - -

JOY SWEETING,                          )
                                       )
          Plaintiff,                   )
                                       )
                    -vs-               )     Civil Action
                                       )     No. 04-0368 Erie
HIGHMARK, INC.,                        )
                                       )
          Defendant.                   )

- - - -

DEPOSITION OF:  ANNA LISA SILBERMAN

(Volume I)

- - - -

DATE:        October 10, 2005
             Monday, 11:10 a.m.

LOCATION:    SCANLON & SANSONE
             2300 Lawyers Building
             Pittsburgh, PA   15219

TAKEN BY:    Plaintiff

REPORTED BY: Beth E. Welsh
             Notary Public
             QCR Reference No. BW1581



PLAINTIFF'S
EXHIBIT
B



ORIGINAL

1    A.    From about 2000 till 2004.

2    Q.    When in 2004?

3    A.    I think it was roughly March or April of 2000

4          to -- I don't know, it was during the first

5          quarter of 2004 sometime.

6    Q.    Well, I'm told from the answers given by the

7          company that you made the decision to terminate

8          my client or at least not offer her another

9          position at Highmark; is that accurate?

10   A.    Well, there was a transition phase, and I can't

11         tell you the exact dates as I'm saying, but

12         Lifestyle Advantage was an affiliate company of

13         Highmark.

14   Q.    Let's go back to my question, I want you to

15         focus on the question I asked you.  I am told

16         that you are the person who made the decision

17         not to offer my client continuing employment

18         with Highmark; is that accurate?

19   A.    That is accurate.

20   Q.    I understand that that decision was made in or

21         about March of 2004; is that accurate?

22   A.    I can't say whether that -- I would say it was

23         sometime during the first quarter, but I can't

24         remember the dates.

25   Q.    Let's see (reviewing documents).  I'm trying to

1      decision you made in a day or a week or a month

2      or did it take months or what?

3  A.  I don't think it was made in a day, but I don't

4      know how long the period was.

5  Q.  Okay.  Is it fair to say that for the four-year

6      period immediately preceding my client's

7      termination you were not working in the area

8      involving HealthPLACE or the areas in which my

9      client was responsible?

10  A.  I stopped working for HealthPLACE around April

11      of 2000, somewhere in there, and from then

12      until, you know, Lifestyle Advantage was closed

13      my primary focus was Lifestyle Advantage.

14  Q.  So the answer to my question would be yes then I

15      take it?  For the four years or approximately

16      four years preceding the decision to terminate

17      my client you weren't working in that area?

18              MS. MUNSCH:  I object to the form.

19      What area?  Do you mean wellness or -- she was

20      not the -- in the reporting chain for

21      HealthPLACE.

22  BY MR. SANSONE:

23  Q.  Right, that's what we had established; is that

24      right?

25  A.  Approximately right.

1  A.  I can't answer that.

2  Q.  Who chose you to make that decision?

3  A.  It would be the person I reported to along with

4      the person in HR.

5  Q.  Who would those persons be by name?

6  A.  Aaron Walton and Cindy Mori.

7  Q.  Who was it that communicated that decision to

8      you or how was that decision communicated to you

9      that you were to make this decision about my

10     client?

11 A.  From my boss, Aaron Walton.

12 Q.  What did he say?

13 A.  I can't remember.

14 Q.  You're allowed to approximate what he said, I

15     can't expect you to remember.

16 A.  I can't remember a word of it.

17 Q.  Well, you must remember something about it, you

18     said he communicated to you the decision that

19     you had to --

20 A.  He gave me the directive to set up a new

21     organization.

22 Q.  I see.  And within that directive I take it you

23     were given the responsibility to decide who

24     would staff that new organization?

25 A.  Would you repeat that?

1  Q.    -- as to staffing of the new organization?

2  A.    Correct.

3  Q.    Were there any of your recommendations for

4        staffing which were overturned or overruled by

5        either Mr. Walton or by Ms. Mori in human --

6  A.    I don't remember that.

7  Q.    I don't understand your answer.

8  A.    I don't remember if any of my recommendations

9        were overturned or not.

10 Q.    Do you have any present recollection that any

11       were?

12 A.    I don't.

13 Q.    Is it fair to say that in the four years,

14       approximately four years prior to making the

15       decision about my client that you played no role

16       in managing her?

17 A.    That's correct.

18 Q.    Is it fair to say that during that time frame,

19       the roughly four years prior to you making this

20       decision about her ongoing employment, that you

21       did not observe her performance in any way?

22 A.    I don't remember.

23 Q.    You don't remember whether or not you had any

24       occasion in which to observe her performance?

25 A.    No.

1  Q.  Do you remember any occasion during that

2      four-year period from 2000 to 2004 in which you

3      did observe my client's performance?

4  A.  I don't specifically remember any.

5  Q.  Would your job have given you occasion to do so?

6  A.  It could have from time to time.

7  Q.  But you have no recollection of doing so?

8  A.  No specific recollection.

9  Q.  I take it then therefore that you made no

10     observations about my client which were

11     unfavorable during that period of time?

12  A.  I can't answer that for sure because there could

13     have been occasions where, you know, we worked

14     together on the same project because our units

15     were very closely related.

16  Q.  Do you have any recollection of working with my

17     client during that period of time?

18  A.  Not specifically.

19  Q.  Do you have any recollection of any negative

20     thoughts you had about my client's performance

21     during that four-year period?

22  A.  I don't know.

23  Q.  You don't know if you have a recollection?

24  A.  Well, I --

25  Q.  My question is do you have any recollection of

1       say.

2  A.   Okay.

3  Q.   It would be important for you to wait until I'm

4       finished with the question before you answer.

5  A.   Okay.

6  Q.   Did the single incident that you have described

7       play any role in the decision to terminate my

8       client?

9  A.   Yes.

10 Q.   What role did it play?

11 A.   It contributed to the role.  I did not assign

12      percentages to exactly what went into it, but I

13      can tell you that it did leave a negative

14      impression with me.

15 Q.   When you made the decision to terminate my

16      client what input did you use?

17 A.   I used the input of her performance reviews, her

18      personnel file in general, and I also asked the

19      woman who she reported to.

20 Q.   That would be?

21 A.   Tina Palaggo-Toy.

22 Q.   You consulted with Ms. Toy?

23 A.   I did.

24 Q.   Did you rely on any other source of information

25      to make the decision as to whether or not to

1    offer my client a position in the new

2    organization or terminate her?

3                    MS. MUNSCH:  A source outside of her

4    own perceptions and --

5                    MR. SANSONE:  Outside of the three

6    sources --

7                    MS. MUNSCH:  Outside of her own

8    personal interactions or knowledge of

9    Ms. Sweeting?  You're asking her about --

10  BY MR. SANSONE:

11  Q.   I asked you what you relied on.  You said her

12       performance reviews, her personnel file and you

13       had a discussion with Ms. Toy.

14  A.   And also my own recollections, my own

15       observations of her performance.

16  Q.   And your own observations?

17  A.   Correct.

18  Q.   Okay, let's start with performance reviews.  How

19       many years of performance reviews did you

20       consider in this decision?

21  A.   I can't say exactly.  I went through her

22       personnel file, and I believe there were at

23       least two years in there.

24  Q.   Did you have access to previous years of

25       performance reviews had you wished them other

1   than the two years that you looked at?

2              MS. MUNSCH:  I object to the form of

3   the question.  I don't believe she said she only

4   looked at two years, she said she looked at the

5   reviews that were in the file and she's

6   recalling now that there were at least two

7   years' worth there.  I don't think she said she

8   only looked at two years' worth.

9   BY MR. SANSONE:

10  A.   I looked at the entire file.

11  Q.   That's not my question.  How many of my client's

12       performance reviews did you review?

13  A.   I can't remember the exact number.

14  Q.   Then I asked you were the performance reviews

15       that were not in her file accessible to you had

16       you wished?

17              MS. MUNSCH:  I object to the form of

18       the question.  How does this witness know if

19       there were performance reviews on Ms. Sweeting

20       that may or may not have been in the file?

21              MR. SANSONE:  She worked there for

22       nine years, she thinks there were two years

23       there, what do you mean?  What does that mean?

24              MS. MUNSCH:  Lack of foundation.  She

25       said she -- Joel, she said she reviewed the

1    entire file.

2                    MR. SANSONE:  Let me try it another

3    way because this --

4                    MS. MUNSCH:  I object.  Lack of

5    foundation that this witness knows how many

6    performance reviews may exist on this witness.

7  BY MR. SANSONE:

8  Q.    Does the company perform annual performance

9        reviews?

10 A.    Yes.

11 Q.    Do you believe that there were more performance

12       reviews that existed than those which you

13       reviewed on my client?

14 A.    I don't know.  I don't know, and I can't

15       remember exactly, but I know I looked at at

16       least two years.

17 Q.    If two is the number or three, would it have

18       been more than three that you looked at?

19 A.    I don't know; I don't remember.

20 Q.    Do you believe that you looked at as many as

21       eight or nine?

22 A.    I don't know.

23 Q.    You don't know what you looked at?

24 A.    I don't remember looking at that many of them,

25       but I'm not sure.

1    Q.    If you looked at any number of performance

2          reviews less than the total number of years that

3          my client worked for Highmark or its

4          predecessor, would you have concluded from that

5          that there were others that you weren't seeing?

6    A.    It didn't occur to me.

7    Q.    Did you know how long my client had worked for

8          the company when you made this decision?  Were

9          you aware of her hire date?

10   A.    That did not figure into my decision.

11   Q.    You have to answer the questions that I'm

12         asking.  Were you aware that she was hired by

13         the company in October of --

14   A.    No.

15   Q.    Wouldn't her personnel file have showed you

16         that?

17   A.    It would have shown that, but that's not what I

18         was looking for.

19   Q.    I'm not asking you at the moment what you

20         considered, I'm asking what you would have known

21         at the time.  Did you know that she had been an

22         employee for roughly ten years?

23   A.    No.

24   Q.    Did you play a role in giving her the temporary

25         assignment?

1  A.  Not really.

2  Q.  Were you aware that she was being offered a

3      temporary assignment --

4  A.  Yes.

5  Q.  -- to bridge her to ten years?

6  A.  Yes.

7  Q.  Then you knew that she was a ten-year -- almost

8      a ten-year employee?

9  A.  I didn't even know what the role was, you know,

10     how long you had to be there to -- you know, to

11     qualify.

12 Q.  Did you know why she was being given a temporary

13     assignment?

14 A.  Yes.

15 Q.  Why did you understand she was being given a

16     temporary assignment?

17 A.  For the reason that you just said.

18 Q.  To bridge her to ten years?

19 A.  Yes.

20 Q.  Then you knew she would be an almost ten-year

21     employee, is that fair to assume?

22          MS. MUNSCH:  At that point in --

23 BY MR. SANSONE:

24 A.  No, no.

25          MS. MUNSCH:  I object to the form of

1     the question.

2  BY MR. SANSONE:

3  Q.  Why is that not fair to assume?

4  A.  Because that whole decision came after.

5  Q.  The decision to offer the temporary position

6     came afterwards?

7  A.  Uh-huh.

8  Q.  You looked at her personnel file as part of what

9     you considered in the decision to terminate my

10    client; is that right?

11  A.  That's correct.

12  Q.  And the personnel file would have told you that

13    my client was hired in 1994, is that right?

14  A.  (Pause without response.)

15  Q.  It's not a trick question I didn't think.

16  A.  Well, you know, I didn't notice the date.  I was

17    looking for performance, period.

18  Q.  Just for the two-year period?

19         MS. MUNSCH:  I object to the form of

20    the question.  The record speaks for itself.

21    You can answer, if you understand.

22  BY MR. SANSONE:

23  Q.  What performance were you looking for, ma'am,

24    her whole performance or just some subset of

25    that performance?

1  A.  Well, the most recent performance would have

2      been the most relevant to me and the most

3      relevant since I had been gone for a few years.

4  Q.  What do you mean by the most recent, do you mean

5      the most recent year?

6  A.  The most recent year or two since I had not been

7      directly involved.

8  Q.  Well, you hadn't been there for four, is that

9      what you told me, '00 to '04?  Why didn't you

10     look for four years?

11 A.  I may have.  I'm telling you I don't remember

12     exactly how many years.

13 Q.  You think it might be two years, but you don't

14     know that exactly?

15            MS. MUNSCH:  Objection, you're

16     badgering the witness.  Asked and answered,

17     Joel, ten times.

18            MR. SANSONE:  I certainly can badger,

19     that's not badgering.  If you'd like to see

20     badgering, I'll do badgering.

21            MS. MUNSCH:  No, you're not going to

22     badger.

23            MR. SANSONE:  No, you're right, I

24     just want to know what the lady looked at when

25     she decided to terminate my client.

1              MS. MUNSCH:  Well, it's been asked

2       and answered.

3  BY MR. SANSONE:

4  Q.   If you can tell me how many years you looked at,

5       otherwise I'm going to pry for a while.

6  A.   I can't tell you how many years.  I can't tell

7       you.

8  Q.   Is it clear to you that you didn't look at

9       performance evaluations for a nine-year span?

10 A.   It is not clear to me.

11 Q.   You might have actually looked at all of them?

12 A.   I may have.

13 Q.   But said to me approximately two years when you

14      answered that question, why is that?

15 A.   Because I was looking for recent performance.

16 Q.   What else in the personnel file did you look at

17      besides performance reviews?

18 A.   I think I looked at that letter, but I'm not 100

19      percent sure.

20 Q.   This letter you talked about from somebody from

21      some time ago?

22 A.   Yes.

23 Q.   Anything else in the personnel file that you may

24      have looked at?

25 A.   Not that I remember.

1   Q.   I'm going to skip the conversation you had with

2        Tina Palaggo-Toy for a moment and go to your

3        observations, which is the fourth component you

4        said that you relied upon in making this

5        decision.  What observations of my client are

6        you referring to?

7   A.   I remember, you know, a few assignments, one in

8        particular was to implement a system-wide

9        arthritis program based on a seminar that your

10       client attended in California, and the

11       assignment was to go to that seminar.

12  Q.   Can you tell me when this was, can you place it

13       in time?

14  A.   No, I can't.

15  Q.   Was it before your work in the Lifestyle

16       Advantage program?

17  A.   Yes.

18  Q.   So sometime prior to 2000?

19  A.   Correct.

20  Q.   Somewhere between '94 and 2000?

21  A.   Correct.

22  Q.   Can you be more specific than that or is that as

23       specific?

24  A.   That's as specific as I can be regarding the

25       date.  I can be more specific regarding the

1  Q.  Did you play a role in supervising my client's

2      implementation of this program?

3  A.  Not directly.

4  Q.  Was my client solely responsible for the

5      implementation of this program?

6  A.  Yes.

7  Q.  Who was her supervisor while she was doing so?

8  A.  Tina Palaggo-Toy.

9  Q.  Did you and Ms. Toy discuss my client's

10     performance with regard to the implementation of

11     this program?

12 A.  Yes.

13 Q.  What was Ms. Toy's observation about that?

14 A.  I don't remember.

15 Q.  Do you remember it being negative?

16 A.  I don't remember.

17 Q.  Do you know what my client's overall ratings for

18     the years '94 through 2000 were?

19 A.  I can't remember specifically.

20 Q.  I'll represent to you that they were all exceeds

21     expectations.  Do you remember whether or not my

22     client was reprimanded in any way for her

23     alleged failure to implement this program?

24 A.  That, I don't know.

25 Q.  Did you suggest that she be reprimanded in any

```
 1        way?
 2   A.   I don't remember.
 3   Q.   Do you have any evidence that you did so, a
 4        writing of some sort or anything like that?
 5   A.   No.
 6   Q.   Is there any paperwork about this which would
 7        evidence my client's failure to perform in this
 8        regard?
 9   A.   There is no paperwork per se, but there was no
10        successful implementation replication, the plan
11        did not -- did not materialize.
12   Q.   And you believe that was a fault of my client;
13        is that right?
14   A.   Yes.
15   Q.   Why?  What is it that she failed to do or did
16        improperly or incorrectly?
17   A.   I don't know what aspect of program
18        implementation failed, but the bottom line is
19        that the investment did not payoff.
20   Q.   I'm asking you what role my client played in the
21        failure.
22   A.   I don't know exactly.  I don't know where it
23        failed.
24   Q.   But you're certain it was my client's fault?
25   A.   I have no reason to believe otherwise.
```

1    Q.    I don't know if I asked this exactly, if I did,

2          I apologize, but was my client disciplined in

3          any way or even written up or was there any

4          adverse consequence to my client for this

5          failure?

6    A.    Not that I remember.

7    Q.    Why not, was it an important program?

8    A.    I don't remember why.

9    Q.    Did you consider it an important program?

10   A.    I did.

11   Q.    But you don't know why my client didn't receive

12         any adverse impact from the alleged failure on

13         her part?

14   A.    No.

15   Q.    But that played a role in your decision, did it?

16   A.    I would say it contributed to that decision.

17   Q.    What personal observations of my client did you

18         make during this process of the implementation

19         of this program, if any?

20   A.    None that I recall.

21   Q.    Your answer came under the category of your

22         observations of my client, that's what I was

23         asking about.

24   A.    Well, it was really the omission of observation,

25         I didn't see much about it afterward.

1    Q.    Were there any observations of my client that

2          you made that contributed to your decision not

3          to offer her a position?

4    A.    Yeah, there were some things along the way, I

5          can give you another example.

6    Q.    This is an example of your observation of my

7          client?

8    A.    Yes, my observation.

9    Q.    When you say another example, have you given me

10         one yet because I didn't get it if you did.

11                    MS. MUNSCH:   Joel, I'm going to

12         object to the -- the record will speak for

13         itself.  I mean if you're talking about observe

14         in the sense of looking at her visually, that's

15         one interpretation, the word observe in a

16         manager's observation of an employee's

17         performance can be more than just direct visual

18         observation.

19                    MR. SANSONE:   Well, I'm asking

20         about --

21                    MS. MUNSCH:   This --

22                    MR. SANSONE:   I'm asking her what her

23         observations were.

24                    MS. MUNSCH:   So he's interpreting

25         observe --

1  BY MR. SANSONE:

2  A.   Okay, I --

3              THE COURT REPORTER:  One at a time or

4       I can't take it down.

5              MS. MUNSCH:  I'm going to object to

6       the form of the question and ask you, Joel, to

7       make sure that -- to explain to her how you're

8       defining the word observe, what do you mean by

9       observe.

10  BY MR. SANSONE:

11  Q.   Well, see, really, contrary to your lawyer's

12       perception, it isn't my job to define anything,

13       it's yours.

14              MS. MUNSCH:  No, I think it is your

15       job to tell her what -- to give her a clear

16       question she can understand.  Do you mean by

17       observe, Joel, visual observation?

18  BY MR. SANSONE:

19  Q.   Ma'am, you used the word observation, you said

20       that a fourth component of your decision was

21       your observation of my client, and I'm asking

22       you to tell me when and under what circumstances

23       you observed my client.

24  A.   Okay.  I'm going to go back to that first

25       example that I gave you, and the way I see

1       observations -- the way I define observations in

2       this context would be that I do not recall

3       seeing that project move to its potential, that

4       I did not see it written up in the newspaper

5       like a lot of our other things were of equal

6       investment or of significant investment. I did

7       not see, you know, a lot of people trained in

8       this who then were motivated to continue to

9       deliver the program. I don't recall seeing any

10      significant amounts of data that came out of

11      that program or outcomes of any nature that came

12      out of the program that were parallel to the

13      other work that was being delivered to our

14      customers.

15  Q.  So your first example is essentially a lack of

16      observation?

17  A.  Exactly, it's a lack of observation. I did not

18      see the results that you would expect to see

19      from a highly developed, expensive piece of

20      work.

21  Q.  And what sources did you seek besides I guess

22      the company newspaper or newsletter?

23              MS. MUNSCH:  I object to the form,

24      and the record will speak for itself.

25  BY MR. SANSONE:

1   Q. What sources did you seek to make these

2      observations?

3   A. I didn't seek any, they typically would come to

4      me.

5   Q. In what form?

6   A. In the form of a monthly report.  There was

7      nothing that really rose to the level of the

8      investment, period, I don't know how else to say

9      it.

10   Q. Well, who would have made such a report to you,

11      a monthly report?

12   A. My staff.

13   Q. I'm sorry, my client had the responsibility to

14      implement this program; is that right?

15   A. Correct.

16   Q. And your staff would have made a report about

17      that; is that right?  Is that what your

18      testimony was?

19   A. Yes.

20   Q. Who on your staff would have made such a report

21      to you?

22   A. It would come from Joy to her supervisor, Tina,

23      and then to me.

24   Q. Okay.

25   A. But it is very typical in these cases to also

1    get communication from people who benefited from

2    it.  For example, with many of our programs we

3    get letters and, you know, a lot of positive

4    feedback from employees, from the community at

5    large, from people who are very appreciative of

6    the opportunity.  I don't remember ever getting

7    anything like that.  I don't remember ever

8    getting, for example, a letter from a physician

9    saying this is such a terrific result.  So what

10   I'm saying is that it's more an absence of

11   result that I observed.

12   Q.   And do you know why there was an absence of

13        result?

14   A.   No.

15   Q.   Did you ever take any steps to determine why

16        there was an absence of result?

17   A.   I don't remember.

18   Q.   At the time that you made the decision not to

19        give my client a position in the new

20        organization did you take any steps to determine

21        why there was this alleged failure to this

22        program some years before?

23   A.   I don't remember.  I may have asked, I don't

24        know.

25   Q.   Who would you have asked?

1  A.  Tina.

2  Q.  So the first example that you've given me was a

3      lack of observation of discernible results of

4      this practice.

5  A.  A lack of result.

6  Q.  Were there any other observations or lack of

7      observations so to speak that played a role in

8      the decision to --

9  A.  I want to go back and clarify.  I may have, you

10     know, heard something back from a training or

11     something that was done at a very low level, but

12     it was nothing that rose to the magnitude that

13     was expected.  So there may have been a

14     training, there may have been some activity, but

15     what I'm saying is that it did not reach its

16     potential.

17 Q.  Why not?

18 A.  As I said, I don't know.

19 Q.  Did you know at the time?

20 A.  No.

21 Q.  Could there be any other reasons besides my

22     client's failure for the failure of the program?

23 A.  If there were, I'm not aware of them.

24 Q.  Did you take any steps to determine that?

25 A.  I probably asked, I can't remember.

1  Q.  But you didn't write any of this down anywhere;

2      is that right?

3  A.  No, I did not.

4  Q.  Why not?  It was an important program that

5      failed, why didn't you write it down somewhere?

6  A.  She was not a direct report of mine.

7  Q.  Well, I asked you why you didn't record anywhere

8      the failure of this program and its reasons.

9  A.  I can't remember.

10 Q.  Was it an important program?

11 A.  It was an important program.  What I can

12     remember is that looking back on it it didn't

13     meet my expectation, period.

14 Q.  But you don't know why?

15 A.  I don't know why.

16 Q.  You don't know whether my client was at fault or

17     not?

18 A.  I don't.

19 Q.  And yet it played a role in the decision not to

20     hire my client?

21 A.  Yes.

22 Q.  Were there any other observations or lack

23     thereof which played a role in the decision not

24     to retain my client?

25 A.  Yes.

93

P R O C E E D I N G S

ANNA LISA SILBERMAN,

the deponent, having been first duly sworn, was

deposed and testified as follows:

MS. MUNSCH:  Before we get into your

examination, Ms. Silberman would like to supplement

her prior testimony from we were together way back on

October 10th.  She would like to supplement her prior

testimony where you were inquiring about input that

she had received from others regarding your client

which influenced her decision not to retain your

client in the new organization.  So allow her to just

supplement that prior testimony and then we can

proceed with additional questioning.

BY MR. SANSONE:

Q.   Feel free.

A.   I had a conversation with Dr. Bradley

Pifalo.

Q.   When was that?

A.   That was sometime during this transition

phase.  I don't have an exact date for you.

Q.   I'm sorry.  What do you mean by this

transition?

A.   The transition phase when I took over the

Division of Preventive Health Services from Health

94

1    Style Advantage.

2          Q.    This would have been in '94; is that right?

3          A.    No.

4                MS. MUNSCH:  We're in 2004.

5          Q.    I'm sorry, '04?

6          A.    Early '04.

7          Q.    '04, '04, I'm sorry?

8          A.    Early in '04.  And at that --

9          Q.    But was that at the time of the decision to

10   -- what decision do you mean?

11         A.    It was prior to, sometime between January

12   and March.

13         Q.    Okay.  But you were talking about the

14   decision not to retain my client, is that the decision

15   you're referring to?

16         A.    Correct.

17         Q.    Sometime between January and March is what

18   you said?

19         A.    Correct.

20         Q.    'Of '04?

21         A.    And Dr. Pifalo had been the vice president

22   of that area before I came back.  And we were going

23   through the staff.  And when it came to your client's

24   name he said to me these exact words, she has to go.

25         Q.    She referring I take it to my client?

95

A.    Correct.

Q.    And did Dr. Pifalo say why it is that my client had to go?

A.    He did not elaborate.  We were just going through staff.

Q.    Did you ask him why he felt that way?

A.    If I did I don't remember and I don't remember what he said, but I do remember those words.

Q.    "She has to go"?

A.    Yes.

Q.    Yeah, you have to answer audibly so that the court reporter can take it down.  She can't take down shakes of the head.

A.    I apologize, yes.

MS. MUNSCH:  And was there another?

A.    There was one other conversation that came to mind in recent weeks, and that is a conversation with Deb Rice, R-i-c-e.  And Deb is Highmark's senior vice president of regional accounts.

Q.    And when was this conversation?

A.    Again, sometime in the same period.

Q.    And what was the nature of that conversation?

A.    She said to me, remember, we need help in Erie.

96

1    Q.   Can you give me --

2    A.   Anybody but Joy, is what she said.

3    Q.   We need help in Erie with what?

4    A.   With the work site.  She as I said is senior

5 vice president of regional accounts, and so typically

6 the person assigned to work site wellness would

7 accompany sales people who worked directly under Deb

8 Rice.

9    Q.   And why did she say, anybody but Joy, did

10 she explain that?

11    A.   She did not.  It was in the context of

12 another meeting.  And we were just sitting down at the

13 table.  And then we resumed -- you know, we started

14 with the other meeting.  But she did make that comment

15 to me.

16    Q.   Did you follow-up on the comment with her?

17    A.   No.

18    Q.   Why not?

19    A.   I don't know.  I did not follow-up on that

20 comment, but I do remember her saying that.

21    Q.   Do you know if she was serious?

22    A.   I assumed she was serious.

23    Q.   Why?

24    A.   Well, she's a very solid person.  She wasn't

25 laughing or there was no other reason to believe that

97

1    she was not serious.

2        Q.    Okay.  But you don't know why she said what

3    she said?

4        A.    I do not.

5        Q.    And she didn't follow-up with you on that

6    comment?

7        A.    No.

8        Q.    Or elaborate in any way?

9        A.    No.  I did call her though just last week to

10   check in with her to make sure my memory was correct.

11       Q.    Uh-huh.

12       A.    Because it's been a while, and she said,

13   yes, in fact that is true.  And she said she got that

14   from one of her sales reps who had gone out to an

15   account.  I'm assuming that is with Joy.

16       Q.    Ms. Rice based a recommendation not to

17   continue the career of my client based on something a

18   sales rep said to her about one visit to a client; is

19   that your testimony?

20       A.    That's what was reported to me.  I don't

21   know that it was one visit.

22       Q.    Oh, I'm sorry.

23       A.    I don't know how she formed her opinion.

24   I'm just telling you what she said to me.

25       Q.    But I thought you said to me that this was

100

1    pick my client.  Do you recall that?

2         A.   I do.

3         Q.   And did you follow-up with Ms. Toy about

4    that comment?

5         A.   That I can't remember.

6         Q.   She indicated that you didn't.  Do you have

7    any reason to believe that's not true?

8         A.   No, I don't.

9         Q.   Why didn't you follow-up with her?

10        A.   I don't remember.

11        Q.   Did you think it was important to know what

12   her opinion was?

13        A.   I did get her opinion.

14        Q.   Well, did you think her opinion was

15   important?

16        A.   I considered it.

17        Q.   Did her opinion play a greater role in your

18   decision than the comment by Dr. Pifalo, if you can

19   tell me that?

20        A.   I can't remember.

21        Q.   Why would Ms. Toy's opinion have been

22   important to you?

23        A.   Because she was her direct supervisor.

24        Q.   So what does that matter?  What is it about

25   being her direct supervisor that makes her opinion

QUALITY COURT REPORTING
412-833-3434

101

1    important?

2        A.    The obvious, that she would be more familiar

3    with her work.

4        Q.    Than?

5        A.    Than, you know -- than other people may

6    have.

7        Q.    And anyone else in the company, right?

8        MS. MUNSCH:    I object to the form of that

9    question.

10       A.    I can't say yes to that.

11       Q.    I have reviewed your deposition transcript

12   from the first session and I am endeavoring not to ask

13   any questions again that I've already asked you about,

14   and so if I missed this, I apologize.    And I'll make

15   this very brief.

16       A.    You said you have or you have not reviewed?

17       Q.    I have.

18       A.    Okay.

19       Q.    I have.    Have you had the opportunity to do

20   so?

21       A.    Yes.

22       Q.    By the way, what was the source for your

23   information about Dr. Pifalo and that conversation

24   that you had with him?    Let me ask the question a

25   different way.    What caused you to remember it, if you

105

1    going to ask you if this is the letter that you were

2    referring to?

3         MS. MUNSCH:  So that the record is clear,

4    the reference to "this" is a letter dated July 16,

5    1998 from a Jan Thompson.  Are you marking that as an

6    exhibit, Joel?

7         MR. SANSONE:  Unless she says no, it's not,

8    then it would be a waste of time.

9         I believe this is the letter we are going to

10   label and have it marked as Silberman Exhibit 5.  And

11   I guess we're going to agree this was the letter that

12   you referenced in your earlier deposition which you

13   said played a role in the termination of my client.

14        (Silberman Exhibit No. 5 and No. 6 were

15   marked for identification.)

16        Q.   I'm showing you what's been marked as

17   Silberman Exhibit 6, and ask you, if you can -- by the

18   way, for the record Exhibit 5 is Defendant's Bates

19   stamp No. 01096 is Defendant's Bates stamp No. 0055

20   through 0058.  I will represent to you that this was

21   contained in Plaintiff's personnel file and appears to

22   be her performance appraisal for the period June 1998

23   through June 1999.  Do you recognize this document?

24        A.   I do not recognize this specific one, but I

25   do see this as a -- you know, one of Highmark's

QUALITY COURT REPORTING
412-833-3434

106

1    standard performance reviews.

2         Q.   Would you look at the last page, please.

3         A.   Sure.

4         Q.   At the bottom left of the last page does

5    your signature appear?

6         A.   Yes, it does.

7         Q.   What does your signature on this document

8    mean?  What does it signify?

9         A.   That I have read this document.

10        Q.   Does it signify any agreement or concurrence

11   with the contents of the document?

12        A.   It does.  It -- how could I say this, it

13   means -- it means that I read the document and that I

14   agreed -- well, I think agreed is too strong of a

15   word.  It means that I read it and that I approved the

16   direction, that I approved the increase that typically

17   goes along with this.

18        Q.   Your signature on the performance appraisal

19   means you approved of the raise that was given?

20        A.   Of the raise.  Well, let me take that back,

21   because agreed is too strong of a word.  I would say

22   that my signature on this meant that I read it and did

23   not strongly disagree with it.

24        Q.   So sort of damning with faint praise, huh,

25   did not strongly disagree.  Is there any indication

107

1    that you can see on this document of any disagreement

2    that you had with anything here?

3        A.   No, there is not.

4        Q.   And what message do you believe your

5    signature on this document would send to an employee?

6        A.   An incomplete message of approval.

7        Q.   An incomplete, what would be incomplete

8    about the message?

9        A.   Well, it's not like I was -- what I'm saying

10   is I was not your client's supervisor.  Someone else

11   was your client's supervisor.  And I read this and it

12   certainly -- you know, it's not -- probably would not

13   have been the same -- would not have been the same

14   evaluation that I would have given Joy, but, then

15   again, I'm not this person.  I mean it's the way

16   management is, Joel.

17       Q.   Well, Anna, let me ask you this, was it part

18   of your procedure, I should say, to meet with Tina

19   prior to, you know, the finalizing of this review in

20   order to give your input?

21       A.   In reality, what often happens is it comes

22   to the deadline and, you know, she gave me this and

23   asked for my signature.  And I, you know, read it over

24   because I read it over and I signed off on it, so I

25   assume responsibility for approving it.

QUALITY COURT REPORTING
412-833-3434

109

1      Q.    Okay.

2      A.    I agree with the contents of this, although

3   I do think it was incomplete because, obviously, this

4   was not included, and it occurred during that -- no,

5   this was in July.  Yeah, it occurred during that time

6   frame.

7      Q.    And that was pretty much my point, bringing

8   it to your attention.

9      A.    Right, right.

10     Q.    That it wasn't in there?

11           MS. MUNSCH:  Well, let her finish.

12     A.    Right.  Two points on this, Joel.  Number

13   one, I do not micromanage my staff at the director

14   level.  And so it probably did not occur to me.  I

15   have my own staff to supervise.  It probably did not

16   occur to me that this negative letter was not included

17   in this.  So it did not occur to me.

18           And secondly, Ms. Palaggo-Toy and I have

19   very different management styles.

20     Q.    And so therefore what?

21     A.    If your client had been my employee I would

22   definitely have it included.  She chose for whatever

23   reason not to.  And as I said, I am not a

24   micromanager.  She was Joy's supervisor and she

25   obviously felt that she deserved this, and I did not

112

1    that?

2        A.   It is.  And furthermore, it says that she's

3    not the only person -- I'm not the only person feeling

4    uncomfortable with the way she is treated by Joy.

5        Q.   Right. Now, there's no other evidence that

6    anyone else made such a complaint; is that right?

7            MS. MUNSCH:  I object to the form of the

8    question.  At what point, Joel?  Her testimony says

9    the fact that there were complaints of this nature

10   throughout Ms. Sweeting's career.

11       Q.   No, I'm talking about in reference to this

12   letter, these others that are named didn't make

13   complaints?

14       A.   I don't know that.

15       Q.   Well, do we have any evidence of it?

16       A.   We don't have evidence, but --

17       Q.   Is there any evidence in the performance

18   review that this was an issue that was an area that my

19   cliented needed improvement in?

20       A.   No.

21       Q.   And you could have instructed Ms. Toy had

22   you wished to include the areas for improvement,

23   something along the lines of this letter, is that

24   right, and the problems raised by this letter?

25       A.   Correct.

113

1    Q.   But you did not do so?

2    A.   I may have.  I may have, and then she didn't

3    do it.  I don't know.

4    Q.   Does that sound like something that would

5    happen between you and Ms. Toy?

6    A.   That could have happened.

7    Q.   I see.

8    A.   I'm not saying it did or it didn't, but it

9    could have.

10   Q.   Do you have any present recollection that it

11   did?

12   A.   I do not.

13   Q.   When you were going through my client's

14   personnel file to apparently assist you making this

15   decision, and I think you said that at that time you

16   read this letter, do you remember your testimony in

17   that regard?

18   A.   Yes.

19   Q.   At that time did you read this performance

20   review for the same year?

21   A.   I don't know.

22   Q.   Do you think that that would be something

23   that would be important to you?  For example, what the

24   performance of that employee was during that entire

25   year in which this issue came up?

120

1    A.    That contributed to it, yes.

2    Q.    I'm wondering do you know why Ms. Toy didn't

3  include anything about this issue in the last

4  performance evaluation of my client that you signed?

5    A.    As I said before, I don't know why.

6    Q.    I don't know if I asked you this.  Did you

7  go to Ms. Toy at the time and say, hey, why isn't

8  there anything about this letter in there?

9    A.    I don't remember.

10    Q.    Did you go to Ms. Toy at the time you found

11  the letter in my client's personnel file and ask her

12  about it?

13    A.    You know, I don't even know that I saw the

14  letter until I looked in her file in 2004.

15    Q.    That's what I'm saying, when you saw it then

16  did you then call Tina and said, what was up with

17  this?

18    A.    No.

19    Q.    How come?

20    A.    I read it on my own.

21    Q.    Well, did you find out that she followed up

22  on it at all to see if it was true?

23    A.    No.

24    Q.    If someone had an ax to grind or something

25  like that?

121

1     A.   No.

2     Q.   Did you think it was unusual that it was the

3   only letter of such a kind in the whole file?

4     A.   I didn't look at the content of the letter

5   and I didn't see anything that said it wasn't true.

6     Q.   Do you know what an anomaly is?

7     A.   Yes.

8     Q.   Did it strike you as an anomaly?

9     A.   No.

10     Q.   Why not?

11     A.   Because I had heard other complaints.

12     Q.   From?

13     A.   Over time.  And I'm sure Tina when I

14   instructed her to dealt with your client on those

15   complaints.

16     Q.   Can you name any other person who was the

17   author of such a complaint besides this Jan Thompson?

18     A.   No, I can't.

19     Q.   Can you give me any specifics about any such

20   complaint with respect to date, time or place?

21     A.   No.  As I said many times before, Joel, I

22   did not directly supervise your client.  I was

23   distanced from her by another supervisor and I am not

24   not a micromanager.

25          MR. SANSONE:  That's all I have.

QUALITY COURT REPORTING
412-833-3434

122

-----

<u>EXAMINATION</u>

<u>BY MS. MUNSCH</u>:

    Q.  I just have one quick question for Ms.

Silberman.

    A.  Yes.

    Q.  Maybe it's two.  Directing your attention to

the voice mail exchange that you had with Tina

Palaggo-Toy in 2004.

    A.  Yes.

    Q.  At the time that you asked for the input

from Tina regarding whether she would choose Becca or

Ms. Sweeting, had you informed Ms. Palaggo-Toy what

you were looking for in a community site consultant?

    A.  I don't believe I had.

    Q.  And did you tell her what the duties and

responsibilities, specifically the specific duties and

responsibilities of a community site consultant would

be?

    A.  No, I don't -- I don't think Tina understood

the skill set that would be required of a community

site consultant.

        MS. MUNSCH:  I have nothing further.

-----

<u>EXAMINATION</u>

QUALITY COURT REPORTING
412-833-3434