**SWEETING vs. HIGHMARK, INC.**
**DEPOSITION OF REBECCA SWICK**
November 22, 2005

**Page 1 to Page 48**

COMPRESSED TRANSCRIPT
AND
WORD INDEX
PREPARED BY:

# Quality Court Reporting

4768 Prescot Drive
Bethel Park, PA 15102
412-833-3434  Fax 412-833-0293



PLAINTIFF'S
EXHIBIT
C

PENGAD 800-631-6989

SHEET 1  PAGE 1 _____ 1

1          IN THE UNITED STATES DISTRICT COURT FOR THE
2                 WESTERN DISTRICT OF PENNSYLVANIA

                        - - - -

3  JOY SWEETING,                    )
4         Plaintiff,                )
5             -vs-                  )      Civil Action
                                    )      No. 04-0368 Erie
6  HIGHMARK, INC.,                  )
7         Defendant.                )

8

9                      - - - -

10          DEPOSITION OF:  REBECCA SWICK

11                     - - - -

12

13             DATE:    November 22, 2005
                        Tuesday, 10:03 a.m.
14

15             LOCATION:  SCANLON & SANSONE
16                        2300 Lawyers Building
                          Pittsburgh, PA  15219

17

18             TAKEN BY:   Plaintiff

19
   REPORTED BY:   Beth E. Welsh
20                Notary Public
                  QCR Reference No. BW1598
21

22

23

24

25
                        QUALITY
   Bethel Park, PA   COURT REPORTING   412-833-3434

---

PAGE 3 _____ 3

1                     * I N D E X *

2  ** Pages 49 through 102 under separate cover **

                                                    4
3  Examination by Mr. Sansone - - - - - - - -      52
   Continued Examination by Mr. Sansone - - - -    82
4  Examination by Ms. Munsch - - - - - - - - -     87
   Re-Examination by Mr. Sansone - - - - - - -    100
5  Certificate of Court Reporter - - - - - - -    101
6  Errata Sheet - - - - - - - - - - - - - - - -   102
   Notice of Non-Waiver of Signature

7

8                 * INDEX OF EXHIBITS *

9  Deposition Exhibit 1 - - - - - - - - - - -      27
10 Deposition Exhibit 2 - - - - - - - - - - -      54
   Deposition Exhibit 3 - - - - - - - - - - -      67
11 Deposition Exhibit 4 - - - - - - - - - - -      71
   Deposition Exhibit 5 - - - - - - - - - - -      71
12

13 NOTE:   Deposition Exhibits 2 through 5 are being
14         attached to the confidential portion of the
           transcript per agreement of counsel.

15

16

17

18

19

20

21

22

23

24

25
                        QUALITY
   Bethel Park, PA   COURT REPORTING   412-833-3434

---

PAGE 2 _____ 2

1            DEPOSITION OF REBECCA SWICK,
   a witness, called by the Plaintiff for examination,
2  in accordance with the Federal Rules of Civil
   Procedure, taken by and before Beth E. Welsh, a Court
3  Reporter and Notary Public in and for the
   Commonwealth of Pennsylvania, at the offices of
4  SCANLON & SANSONE, 2300 Lawyers Building, Pittsburgh,
   Pennsylvania, on Tuesday, November 22, 2005,
5  commencing at 10:03 a.m.

                      - - - -

6

7  APPEARANCES:

8        FOR THE PLAINTIFF:

9  Joel S. Sansone, Esq.
   SCANLON & SANSONE
10 2300 Lawyers Building
   Pittsburgh, PA  15219
11 412-281-9194

12      FOR THE DEFENDANT:

13 Martha Hartle Munsch, Esq.
   REED SMITH, LLP
14 435 Sixth Avenue
   Pittsburgh, PA  15219
15 412-288-3131

16      ALSO PRESENT:

17 Carl H. Shuman, Esq.
   Joy Sweeting
18

19

20

21

22

23

24

25
                        QUALITY
   Bethel Park, PA   COURT REPORTING   412-833-3434

---

PAGE 4 _____ 4

1                REBECCA SWICK,
2          having been duly sworn,
3        was examined and testified as follows:

4                  EXAMINATION
                      - - - -
5

6

7  BY MR. SANSONE:
8  Q.   Your name is Rebecca Swick; is that right?
9  A.   S-W-I-C-K.
10 Q.   Is it Swick?
11 A.   Swick.
12 Q.   Ms. Swick, where are you currently employed?
13 A.   Highmark.
14 Q.   In what capacity?
15 A.   I'm a community site consultant.
16 Q.   How old are you?
17 A.   I'm about to be 34.
18 Q.   How far did you go in school?
19 A.   I'm about to get my master's degree on
20      December 11th.
21 Q.   On December 11th of 2005 you will get your
22      master's degree in what?
23 A.   Public administration.
24 Q.   Master's in public administration.  From what
25      university?
                        QUALITY
   Bethel Park, PA   COURT REPORTING   412-833-3434

SHEET 2   PAGE 5

5

1  A.   Gannon University in Erie.
2  Q.   Congratulations.
3  A.   Thank you.
4  Q.   You expect to be receiving your master's at that
5       time.  What is the highest degree that you
6       currently hold?
7  A.   A bachelor of arts in social work from the
8       University of Pittsburgh.
9  Q.   From Pitt, which is where I went to school.
10      When did you receive your bachelor's from Pitt?
11 A.   That was '94.
12 Q.   When did you start working at Highmark?
13 A.   Nine years ago in February, so I don't know what
14      year that would be, what, '98.
15 Q.   Boy, that's a tough one.  Nine years ago,
16      wouldn't that be '97?
17 A.   February will make it --
18                    JOY SWEETING:   '97.
19 BY MR. SANSONE:
20 Q.   I just looked at your personnel file, but I
21      forget already.  Let's assume it was '97 you
22      started with Highmark.
23 A.   (Witness nodding head up and down.)
24 Q.   During your employment with Highmark have you
25      been continuously going to school to try to get

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

---

PAGE 6

6

1       your master's degree?
2  A.   Not since the very beginning, about three years
3       ago I started.
4  Q.   You started about three years ago?
5  A.   Uh-huh.
6  Q.   In '02?
7  A.   I couldn't say for sure to tell you the truth
8       off the top of my head.
9  Q.   Roughly three years.
10 A.   Roughly three years.
11 Q.   At that time what degree were you pursuing?
12 A.   I started with an MBA, master's in business
13      administration, but I found that that really
14      didn't suit me.
15 Q.   The reason I'm asking some of these questions is
16      because the company has responded to a charge
17      which we filed at the EEOC in this case, and one
18      of the comments in it was this, I'll read to
19      you, while a Highmark employee Ms. Swick
20      completed graduate school receiving an MBA with
21      a concentration in marketing.  That statement is
22      not accurate I take it?
23 A.   I don't know who said that, but no, obviously
24      not.
25 Q.   Okay.  That's really all I was kind of getting

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

---

PAGE 7

7

1       at there.  So you began working with Highmark in
2       roughly 1997?
3  A.   Uh-huh.
4  Q.   In what capacity did you begin working with
5       Highmark?
6  A.   Customer service representative in Erie.
7  Q.   Who was your immediate supervisor in that
8       position?
9  A.   Initially it was Debra Johnson.
10 Q.   How long did she remain your immediate
11      supervisor?
12 A.   I want to say it was probably close to two and a
13      half years and then I switched units to Kathleen
14      Rzodkiewicz.
15 Q.   How do you spell Rzodkiewicz?
16 A.   It's R-Z-O-D-K-I-E-W-I-C-Z.
17 Q.   Wow.  Can you do that one more time?
18 A.   R-Z-O-D-K-I-E-W-I-C-Z.
19 Q.   How long did Kathleen remain your immediate
20      supervisor?
21 A.   Maybe about a year.  I think it was total about
22      three and a half years in customer service.
23 Q.   You said something about changing units.
24 A.   Yeah, they frequently restructure up there.
25 Q.   I see.  But you remained a customer service rep?

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

---

PAGE 8

8

1  A.   Yes.
2  Q.   Just a different supervisor?
3  A.   Correct.
4  Q.   How long did you remain in this position as
5       customer service rep?
6  A.   A total of about three and a half years.
7  Q.   Then what happened?
8  A.   Then I became the assistant at HealthPLACE.
9  Q.   By the way, I've got us somewhere around '00 or
10      '01.
11 A.   What's that, I'm sorry?
12 Q.   I have the chronology so far as somewhere around
13      2000 or 2001.
14 A.   I guess so.  I mean I'm not the greatest with
15      dates.
16 Q.   Oh, okay.
17 A.   I can tell you three and a half years in is when
18      I moved to HealthPLACE.
19 Q.   Okay.  What do you mean by moved to HealthPLACE,
20      what does that mean?
21 A.   My job was transferred.  I was no longer a
22      customer service representative.  I became the
23      assistant at the Highmark HealthPLACE in Erie.
24 Q.   The assistant what?
25 A.   I'm trying to remember what the title was, just

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

SHEET 5  PAGE 17

17

1   can give a -- I don't think that's a fair
2   question for me to answer.  I'm not in a
3   position to judge her.
4 Q.  Well, first of all, I'm not asking you about any
5   aspect of her job that you were unable to
6   observe.  What you told me in your testimony was
7   that you worked with her on a daily basis side
8   by side, which gave you, in my view, a unique
9   ability to observe her conduct and while I
10  understand that it was not your job at the time
11  to rank her performance, I am now asking your
12  opinion based on what your observations were at
13  that time.  So you should limit your answer to
14  only those things you were able to observe and
15  give me your impressions based on those
16  observations.
17           MS. MUNSCH:  I'm assuming you're
18  including in that her observations of how she
19  interacted with others, if that is what she
20  observed?
21           MR. SANSONE:  Surely.  That was a big
22  part of her job, wasn't it, interaction with the
23  public?
24 BY MR. SANSONE:
25 A.  Well --

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

PAGE 18

18

1           MS. MUNSCH:  Or members of -- other
2   employees.
3           MR. SANSONE:  Yeah.
4           MS. MUNSCH:  So if you've observed
5   that, Becca, you can give Mr. Sansone your
6   impressions of observations of interactions
7   anecdotal or otherwise.
8 BY MR. SANSONE:
9 A.  Well, I have to say honestly that I don't think
10  that she had a very good relationship with most
11  of the people that we worked with.
12 Q.  Do you mean within Highmark or do you mean
13  customers?
14 A.  Both at times.  There were a lot of arguments.
15  Yeah, I mean when individuals would come to me
16  it would frequently be because she was -- I
17  don't know.  I mean I observed some rudeness and
18  some shortness.  I think that in many capacities
19  she did a very good job and in others I don't
20  think that was the case.
21 Q.  Do you have an ability based upon the
22  observations you've made to rank her overall
23  performance?  In other words, was one aspect of
24  her performance so good that it outweighed these
25  bads in your mind or so bad that it outweighed

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

PAGE 19

19

1   the good?  Is there any way for you to give me
2   an idea of what you thought of her overall
3   performance which was my question to you?
4           MS. MUNSCH:  I'm going to object to
5   the form of that question.  I don't know that
6   this witness is in a position to do that, but if
7   she has --
8 BY MR. SANSONE:
9 Q.  If you have an opinion --
10          MS. MUNSCH:  If she has opinions
11  about certain aspects of performance or an
12  opinion about overall, you may give it, but I
13  don't think that you can force her to sit here
14  and form that opinion --
15          MR. SANSONE:  No, no -- I --
16          MS. MUNSCH:  -- today.
17 BY MR. SANSONE:
18 Q.  No, no, I asked you do you have an opinion based
19  upon your observations of her overall
20  performance.  That was my question originally to
21  you.
22 A.  Yeah, I don't feel comfortable with that.  I
23  don't feel like I was in a position where I can
24  really judge that.  I think there's so many
25  aspects to it, and I was in a supportive

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

PAGE 20

20

1   position where I was doing my own -- my own
2   roles, my own jobs, and there was a lot that had
3   to do with the administrator's position that I
4   really was kept separate from.  So no, I really
5   don't think I can elaborate on that.
6 Q.  What is or was HealthPLACE at the time that you
7   took the position there in 2000 or 2001?
8 A.  What was it?
9 Q.  Yes.
10 A.  It was a department of Highmark that promoted
11  health and wellness programming.
12 Q.  What happened to HealthPLACE?
13 A.  Speakers were brought in, there were different
14  classes and programs that were run there.
15 Q.  I'm sorry, what happened to the program, to the
16  department?
17 A.  Ultimately?
18 Q.  Yes.
19 A.  It was dissolved.  It was ineffective.
20 Q.  I'm sorry?
21 A.  It was ineffective.
22 Q.  Were you working at HealthPLACE up to the time
23  of its dissolution?
24 A.  Yes.
25 Q.  When was that?

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

SHEET 6  PAGE 21 _____
21

1  A.  It will be two years in February.
2  Q.  So '04, February of '04?
3  A.  Uh-huh.
4  Q.  What was your position at the time of the
5      dissolution of HealthPLACE?
6  A.  Program assistant.
7  Q.  The same position you had taken in roughly 2000?
8  A.  Correct.
9  Q.  What happened to your employment with Highmark
10     thereafter?
11 A.  It was transitioned to the position that I hold
12     now.
13 Q.  That position is community site consultant?
14 A.  Correct.
15 Q.  Would you tell me, please, what are the duties
16     and responsibilities of the community site
17     consultant?
18 A.  Various -- in a nutshell, community site
19     consultants are tasked with establishing and
20     keeping on track community organizations that
21     adopt our programming and deliver them to the
22     community at large.  It basically involves a
23     million little tasks.  It's
24     organizational, mostly administrative.  I
25     currently work with thirteen sites, but that's
                    QUALITY
        Bethel Park, PA  COURT REPORTING  412-833-3434

PAGE 22 _____
22

1      growing.
2  Q.  Can I just stop you and break that down so I can
3      understand it.  What programs are you referring
4      to?
5  A.  Highmark Preventive Health Services offers a
6      number of courses right now in program to the
7      community, including personal nutrition
8      coaching, nutrition courses, relaxation courses,
9      an osteoporosis prevention course, smoking
10     cessation programming.
11 Q.  Were any of these programs available through
12     Highmark prior to your taking this position in
13     '04?
14 A.  Not in the form that they are now.  There were a
15     couple that existed in name, but all of the
16     programs have been redeveloped.
17 Q.  I wasn't asking if the exact programs existed.
18     For example, did Highmark offer a smoking
19     cessation program prior to?
20 A.  Correct, yes.
21 Q.  Personal nutrition courses, were they offered as
22     well?
23 A.  There was coaching available, yes.  And there
24     was a program called Eat Well for Life.  They
25     carried that name over actually and revamped the
                    QUALITY
        Bethel Park, PA  COURT REPORTING  412-833-3434

PAGE 23 _____
23

1      program.
2  Q.  Prior to this revamping that we're talking about
3      in '04 were these programs offered through
4      HealthPLACE?
5  A.  Like I said, not in that exact form.  They were
6      wellness courses by different names and slightly
7      different content.  The selection of wellness
8      programming absolutely changed, but were there
9      wellness programs available at HealthPLACE, yes,
10     that's what they did.
11 Q.  That's what I'm asking, how similar or
12     dissimilar were the programs that were
13     redeveloped or retooled I guess you said from
14     what existed at HealthPLACE?
15 A.  I don't know that I really have a way to tell
16     you how different they are.  All of the
17     programming has been, as I said, kind of picked
18     apart, revamped.  They were pretty boring.  They
19     were much longer.  For example, they were
20     eight-week classes that people really wouldn't
21     commit to and nobody ever signed up for them.
22     The programs were failing the way that they were
23     so they basically took everything apart, kept
24     some of the good information that was core,
25     revamped it, repackaged it, made it more
                    QUALITY
        Bethel Park, PA  COURT REPORTING  412-833-3434

PAGE 24 _____
24

1      accessible and more palatable.  I don't know if
2      that answers your question.
3  Q.  Somewhat.  What is it exactly that you did with
4      these programs?
5  A.  Personally?
6  Q.  Yes, in your job as community site consultant.
7  A.  Oh, what is it I do now?
8  Q.  Yes.
9  A.  Okay.  Community site consultants, as I said, go
10     out, they choose community locations, sites to
11     deliver the program, that's the first thing.  We
12     have to decide where it is appropriate that they
13     actually go.
14 Q.  For example?
15 A.  For example, a local YMCA, okay.  We find a
16     location based on the list of criteria, see if
17     the staff is able to manager the programs.  If
18     so, we implement training, get everybody on
19     board, work with a marketing program, try to get
20     people in the door, enrolled.  Every course
21     comes with paperwork.  Everything we do needs
22     outcomes.  We need to know if the programs are
23     effective or not.  There's constant re-staffing
24     issues.  It's basically baby-sitting the
25     programs at each of these places, making sure
                    QUALITY
        Bethel Park, PA  COURT REPORTING  412-833-3434

**SWEETING vs. HIGHMARK, INC.**
**DEPOSITION OF CYNTHIA MORI**
November 22, 2005

**Page 1 to Page 40**

COMPRESSED TRANSCRIPT
AND
WORD INDEX
PREPARED BY:

# Quality Court Reporting

4768 Prescot Drive
Bethel Park, PA 15102
412-833-3434  Fax 412-833-0293



PLAINTIFF'S
EXHIBIT
D

SHEET 7    PAGE 25 ————————

25

1    probe her discussion.
2         MR. SANSONE:  The argument that's
3  been advanced as you know is that once you've
4  made this a part of the record, you've waived
5  that privilege.
6         MS. MUNSCH:  We have not waived the
7  discussions that she had with counsel in
8  connection with the preparation of the document.
9         MR. SANSONE:  I believe I understand
10  your position.  My point is that there's a
11  counterposition which is that once this occurs
12  you waive that and, of course, it's been the
13  subject of great debate.  Well, I'll tell you
14  what --
15         MS. MUNSCH:  We can --
16         MR. SANSONE:  Let me ask about some
17  specific facts.
18         MS. MUNSCH:  She's been instructed
19  and I can instruct on the record that she's not
20  going to disclose to you any conversations that
21  she had with counsel about the defense of or the
22  preparation of the defense of the company to
23  your client's charge and/or lawsuit.
24         MR. SANSONE:  I understood that.  So
25  I now understand it really.

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

PAGE 26 ————————

26

1  BY MR. SANSONE:
2  Q.  I'm going to ask you about some specific factual
3      allegations that appear in this exhibit, and I'm
4      going to ask you if you recall what the source
5      of information was for that statement.  The
6      first one I'd like to draw your attention to is
7      on the first page of the letter or of the
8      statement which is at the last paragraph,
9      literally the sentence begins the third line
10     from the bottom at the end of the line, it
11     begins while, and I'm going to read that to you,
12     it reads while a Highmark employee, Ms. Swick
13     completed graduate school, receiving an MBA with
14     a concentration in marketing.  Did you see that
15     that I read?
16  A.  I do.
17  Q.  Can you tell me where you got that information?
18  A.  I don't recall.
19  Q.  Do you recall at least whether it was from one
20     of the two women that you talked to or from some
21     document or some source like the personnel file?
22  A.  I don't remember.
23  Q.  Do you know whether that statement's accurate or
24     not?
25  A.  I know it's not accurate now.

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

PAGE 27 ————————

27

1  Q.  How do you know it's not accurate now?
2  A.  At Joy's deposition.
3  Q.  You heard what Joy had to say about that, okay.
4     Did you do some checking after that?
5  A.  I did.
6  Q.  What did you do?
7  A.  I went and looked at her personnel file.
8  Q.  Do you know why you wrote that in there?
9  A.  Honestly I don't.  That was a mistake.
10  Q.  Do you agree that this statement about her MBA
11     came during a series of statements about what
12     appear to be her qualifications for the
13     position?  You talk about her MBA and then she
14     exceeds expectations on her reviews.
15         MS. MUNSCH:  I object to the form of
16  the question.  The document speaks for itself.
17         You can answer, Cindy, if you --
18  BY MR. SANSONE:
19  Q.  Do you agree with me that this is apparently
20     intended to illustrate one of her qualifications
21     for the position?
22  A.  No, I do not agree with that.
23  Q.  What was the purpose of putting that sentence in
24     there besides what I just said?
25  A.  You know what, when I wrote this I don't recall.

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

PAGE 28 ————————

28

1     I'd have to look at what the EEOC had written
2     and asked for.
3  Q.  You don't know why you wrote this in here the
4     way it is, that's your testimony?
5  A.  I think I made a mistake.
6  Q.  What was the mistake?
7         MS. MUNSCH:  Asked and answered.
8  BY MR. SANSONE:
9  Q.  I mean did you misunderstand somebody or misread
10     something or how did the mistake happen is what
11     I'm asking?
12  A.  I don't know.  That's what I'm trying to wonder.
13  Q.  You said I think I made a mistake.  What was
14     your mistake is what I'm asking?
15  A.  That Ms. Swick did not have an MBA, she was
16     working towards it, but did not have it
17     completed.
18  Q.  I understand that, but why are you saying that
19     was your mistake, maybe somebody told you that?
20     How is it your mistake is what I'm asking?
21  A.  When I went back and looked there was nothing in
22     her personnel file, and that's where I would
23     have obtained that information.
24  Q.  So you should have verified through her
25     personnel file whether that was accurate or not,

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

SHEET 8  PAGE 29

29

1    is that it?
2        MS. MUNSCH:  I object to the form of
3    the question.  That's not what she said.  She's
4    not telling you that somebody told her that and
5    that she failed to corroborate it in the file.
6    She's saying she doesn't remember where she got
7    that.
8  BY MR. SANSONE:
9  Q.  Well, did you look at her personnel file in
10     connection with making up this answer?
11  A.  I did.
12  Q.  Would you have looked in the place in the
13     personnel file where it would have said what her
14     degree was?
15  A.  I can't remember if I did that.
16  Q.  Was that something you would have done based on
17     the way you handle things?
18  A.  Yes.
19  Q.  Well, did you have a copy of the job
20     description, the position that's being discussed
21     here that Ms. Swick was given and my client
22     wasn't considered for, this community site
23     consultant?  Did you have that at the time of
24     the job description?
25  A.  I had that when I was writing the position

QUALITY
Bethel Park, PA  COURT REPORTING  412-833-3434

PAGE 30

30

1    statement.  I used that as an exhibit.
2  Q.  Right.  So you knew that the position
3    description said that a master's degree was
4    preferred, did you not?
5  A.  I don't remember that.
6  Q.  We actually have it here.  Let me see if I can
7    pull it out, and we'll look at it (reviewing
8    documents).  Here it is.  This is Swick
9    Deposition Exhibit 1.  We talked to Ms. Swick
10     about this.  I'll show you Page 2 under minimum
11     qualifications.  Do you see that part about the
12     preferred part?
13                - - - -
14        (The witness reviewed the document.)
15                - - - -
16  BY MR. SANSONE:
17  Q.  Did you see where I'm talking about?
18  A.  Yes, I do.
19  Q.  At the time that you wrote this position
20     statement you would have known that the master's
21     degree was a preferred degree for that position,
22     would you not?
23  A.  I did not write this job description.
24  Q.  No, I said at the time you wrote this statement.
25  A.  Oh, statement.

QUALITY
Bethel Park, PA  COURT REPORTING  412-833-3434

PAGE 31

31

1  Q.  You would have known that the job description --
2    in the job description it indicated that a
3    master's degree was preferred for this position?
4  A.  That's correct.
5  Q.  Was an MBA one of the master's degrees that was
6    a preferred degree?
7        MS. MUNSCH:  You're asking her to
8    refer to the position description because that
9    would be the only source of her knowledge.
10  BY MR. SANSONE:
11  A.  A master's degree in business, health
12     administration or health promotion is preferred.
13  Q.  So where it says here that an MBA -- that she
14     received an MBA with a concentration in
15     marketing, that would be one of those preferred
16     master's that the job description listed; right?
17  A.  It doesn't ask for that.
18  Q.  Doesn't it say master's in business, MBA,
19     master's in business?
20  A.  It does.
21  Q.  Okay.  So this sentence here would have made
22     Ms. Swick, at least as to her degree, look
23     pretty qualified for the position, she had the
24     preferred degree for the position; right?
25  A.  Ask me that again.

QUALITY
Bethel Park, PA  COURT REPORTING  412-833-3434

PAGE 32

32

1  Q.  This statement that appears in the position
2    statement would have made Ms. Swick look pretty
3    well qualified at least as to her education to
4    hold the position she was given, wouldn't it?
5  A.  That's not what I was trying to do there.
6  Q.  Well, wait a minute, I thought -- well, what
7    were you trying to do?
8  A.  Just list what her educational background was.
9  Q.  Why?
10  A.  And I mistakenly put she had an MBA instead of
11     working on an MBA.
12  Q.  But why did you feel it was important to list
13     her educational background, what was that
14     relevant to?  The paragraph is about this
15     community site consultant, that's what the
16     subject or sentence there talks about.
17  A.  I can't recall the questions that were in the
18     EEOC charge.  It might have been related to
19     that.
20  Q.  Well, you just told me that you didn't put this
21     in here to make Ms. Swick look, you know, well
22     qualified for the position.
23  A.  That's right.
24  Q.  You can tell me why you didn't put it in there,
25     but you can't tell me why you did?

QUALITY
Bethel Park, PA  COURT REPORTING  412-833-3434

37

1    July 26th.  That's actually why I was asking the
2    question, I was wondering when you had the
3    conversation with Ms. Silberman.  It looks like
4    this letter might have been begun in April and
5    finished in July or something.
6            MS. MUNSCH:  Or it's just a typo.
7    BY MR. SANSONE:
8    Q.   Or it's just a typo, right.
9            MS. MUNSCH:  I don't even know if the
10   charge was served back in April, I don't know if
11   she can remember that.
12   BY MR. SANSONE:
13   A.   I can't recall when the charge was served.
14   Q.   But anyway, I think you earlier testified that
15   you wrote this letter within the several weeks
16   prior to the July 26th date?
17   A.   That's correct.
18   Q.   Okay.  Would you have been talking to
19   Ms. Silberman during that time frame?
20   A.   I would have talked to her to write my
21   performance -- I mean to write my position
22   statement.
23   Q.   Okay.  And it was she that told you that there
24   was a comparison of the performance appraisals
25   which was a factor in the decision; is that

---

38

1    right?
2    A.   That's correct.
3    Q.   Were there any other factors that she mentioned
4    in the decision?
5    A.   I can't recall our discussion.
6    Q.   Did you make notes of your discussion?
7            MS. MUNSCH:  I think that was asked
8    and answered.
9    BY MR. SANSONE:
10   A.   If I would have --
11   Q.   I guess I did ask that question.  I'm sorry?
12   A.   If I would have, you would have them.
13   Q.   Okay.  You've looked for notes and you haven't
14   found any, is that it?
15   A.   I haven't looked for anything.  I gave counsel
16   everything they asked for.
17           MS. MUNSCH:  I gave you a folder
18   marked Cindy Mori's folder.  She gave me her
19   folder.
20           MR. SANSONE:  I just --
21           MS. MUNSCH:  I don't think she went
22   through page to page to determine what she was
23   giving me.  She gave me her folder, which we've
24   given to you.
25           MR. SANSONE:  Well, before the end

---

39

1    I'm going to go back and look at it again to
2    make sure I didn't miss something.
3    BY MR. SANSONE:
4    Q.   Do you know any other reasons for
5    Ms. Silberman's statement that she chose
6    Ms. Swick as being better qualified other than
7    the performance appraisals?
8            MS. MUNSCH:  Her personally?
9    BY MR. SANSONE:
10   Q.   Do you know of any other reason that
11   Ms. Silberman had, whether she told you another
12   reason, you saw a note written by her or
13   something?
14   A.   I'm not aware of any other reasons that I can
15   recall.
16   Q.   Okay.  I'm going to show you what has been
17   marked as Swick Deposition Exhibit 2, and I
18   understand that at this point forward we have to
19   seal the record as Swick Exhibit 2 is a matter
20   which is -- a document which is covered under
21   the agreement between the parties with regard to
22   confidentiality.  Until the court reporter is
23   directed otherwise this portion of the record
24   will remain under seal.
25           MS. MUNSCH:  And Cindy wouldn't know

---

40

1    anything about this.
2            Just so you know, this is just to
3    maintain the privacy of information that's
4    coming from personnel files of people who aren't
5    parties to this litigation.  So that's the
6    reason for why we're doing this, to maintain the
7    confidentiality of information contained in
8    other people's personnel files, but you may
9    answer the questions.
10           THE WITNESS:  Okay.
                    - - - -
12           (Whereupon, the remaining pages of
13   this deposition are being marked confidential
14   and are being sealed under separate cover.)
                    - - - -

# SWEETING vs. HIGHMARK, INC.
## DEPOSITION OF TINA PALAGGO-TOY
### November 22, 2005

## Page 1 to Page 73

COMPRESSED TRANSCRIPT
AND
WORD INDEX
PREPARED BY:

# Quality Court Reporting
4768 Prescot Drive

412-8          )2          3-0293

PLAINTIFF'S
EXHIBIT
E
PENGAD 800-631-6969

SHEET 12  PAGE 45

45

BY MR. SANSONE:
1
2   Q.  You don't know if you recommended two percent?
3   A.  I don't.  I don't remember this.
4   Q.  That's the bottom of that range; right?
5   A.  Right, it was two to three.
6   Q.  Oh, two to three that year?
7   A.  Correct.
8   Q.  I see.  But you said you're the type of manager
9       that wants to give as much as you can?
10  A.  I usually do, yes.
11  Q.  Is it likely that you recommended the lowest
12      possible raise?
13              MS. MUNSCH:  If you can recall.
14  BY MR. SANSONE:
15  A.  I don't remember.  I honestly don't remember.
16  Q.  Don't worry about that if you can recall stuff.
17              MS. MUNSCH:  Well, no, that's the --
18              MR. SANSONE:  What I mean is --
19              MS. MUNSCH:  She is my client.
20              MR. SANSONE:  I know, but you don't
21      have to cue her every time --
22              MS. MUNSCH:  She's not to guess
23      because you're pressing her to guess.
24              MR. SANSONE:  You don't have to cue
25      her every time I ask a question.  She knows to

QUALITY
Bethel Park, PA  COURT REPORTING  412-833-3434

---

PAGE 46

46

1       answer if she remembers.
2               MS. MUNSCH:  Well, she --
3   BY MR. SANSONE:
4   Q.  And I'll tell you again, if you don't remember,
5       don't make it up, just say I don't remember --
6               MS. MUNSCH:  She's not making
7       anything up.
8   BY MR. SANSONE:
9   Q.  -- that way she doesn't have to cue you every
10      time I ask you a question.  She doesn't have to
11      say to you if you remember so you can say I
12      don't remember.  We call that cuing.
13  A.  But she's not cuing me.
14  Q.  That's why I said don't pay attention.
15  A.  I don't remember, I've said it three times.
16  Q.  Okay.  We have introduced into the record a
17      little bit earlier in one of the earlier
18      depositions, and I think it's Swick Exhibit 1,
19      it might not be, the position statement of the
20      company sent by Ms. Mori to the EEOC sometime
21      around July 26th of 2004.  I'm going to show it
22      to you and ask you if you've seen it before.
23              - - - -
24      (The witness reviewed the document.)
25

QUALITY
Bethel Park, PA  COURT REPORTING  412-833-3434

---

PAGE 47

47

1   BY MR. SANSONE:
2   A.  I don't remember seeing it in this format.
3   Q.  Do you know if you played any role in providing
4       information that went into the preparation of
5       this?
6   A.  I'm sure I provided information that went into
7       this.
8   Q.  Ms. Mori indicated that she did call you on a
9       couple occasions.
10  A.  Yeah.
11  Q.  Do you remember talking to her about that?
12  A.  I remember talking to her about many things, and
13      I do remember her prepping for this case, yes.
14  Q.  Do you mean for these depositions or for this --
15  A.  For the EEOC.
16  Q.  I see.  Let me ask you this:  What was your role
17      in determining that my client would be
18      terminated and her position would be eliminated,
19      what role did you play in that decision?
20  A.  I didn't play any role.
21  Q.  Were you consulted in that decision?
22  A.  Very close to when the job was eliminated I had
23      received a voicemail from Anna, who was our
24      new --
25  Q.  Anna is?

QUALITY
Bethel Park, PA  COURT REPORTING  412-833-3434

---

PAGE 48

48

1   A.  Anna Silberman is my current vice president.
2   Q.  Your boss?
3   A.  Yes.
4   Q.  Okay.
5   A.  And at that time was to, they were just assuming
6       responsibility for us.
7   Q.  I see.
8   A.  And she asked me via voicemail if I had to
9       choose between Joy or Becca for a position in
10      the new organization, who would I choose.  And
11      of course I left her a voicemail back because we
12      weren't meeting on it, it was via voicemail, and
13      I said that I would choose Joy, but that was the
14      only encounter.
15  Q.  This was sometime near the time that the
16      decision was made?
17  A.  It feels that way.  I don't remember the actual
18      time frame.
19  Q.  Okay.
20  A.  That was a stressful time frame.
21  Q.  I'm sure it was.  It was near to the time of
22      that decision; is that right?
23  A.  Yes.  But whether it was February, mid, I'm not
24      even sure, I don't know.  I don't know.
25  Q.  Okay.  Sometime maybe in the month or so prior

QUALITY
Bethel Park, PA  COURT REPORTING  412-833-3434

SHEET 13   PAGE 49

49

1   to that decision being made, somewhere in that
2   time frame?
3 A. It seems like that could be the case. I don't
4   remember any dates.
5 Q. So you called Ms. Silberman back, didn't get her
6   I guess and left a voicemail?
7 A. That's what I remember.
8 Q. Okay. In the voicemail response you left a
9   message to the effect that you would choose Joy
10   over Becca for that position; is that right?
11 A. Yes. I did not know what the position was
12   though, it was -- her voicemail to me was just
13   posed if I had to choose.
14 Q. For any position you mean?
15 A. Right.
16 Q. I see.
17 A. Well, she didn't say for any position. Her
18   words to me were, as I recall, if I had to
19   choose between Joy or Becca for the new
20   organization, who would I choose.
21 Q. For some job, but you didn't know for what job?
22 A. I don't remember if she said the actual job
23   title, I don't remember that.
24 Q. Okay. When you learned what job Becca
25   eventually was given, if you had known that at

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

---

PAGE 50

50

1   the time of the question being posed to you,
2   what would your answer have been?
3 A. I don't know. I mean I don't imagine it would
4   have been different.
5 Q. That's what I figured you'd say.
6 A. I don't know. I didn't know what that job was.
7 Q. Well, do you know now know what --
8 A. Do I know now, yes, I know now.
9 Q. Well, I'm saying using the knowledge that you
10   have now, if you were asked the same question,
11   would you still answer the same way?
12 A. I don't know because I'm not there, do you know
13   what I mean?
14 Q. No, I don't.
15 A. Well, that's my answer. I don't know how I
16   would answer it today.
17 Q. Well, is there anything that you've learned
18   about that position which would suggest to you
19   that Becca was a better choice for it than Joy?
20      MS. MUNSCH: I'm going to object
21   because there's no foundation laid that to this
22   day she knows what that job involves because I
23   think she testified that she manages work site,
24   there's been no foundation that she manages
25   community site.

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

---

PAGE 51

51

1 BY MR. SANSONE:
2 Q. We'll go back to my original instructions which
3   I've repeated over and over again. You only can
4   tell me what you know. It goes without saying
5   that if you have no knowledge that can answer
6   the question, you should say I don't know. That
7   way Martha doesn't have to keep helping you with
8   this testimony because I know you don't need it,
9   I understand that. She doesn't seem to get
10   that.
11      MS. MUNSCH: Then she's answered it
12   three times. I think she's told you she doesn't
13   know.
14 BY MR. SANSONE:
15 A. I am the director of the work site wellness
16   area. I have not been involved in that
17   community part of life in PHS.
18 Q. I'm asking you this question now: Have you
19   learned anything about this position which would
20   change your answer? I take it that the answer
21   to that would be no, but --
22      MS. MUNSCH: I'm going to object to
23   that absolutely, Joel, because --
24      MR. SANSONE: Well, if you get to
25   suggest her answers --

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

---

PAGE 52

52

1      MS. MUNSCH: -- what she said is --
2      MR. SANSONE: -- why can't I?
3      MS. MUNSCH: -- that at the time she
4   gave the answer she didn't know -- I mean she --
5      MR. SANSONE: I'm not asking that
6   question. Listen to the question.
7      MS. MUNSCH: She still doesn't know
8   what the community --
9 BY MR. SANSONE:
10 Q. I said now, have you learned anything since then
11   that's changed your opinion, that's all. It's a
12   simple question. Have you learned anything
13   since the time you were first asked that
14   question which would change your opinion? You
15   must know the answer to that question, it's
16   either yes or no.
17      MS. MUNSCH: Or it's --
18 BY MR. SANSONE:
19 A. I mean I think it's an unfair question. I
20   don't --
21 Q. For example --
22 A. You're asking me how would I answer that
23   question today. I'm so blurred by it today.
24 Q. Actually, I'm asking a different question.
25      MS. MUNSCH: Let her finish.

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

SHEET 14   PAGE 53

53

BY MR. SANSONE:

1  Q.  I'm asking this question: When you were asked
2      the question before you said I didn't know what
3      the job was, she might have said the title, I
4      don't remember, but I certainly didn't know
5      exactly what it entailed; correct?
6
7  A.  Right.
8  Q.  Now, what I'm trying to find out is if you have
9      learned anything since the time of being asked
10     that question which would cause you to answer
11     the question any differently today? That's the
12     only question I'm asking you.
13  A.  No, because I manage the work site health
14      promotion area.
15  Q.  Theoretically somebody could have come to you
16     and said, this is what Becca's doing and she's
17     much better at it than Joy would have been and
18     here's why it's better for her. You could have
19     had --
20           MS. MUNSCH: Well, that's secondhand
21     knowledge, Joel, and that's --
22  BY MR. SANSONE:
23  A.  I never trust that kind of stuff.
24  Q.  Even if you don't trust it, I want to know if
25     you had any input like that, whether you believe

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

---

PAGE 54

54

1     it or accept it or not, now I want to know has
2     anybody come to you to try to justify why this
3     choice was made?
4  A.  No.
5  Q.  Okay. Why did you answer the question the way
6     you did when you were asked it back sometime in
7     early '04?
8  A.  Because I really like Joy, I had worked with her
9     for a really long time, we had a good
10     relationship, I respected her -- I mean I
11     respect her, I don't mean to say it "ed".
12  Q.  I appreciate that.
13  A.  It was an honest answer. I had much more
14     experience with Joy than I did with Becca. I
15     worked with her much longer and very closely
16     over those years.
17  Q.  Do you have enough information to give an
18     opinion as to who -- well, do you know anything
19     about the position that Becca was given -- I
20     hate to call her Becca, I don't know her,
21     Rebecca was given?
22  A.  I really -- then, now?
23  Q.  As you sit here.
24  A.  My responsibility now is 100 percent work site
25     wellness. I am like that one objective that you

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

---

PAGE 55

55

1     saw on that performance appraisal --
2  Q.  I understand that.
3  A.  -- blown up nationally.
4  Q.  I understand that, but that's not what I asked
5     you.
6  A.  Okay.
7  Q.  I asked you --
8           MS. MUNSCH: It is what you asked
9     because that's not what Becca does.
10  BY MR. SANSONE:
11  Q.  Let me ask the question again slowly.
12           MS. MUNSCH: Okay, but it's been
13     asked and answered.
14  BY MR. SANSONE:
15  Q.  What I asked you was have you learned anything
16     about that job -- simply because you work
17     somewhere else in the company doesn't mean you
18     might not have learned something, so I'm asking
19     you have you learned any of the details of the
20     job that she now performs from any source?
21  A.  My experience with the folks that do that job is
22     working collaboratively with the team that I'm
23     responsible for to take those community programs
24     and put them on-site at the work site. That's
25     what my experience is, and I have learned how to

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

---

PAGE 56

56

1     do that pretty well.
2  Q.  Okay.
3  A.  That's what I do.
4  Q.  Right. Of course that isn't what I asked you.
5  A.  I'm not understanding your question. I'm not
6     trying to not answer it.
7  Q.  That's okay. I'll try to ask it a different
8     way. I understand that when the change happened
9     here in early '04 you took on this specific
10     focused responsibility?
11  A.  Correct.
12  Q.  You no longer had responsibility for other
13     aspects of this program, I understand all those
14     things. All I'm asking you is whether or not
15     despite the fact that your responsibilities
16     changed did you come to learn what job it was
17     that Becca was given and what she does so that
18     you might evaluate the question of whether one
19     was more competent than the other?
20  A.  No, because Becca doesn't report to me.
21  Q.  Okay, I understand. You --
22  A.  My day-to-day has nothing to do with those folks
23     except for using those programs that they have
24     relationships with those community agencies and
25     bringing them on-site to the work site.

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

SHEET 15   PAGE 57

57

1  Q.  Is it fair to say that -- and by the way, the
2      question was posed to you by Ms. Silberman, did
3      I understand that right in a voicemail to you?
4  A.  Correct.
5  Q.  After you answered to the effect of Joy Sweeting
6      would be your choice, did you ever have any
7      other contact with Ms. Silberman on that issue?
8  A.  No, not following that call. I can tell you
9      that prior to, and I don't know what the timing
10     was, I went up to Anna's office before they
11     moved to our area and just went through --
12     without her asking me, went through our entire
13     staff and told her their strengths. I was
14     scared. I didn't want anybody to lose their
15     job. I was trying to protect everybody. So
16     I -- I mean you feel these things, you know it's
17     going to happen, you know something's happening,
18     and I was completely out of the loop. That
19     didn't feel good. So I went to her office and
20     went through everybody.
21 Q.  And their strengths?
22 A.  And their strengths.
23 Q.  Did you go through their weaknesses as well or
24     just --
25 A.  I did not.

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

PAGE 58

58

1  Q.  Okay.
2  A.  Because I don't usually go that route.
3  Q.  I'm trying to focus exactly on what happened
4      after you told Ms. Silberman that you would
5      choose Joy Sweeting. I was asking you did she
6      ever contact you about this again?
7  A.  No.
8  Q.  Did anyone ever contact you about that again,
9      whether it be Ms. Silberman or anybody else?
10 A.  Not until the time when they pulled me in, they
11     meaning Cindy and Anna, as the manager to tell
12     me that people were losing their jobs and it
13     would be my job to tell four of the seven people
14     that their jobs were eliminated.
15 Q.  And among the four that you told was my client?
16 A.  That's right.
17 Q.  But you didn't make the decision?
18 A.  I did not.
19 Q.  Nor participate in it --
20 A.  What do you mean by --
21 Q.  -- except to the extent that you were asked that
22     question? Well, did you do anything else to
23     participate in the decision as to who would be
24     terminated and who would not be?
25 A.  What do you mean by participate?

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

PAGE 59

59

1  Q.  I don't know what was done. I mean one thing
2      was you were asked the question who would you
3      choose, Becca or Joy, and I would call that
4      participation in that question.
5  A.  Right.
6  Q.  Was there anything else that was like that or
7      anything else that would constitute in your mind
8      participation in the decision?
9  A.  I would say --
10         MS. MUNSCH:  She told you giving the
11     input on the strengths, I would think that might
12     be at least unsolicited participation.
13         MR. SANSONE:  Okay.
14 BY MR. SANSONE:
15 Q.  Did you consider that as participation in the
16     decision as to who would stay and who would
17     leave?
18         MS. MUNSCH:  I'm going to object.
19     She asked you to define participate, that's
20     something she already described as input. I
21     mean define participate for her.
22 BY MR. SANSONE:
23 Q.  Well, see, what I like to do when I do these
24     depositions is I like to use your definition of
25     words so that it's not confusing.

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

PAGE 60

60

1          MS. MUNSCH:  Joel, I'm going to
2      object to that. You're the one asking the
3      questions, it's up to you to tell her what you
4      mean by that. I think it's fundamental, you
5      tell her what you mean by participate.
6          MR. SANSONE:  Martha, we're going to
7      do this my way and depending how long you --
8          MS. MUNSCH:  Define it because I'm
9      not going to allow -- have her try to --
10         MR. SANSONE:  She's going to answer
11     whatever questions I ask.
12         MS. MUNSCH:  So ask it.
13         MR. SANSONE:  I just did.
14         MS. MUNSCH:  She has a right to
15     interrogate the interrogator.
16 BY MR. SANSONE:
17 Q.  Did you participate in the decision to terminate
18     my client?
19 A.  No. If you -- I handed over the files on people
20     as I was asked.
21 Q.  You were asked to give files?
22 A.  Correct.
23 Q.  But you weren't asked to give any input?
24 A.  No, just that voicemail.
25 Q.  With the exception of that voicemail. That's

QUALITY
Bethel Park, PA   COURT REPORTING   412-833-3434

SHEET 16  PAGE 61

61

1   what you mean by being out of the loop, isn't
2   it, that you weren't really asked for input as
3   to who was going to be --
4 A. Right. It wasn't a -- I wasn't part of what the
5   new organization was going to look like in terms
6   of structuring it.
7 Q. I see.
8 A. I knew -- that's about it.
9 Q. In whatever time passed between when you were
10   asked that question and gave the answer and the
11   time of the decisions being announced, and I
12   think it was a short time, weeks or something or
13   maybe months at the most?
14 A. Yeah.
15 Q. And I think you've already said that
16   Ms. Silberman never contacted you, nor did
17   anybody else to follow up on your answer?
18 A. No.
19 Q. Was that surprising to you?
20 A. Not really.
21 Q. When you learned that my client would be one of
22   the persons who was terminated, were you
23   surprised?
24 A. Sad more than --
25 Q. To be fair, sad I understand, but the question

QUALITY
Bethel Park, PA  COURT REPORTING  412-833-3434

PAGE 62

62

1   is not sad or happy, it was surprised. Were you
2   surprised at that result?
3 A. Surprised? No.
4 Q. Why not?
5 A. You know, I'm not sure. When you asked me was I
6   surprised, I wasn't surprised. I didn't know
7   how things would go. I wasn't surprised about
8   anything. Everything was -- it was -- who knew
9   how it was going to go.
10 Q. Did you know at that time how much experience --
11   what the comparison in experience at Highmark
12   was as between Ms. Swick and my client?
13 A. Becca reported to me, I knew her strengths too.
14 Q. No, no, I said the amount of experience, years
15   of experience?
16 A. Years of experience?
17 Q. Yes.
18 A. Difference in their experience like years?
19 Q. Yes.
20 A. Heck yeah.
21 Q. Was it clear to you that my client had
22   significant more years of experience than
23   Ms. Swick working for --
24         MS. MUNSCH: I object to the form.
25   Experience doing what?

QUALITY
Bethel Park, PA  COURT REPORTING  412-833-3434

PAGE 63

63

1         MR. SANSONE: I was still talking and
2   finishing.
3         MS. MUNSCH: I object to the form of
4   the question.
5         MR. SANSONE: You have to wait until
6   I finish it before you object.
7 BY MR. SANSONE:
8 Q. I'm talking about experience at Highmark, was it
9   clear that my client had significantly more
10   experience than Ms. Swick did working at
11   Highmark?
12 A. Well, Becca came from customer service, so I'm
13   not sure how many years she had working at
14   Highmark prior to coming to us.
15 Q. Would you have known that at the time?
16 A. What do you mean?
17 Q. Back in '04 would you have known the answer to
18   that question then?
19 A. In terms of how long she worked for Highmark?
20 Q. Yes, would you have --
21 A. I'd have to look it up, I don't memorize that
22   stuff.
23 Q. But would you have had it at your disposal if
24   you wanted to know such a thing?
25 A. I would call HR, yeah.

QUALITY
Bethel Park, PA  COURT REPORTING  412-833-3434

PAGE 64

64

1 Q. When you were asked the question would you
2   choose Joy or would you choose Becca, what
3   factors did you take into account when you
4   answered Joy?
5         MS. MUNSCH: I think she answered
6   that already.
7 BY MR. SANSONE:
8 A. Because I knew her very well, we had worked
9   together for many years.
10 Q. You said that.
11 A. We were very close. I respected her -- I
12   respect her.
13 Q. Okay.
14 A. There's nothing more to that. We had --
15 Q. Well, did you, for example -- since you were
16   asked to make a comparison, did you consider the
17   difference in years of experience at Highmark
18   for example?
19 A. It was a gut -- emotional, I was having to pick
20   between two people that I really liked.
21 Q. A tough call.
22 A. I didn't want to do that.
23 Q. I understand that. But I understand that it's
24   business and you had to make a call, and you
25   did, now what I'm asking you is were there --

QUALITY
Bethel Park, PA  COURT REPORTING  412-833-3434

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

- - - - -

JOY SWEETING,                          | CIVIL ACTION NO. 04-0368

      Plaintiff,

    vs.

HIGHMARK, INC.,

      Defendant.

- - - - -

## DEPOSITION OF WILLIAM BRADLEY PIFALO

- - - - -

Scanlon & Sansone
2500 Lawyers Building
428 Forbes Avenue
Pittsburgh, PA 15219
412-281-9194

Thursday, December 8, 2005

**Quality Court Reporting**
**412 833-3434**



PLAINTIFF'S
EXHIBIT
F

ORIGINAL

W. Pifalo - by Mr. Sansone

- - - - -

1    to ensure attendance at this retreat?

2        A.    I don't remember what efforts she made.

3        Q.    Did you play any role in the decision not

4    to retain my client in her employment after the

5    HealthPLACE locations were closed?

6            By the way, we all understand that she had

7    a temporary assignment from March to October, after

8    the closing of the HealthPLACEs, but I'm talking

9    about the failure to give her a new position in the

10    ongoing reorganization.  Did you play any role in

11    that?

12        A.    No.

13        Q.    Were you consulted with respect to that

14    decision?

15        A.    I met with Anna Silverman on one occasion.

16    It was after a lunch meeting with her and Aaron

17    Walton.  After lunch she asked if I would review with

18    her the staff of HealthPLACE, and it was only at that

19    time that I was consulted on anyone in the

20    department.

21        Q.    Was that after the decision was made as to

22    how it would be staffed?

23        A.    No.  This would have been early in the

24    process.

25        Q.    In that conversation with Ms. Silverman did

W. Pifalo - by Mr. Sansone

- - - - -

1 you discuss my client and her potential to remain?

2     A.    I do not remember having discussed Joy

3 Sweeting, but my general impression is that we went

4 through the entire list of HealthPLACE employees.

5     Q.    Do you recollect telling Ms. Silverman that

6 you did not consider my client a good candidate for

7 retention?

8     A.    I do not recall that.

9           MR. SANSONE:  I am going to have to

10 ask you to take a quick break.  I left something in

11 the other room.  I'll be right back.

12           (Whereupon, a brief recess was taken.)

13     Q.    I took the deposition of Ms. Silberman in a

14 couple of parts, the most recent of which I think was

15 last week or the week before.  She told me that she

16 had a conversation with you about my client and her

17 potential for retention in the new organization, and

18 I don't have the transcript yet in which her exact

19 words were used, so I've only relied on the notes

20 that I made at the time.

21           I made the note that Ms. Silberman said

22 that you, Dr. Pifalo, said words to the effect of

23 she, Joy Sweeting, has to go.  Do you recall making

24 that statement or a statement like that to Anna

25 Silberman at any time?

W. Pifalo - by Mr. Sansone

- - - - -

1    A.    I do not.

2    Q.    Did you have an opinion as of the early

3    part of 2004 as to whether or not my client should be

4    retained in the new organization?

5    A.    No.  I had no involvement in the decision

6    as to who would be retained in the new organization.

7    Q.    I beg your pardon, sir.  My question was

8    not as to what your involvement was.  I asked you

9    what your opinion was at that time, even if nobody

10   asked you --

11               MS. MUNSCH:  If you had one.  If you

12   didn't have one, you don't have to form one now.

13   A.    I did not have one.

14   Q.    But you plainly did not have the opinion

15   that she should be fired or terminated, is that

16   right, or had not offered any opinion --

17               MS. MUNSCH:  I'm going to object to

18   the form of the question.  I think he said he didn't

19   recall what he said to Ms. Silberman about any of the

20   employees when they reviewed the list of employees.

21               MR. SANSONE:  That's a different

22   question.  My question is --

23               MS. MUNSCH:  Well, he said he didn't

24   recall what he said.

25               MR. SANSONE:  I didn't ask him what he

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

- - - - -

JOY SWEETING,                         |    CIVIL ACTION NO. 04-0368
                                      |
            Plaintiff,                |
                                      |
     vs.                              |
                                      |
HIGHMARK, INC.,                       |
                                      |
            Defendant.                |
                                      |

- - - - -

**DEPOSITION OF DEBORAH RICE**

- - - - -

Scanlon & Sansone
2500 Lawyers Building
428 Forbes Avenue
Pittsburgh, PA 15219
412-281-9194

Thursday, December 8, 2005

**Quality Court Reporting**
**412 833-3434**

ORIGINAL

PLAINTIFF'S
EXHIBIT
6

PENGAD 800-431-6989

D. Rice - by Mr. Sansone

- - - - -

1    A.   I am.

2    Q.   How long have you been married?

3    A.   11 years.

4    Q.   Is it your first marriage?

5    A.   No.

6    Q.   Second marriage?

7    A.   Yes.

8    Q.   Do you have children?

9    A.   One daughter.

10   Q.   By the first, or second?

11   A.   Second.

12   Q.   How old is your daughter?

13   A.   She's nine.

14   Q.   How many directors did you have --

15   A.   At that time?

16   Q.   -- reporting to you?  Yes.

17   A.   Four.

18   Q.   So the 35 sales people were broken up into

19   four directors?

20   A.   Right.

21   Q.   I know Tina Palaggo-Toy was one of them?

22   A.   No.

23   Q.   No?

24   A.   No.  She was not in the sales group.

25   Q.   I'm sorry.  So you didn't have any direct

D. Rice - by Mr. Sansone

- - - -

1   responsibility for Tina Palaggo-Toy either?

2       A.   No, I didn't.

3       Q.   And no direct responsibility for my client

4   either?

5       A.   No.

6       Q.   Did you ever observe my client in the work

7   that she did?

8       A.   One time I recall being at a meeting with

9   the client.

10      Q.   One time you were at a meeting with my

11  client and a client of Highmark?

12      A.   Right.

13      Q.   Do you remember when that was?

14      A.   I don't.  It would have been during that

15  tenure.

16      Q.   '01 to '03, sometime in that time frame?

17      A.   Right.

18      Q.   What was the occasion upon which you were

19  with this client and my client?

20      A.   We were talking about worksite wellness.

21      Q.   Can you give me some more details?  Where

22  were you?  Who was the client?  What was --

23      A.   I don't recall who the client was.  I

24  recall that we met with the client to talk about

25  worksite wellness.

14

D. Rice - by Mr. Sansone

- - - - -

1    Q.    You and Ms. Sweeting?

2    A.    Yes; and one of my client managers, and I

3    can't recall which one it was.

4    Q.    This was unusual, obviously?

5    A.    No.  Periodically I go out with my client

6    managers to visit a client, and that's what we were

7    doing.

8    Q.    Well, why was Joy Sweeting involved in this

9    particular meeting?

10    A.    Because we thought a topic that we could

11    cover in my meeting -- I wouldn't just typically go

12    to meet with a client, we would go with a topic to

13    cover.  The topic we were covering was worksite

14    wellness.

15    Q.    I see.  So you brought Joy, I take it, as

16    sort of a specialist?

17    A.    My client manager brought her in.

18    Q.    But the point is to bring her in as a

19    specialist on the issue of worksite wellness?

20    A.    To come in to talk about worksite wellness,

21    yes.

22    Q.    Did you object to my use of the term

23    "specialist" there?

24    A.    No.

25    Q.    Would you agree with that?

D. Rice - by Mr. Sansone

- - - - -

1    A.    I don't know, personally, what Joy

2  specializes in.  All I know is that we were bringing

3  her out to talk about Wellness.  I don't know,

4  because I wasn't responsible for the area, what level

5  she played in that organization.

6    Q.    I take it you don't know much about what my

7  client did?

8    A.    Not really.

9    Q.    By "my client," I mean my client or anybody

10  else in her position, you're not real familiar with

11  the duties of her position?

12    A.    Not specifically.

13    Q.    I take it's fair, then, to say that you

14  didn't know much about my client's performance at

15  all?

16    A.    All I knew was the discussion we were

17  covering was talking about Wellness.

18    Q.    She, my client, was selected by somebody

19  that was under you; is that right?

20    A.    Because --

21    Q.    First just answer that.

22    A.    Yes.

23    Q.    Who was that, again?

24    A.    I don't recall.

25    Q.    You don't remember?

D. Rice - by Mr. Sansone

- - - -

1    A.    I can't remember which client manager it

2    was.

3    Q.    The title was client manager?

4    A.    Client manager.

5    Q.    So one of your client managers?

6    A.    Right.

7    Q.    Of whom there were how many?

8    A.    I had four, four of the eight.

9    Q.    So one of four people selected my client to

10   accompany you and him or her on this meeting with the

11   client?

12   A.    That's right.  Joy was responsible for

13   doing that in the Erie office, talking about

14   Wellness.

15   Q.    Is it likely that the client was somewhere

16   in the Erie area?

17   A.    It was, absolutely.

18   Q.    But you don't remember who the client was?

19   A.    I don't remember.

20   Q.    Other than this one interaction, did you

21   have any other interaction with my client?

22   A.    Not on a work basis, more just seeing each

23   other, casually saying hi, and that sort of thing.

24   Q.    Okay.  Let's go back to this one instance.

25   A.    Okay.

D. Rice - by Mr. Sansone

- - - - -

1    Q.    My client was brought in to consult with
2    the client on worksite wellness?
3    A.    The meeting was really meant to give me an
4    opportunity to meet the client, and often whenever we
5    do that we like to bring some topic in.  So while it
6    wasn't a very detailed meeting, from what I recall,
7    it's been some years ago, we had discussion about
8    their business, discussions -- typically what we do,
9    a discussion about their business, a discussion about
10   what Highmark does for them, and then we start
11   talking about some aspect of the business.  At this
12   juncture it was talking about some aspect of
13   Wellness.
14       Q.    That was what Joy was to contribute?
15       A.    That's right.
16       Q.    Do you have any recollection of how that
17   meeting went?
18       A.    I thought it went fine, but I don't have a
19   lot of detail to my memory.  It's been a lot of years
20   ago and it was one of many meetings that I attended
21   with clients that day.
22       Q.    Sure, two years ago or three years ago,
23   maybe four, you've probably been in a lot of meetings
24   since then?
25       A.    Absolutely.

D. Rice - by Mr. Sansone

- - - - -

1    Q.   Do you have any present recollection that

2   there were any problems that occurred in the meeting?

3    A.   No.   There were no problems in the meeting.

4    Q.   Do you recall my client's performance in

5   that meeting as she gave the information about Work

6   Site Wellness?

7    A.   I don't recall specifically.

8    Q.   Is it fair to say that you don't recall her

9   doing a poor job or anything like that?

10    A.   I don't recall.

11    Q.   If I were to ask you do you have any

12   knowledge of my client's work, from personal

13   observation of client's work, wherein she did not do

14   a good job, what would your answer be?

15    A.   I only have one observation that I remember

16   and it was at that meeting, and I don't recall much

17   about the meeting.

18    Q.   You can't tell me whether she did a good

19   job, or a bad job?

20    A.   I don't know.

21    Q.   But you do know that the meeting seemed to

22   go fine?

23    A.   I just remember being at the meeting with

24   Joy and one of my client managers.

25    Q.   Did you say that you remember the meeting

D. Rice - by Mr. Sansone

- - - -

1  going fine?

2      A.    I thought it was fine.  If it was a bad

3  meeting, that's something you'd remember.

4      Q.    Okay.  Fair enough.  Other than that one

5  time, did you have any other source of information

6  about my client's performance?

7      A.    Just one comment that I recall from one of

8  my client managers, I can't recall which one it was,

9  but just indicating that they didn't want to bring

10  Joy to a meeting, and I don't remember anything else

11  about that.

12      Q.    Even the reason why?

13      A.    I don't remember.

14      Q.    Do you remember, whatever the reason was,

15  it was something about my client that this person

16  didn't like, or was it some other reason like she

17  wasn't available, or something like that?

18      A.    No.  What I recall is that they thought

19  they needed a better performer.

20      Q.    I see.  But you don't remember who that

21  manager was that said this?

22      A.    I don't.  I don't.

23      Q.    Do you know why you're being deposed today?

24      A.    I do.

25      Q.    Why?

D. Rice - by Mr. Sansone

- - - - -

1        MS. MUNSCH:  Actually I'm not going to

2  allow her to reveal anything that her lawyers told

3  her.

4        A.    That's all I know.

5        Q.    What's all?  What do you mean?

6        A.    Just to prepare me to come here today.

7        Q.    What, if anything, did you review for your

8  deposition today?

9        A.    Nothing.  I was just trying to remember the

10  one meeting we were in.

11        Q.    I'm not asking you to tell me what your

12  lawyer said.  I don't want to know about that

13  conversation.  I assume that you know that some

14  statements have been attributed to you by

15  Ms. Silberman?

16        A.    Yes.

17        Q.    Whose deposition we finished up last week,

18  if I remember that right.  Do you know the statements

19  that are being attributed to you?

20        MS. MUNSCH:  I'm going to object to

21  the form of the question.  If you want to, ask her to

22  testify about what she recalls, but, again, if you're

23  asking her what did her lawyers --

24        MR. SANSONE:  We're going to get to

25  this, we're going to get to the statements, Martha.

D. Rice - by Mr. Sansone

- - - - -

1    MS. MUNSCH:  So just ask her what --

2 yes, I mean, I'm not going to -- what I don't want to

3 do is have to have her testify about what the lawyers

4 told her.

5    MR. SANSONE:  The reason is we don't

6 have the transcript of exactly what Ms. Silberman

7 said.  I wrote down what I thought she said, gut what

8 I'm trying to do is not misquote her.

9    Q.  I'll tell you what I understand that she

10 said, and this is as close as I can get by having

11 written it down.  Ms. Silberman indicated that at

12 some point, at which point was not clear, you were to

13 have said something to this effect:  "Remember we

14 need help up in Erie, or the Erie area, and anybody

15 but Joy," is what I wrote down.  I think that's an

16 approximation of what her testimony was, without

17 having the transcript in front of me.

18    Did you ever make such a statement?

19    A.  I don't recall the statement specifically.

20 What I do recall is what I just said earlier, that a

21 client manager had indicated that we needed somebody

22 to go out to a client and anybody but Joy.  That's

23 all I recall.

24    Q.  Wait a minute now.  You mean to say that

25 the client manager, whose name you don't recall, is

D. Rice - by Mr. Sansone

- - - - -

1   the one who actually used the statement get anybody

2   but Joy to go to the client?

3       A.   No, no.  Let me restate that.  They felt

4   they needed somebody other than Joy.  I corresponded

5   with Anna indicating anybody but Joy, requesting for

6   somebody to come.

7       Q.   For that meeting, though?

8       A.   For that meeting, because there was

9   apparently an issue, and I don't know anything more.

10      Q.   As I understood the statement from

11  Ms. Silberman, and again all I can do is tell you

12  what I wrote down about it and tell you what I think

13  she said, the question was in the context of her

14  making the decision as to who to retain in the new

15  organization after the HealthPLACE was disbanded.

16  Did you ever tell Ms. Silberman any words to suggest

17  that she shouldn't retain my client for a position in

18  the new organization?

19      A.   I don't recall the discussion like that.

20  What I recall is having a discussion and my opinion

21  would have come because of information that I had

22  from the client manager.

23      Q.   That one single incident?

24      A.   I don't recall the conversation in any

25  greater detail than what I described.  I may have

D. Rice - by Mr. Sansone

- - - - -

1  said that.  I don't recall.

2      Q.   You misunderstood my question.

3      A.   Okay.

4      Q.   Do I understand that you were relaying to

5  Ms. Silberman an opinion about my client based on

6  that one incident?

7      A.   What I -- I can just share with you what I

8  remember saying is we needed somebody to fill a need

9  with a client and I said anybody but Joy.  That's

10 what I recall.

11     Q.   Okay.  What were you responding to when you

12 recall that?

13     A.   I don't recall.

14     Q.   Who did you say that to?

15     A.   Anna.

16     Q.   Was it on the telephone, or in person?

17     A.   It would be in person, most likely, because

18 I am in the Pittsburgh office, as she is.

19     Q.   Do you remember, were you having a

20 water-cooler conversation, or was this a meeting you

21 were having, or what?

22     A.   It was a discussion specifically meant to

23 find somebody to fill a need.

24     Q.   That's a little vague.  Do you mean to say

25 that it was to fill a need in the new organization,

D. Rice - by Mr. Sansone

- - - - -

1    or a need for that particular meeting that you were

2    referring to?

3        A.   For that meeting, is what I recall.

4        Q.   You do not recall having a conversation

5    with Ms. Silberman about my client's appropriateness

6    for a position in the new organization?

7        A.   I don't recall talking about a position in

8    her organization.

9        Q.   Nor do you recall, I take it, indicating

10   that my client would not have been appropriate to

11   fill a position in the new organization?

12       A.   I don't recall that discussion.

13       Q.   Is that something you think you would

14   likely recall if you did say that?

15       A.   I don't know.

16       Q.   Did you give any opinions to Ms. Silberman

17   about Rebecca Swick?

18       A.   No.

19       Q.   About the appropriateness of hiring her for

20   the new organization?

21       A.   No.  I had not worked with Rebecca.

22       Q.   So you knew nothing about Rebecca as a

23   candidate?

24       A.   Exactly.

25       Q.   Do you now know anything about her?

D. Rice - by Mr. Sansone

- - - - -

1    A.    No.

2    Q.    I'm going to ask this question very

3    carefully and I want you to listen very carefully to

4    my question and answer the one I'm asking you.

5    Okay?

6    A.    Okay.

7    Q.    Do you have any present recollection of

8    giving any recommendation to Ms. Silberman about my

9    client as a potential employee in the new

10   organization?

11   A.    I do not.

12   Q.    Sometime during the '01 to '03 time frame

13   we've been talking about, probably sometime in 2002,

14   probably in the summer months of 2002, do you recall

15   spending a day with my client on a fishing boat up in

16   Erie?

17   A.    I do.

18   Q.    What do you recall about that day?

19   A.    Not anything specifically other than we

20   were fishing.

21   Q.    Are you a fisher-woman?

22   A.    No.  Just that one time a year.

23   Q.    You do this fairly regularly?

24   A.    One time a year.

25   Q.    With the same client?

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOY SWEETING     )  CIVIL ACTION NO. 04-0368
          )
    Plaintiff,   )
          )
  vs.      )
          )  Hon. Sean McLaughlin
HIGHMARK, INC.,    )
          )
    Defendant.  )

## AFFIDAVIT OF JOY SWEETING

COMMONWEALTH OF PENNSYLVANIA)
          )  SS:
COUNTY OF ERIE     )

  Before me, the undersigned authority, a notary public, personally appeared Joy

Sweeting who, being duly sworn and according to law, deposes and says that the

following statements are true and correct to the best of her personal knowledge,

information and belief:

1.  I am the Plaintiff in the above-captioned action. My date of birth is April 22,

1938, and I was 66 years of age when I was fired from employment with the Defendant.

2.  At the time of my involuntary termination, I was employed as the manager of the

Defendant's HealthPlace facility, and I was personally aware of all of the other managers

of the Defendant's HealthPlace facilities. I knew these individuals from the regular staff

meetings which we attended, as well as from other activities related to my job duties.

Because of personal interactions with each manager, I was generally aware of their ages,

and of their tenure with the Defendant. At the time of my termination, I was the oldest



PLAINTIFF'S
EXHIBIT
H

**"Mostly Administrative"**

In my position as manager of HealthPlace, I was required to perform a significant amount of administrative duties, including the administration of our programs. This included contracting with various educators to teach these programs, as well as scheduling and organizing these programs, together with following up on each of the programs to assure quality. I personally instructed Ms. Swick on how to accomplish these administrative tasks, as well as the overall importance of strong administration to the success of our programs.

**"Various Duties"[1]**

I have reviewed the list of additional duties performed by Ms. Swick as described in her deposition at pp. 21-22. Each of the duties listed by Ms. Swick is a duty which I performed for many years before she became my assistant. I personally trained Ms. Swick in a number of these duties, including working with the marketing programs and recruiting. As to others of those duties, at the time she was given the position, she had little or no experience. Those duties include choosing community locations, determining staff capabilities, implementing training, re-staffing, follow up (or "babysitting") for the programs, troubleshooting (putting out fires), and quality assurance.

---

[1] The various duties described by Ms. Swick that make up this category are:
- ❖ Choose Community locations (i.e. sites to deliver the program)
- ❖ Determine if staff is able to manage program
- ❖ Implement training
- ❖ Work with marketing program
- ❖ Try to get people in the door
- ❖ Paperwork
- ❖ Re-staffing issues
- ❖ Basically "babysitting" the programs at each location
- ❖ Hands on/Putting out fires
- ❖ Keeping programs up and running
- ❖ Making sure the word is out there
- ❖ Insuring quality in the programs
- ❖ Insuring respect for the guidelines

HealthPlace manager working for the Defendant, and I had the longest tenure in the HealthPlace manager's position of any of Defendant's employees.

3.    I have reviewed the duties and responsibilities of the Community Site Consultant position awarded to Rebecca Swick in March of 2004, both as described in Ms. Swick's deposition testimony, as well as by reviewing the position description provided by the Defendant.  With respect to each job duty described therein, I am fully qualified to perform each of those functions, and I have more experience in all of the areas listed.  In fact, in many areas of responsibility, I trained Rebecca Swick, and was therefore responsible for the majority of the experience which she had at the time she was awarded the position.

4.    With respect to the specific duties listed, my experience in those areas at the time of my termination from the Defendant was as follows:

- **"Establish and keep on track community organizations that adopt Highmark programming"**

  My experience working with community businesses and organizations in the Erie area includes direct support and regular contact in order to "keep on track" those organizations working with Highmark programs. I began that type of experience over 10 years ago, and I personally trained Rebecca Swick in this area, and introduced her to all of her contacts in the Erie Community. For many years I served on the Erie County Health Education Board, whose members represented the Erie County health educators in the non-profit area, which was a significant part of the Defendant's target customer base. Ms. Swick was never a part of this organization, and did not have those, and other significant contacts in the Erie community.

2

5. I have reviewed those programs which Ms. Swick says she is currently administering in her new position. These include:

* Personal Nutrition
* Relaxation
* Osteoporosis prevention
* Smoking Cessation

6. With respect to Personal Nutrition, Relaxation and Smoking Cessation, I personally taught all of these programs for over 20 years. In my position as manager of the Erie HealthPlace, I personally administered each of these programs for 10 years. With respect to the Osteoporosis Prevention program, I was personally responsible for the administration of that program from its inception at Highmark, including contracting for instructors to teach the course. At the time of my termination, Ms. Swick had no experience administering any of these programs.

FURTHER THE AFFIANT SAYETH NOT

_____
Joy Sweeting

Sworn to and subscribed
to before me this 24th
day of January, 2006.

_____
Notary Public

My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Carol M. Jordan, Notary Public
City Of Erie, Erie County
My Commission Expires Jan. 29, 2008
Member, Pennsylvania Association Of Notaries

4

July 26, 2004

EXHIBIT ﾟﾟ

3 Silberman

10·10·05

Equal Employment Opportunity Commission
Pittsburgh Area Office
1001 Liberty Avenue, Suite 300
Pittsburgh, PA 15222

**RE: Joy H. Sweeting**                    **EEOC Charge # 172-2004-01454**

To Whom It May Concern:

Please accept this letter as the confidential Position Statement of Highmark, Inc., d/b/a Highmark Blue Cross Blue Shield ("Highmark"). Joy H. Sweeting ("Ms. Sweeting") has alleged that Highmark has discriminated against her based on age, 66, because it retained and promoted an allegedly less qualified younger female employee, Rebecca Swick, age 32. Ms. Sweeting also has alleged that Highmark discriminated against her based on her age and sex because her territory was turned over to Vickers Ward, age 42, a younger male employee who lives and works outside of the Erie area. Highmark denies that it has discriminated against Ms. Sweeting because of her age and sex or for any other reason prohibited by law.

Highmark hired Ms. Sweeting on October 17, 1994, as a HealthPLACE Administrator for the Erie HealthPLACE Center, one of the Health Education Centers in the HealthPLACE System. The centers were designed originally to offer Highmark subscribers and community residents nutrition, stress management, fitness, and health-related programs and services.

In December of 2003, Highmark announced that it would be creating a new Preventive Health Services Division effective April 2004 and appointed Anna Silberman as its vice president. As part of the reorganization, Highmark first closed its Monroeville site in December 2003 and then closed the Erie, McCandless, Greentree, Johnstown, West Mifflin, and Weirton, WV, Centers in March of 2004. Ms. Silberman eliminated the HealthPLACE Administrator positions at these locations. Four of the HealthPLACE Administrators were terminated on March 15, 2004. The Erie HealthPLACE Administrator, Ms. Sweeting, was given an opportunity to work temporarily in the Operations division in Erie until October 18, 2004, so that she could realize ten years of service and thereby qualify for retiree medical benefits.

As part of the reorganization, Ms. Silberman created a new position, "Community Site Consultant" (see Attachment No. 1), and selected Ms. Swick to fill the position based in Erie. Highmark hired Ms. Swick on February 24, 1997, as a Member Service Representative. She transferred into a new position, HealthPLACE Program Assistant, in August 2000. While a Highmark employee, Ms. Swick completed graduate school, receiving an MBA with a concentration in marketing. She received "Exceeds Expectations" on her annual reviews for



LH-110 (12-89) S1610

**PLAINTIFF'S EXHIBIT**

I

Page Two
April 26, 2004

2001, 2002, 2003, and 2004 (see Attachment No. 2). Ms. Silberman did not consider Ms. Sweeting for the Community Site Consultant position in Erie because she did not produce the results expected in a key program area. In the last two years Ms. Sweeting failed to meet the expectations of monitoring, evaluating, and producing key marketing and operational objectives. Ms. Sweeting failed to generate and report clinical outcomes, including biometric risk factor improvements and positive behavior changes with the minimum number of Highmark group accounts. Ms. Silberman did not choose Ms. Swick for the Community Site Consultant because she was younger than Ms. Sweeting. She chose Ms. Swick because she was better qualified for the position than Ms. Sweeting and eliminated the HealthPLACE Administrator position held by Ms. Sweeting because it no longer served the business needs of the organization.

As part of the reorganization, Ms. Silberman also created another position, "Worksite Consultant" (see Attachment No. 3). Mr. Vickers Ward had been functioning as a Worksite Consultant without holding that title since August 2001 servicing accounts in western and central Pennsylvania as well as national accounts. Ms. Sweeting's Erie accounts were transferred to Mr. Ward who was based in Pittsburgh. Ms. Silberman could not justify keeping this position opened in Erie since the service region did not warrant a full-time position and the HealthPLACE Administrator responsibilities had ended when the center closed. A comparison of their performance reviews helps to explain why Ms. Silberman chose to expand Mr. Ward's service region and not fill the position with Ms. Sweeting (see Attachment No. 4). Unlike Mr. Ward, who had received overall ratings of "Exceeds Expectations" for 2002 and 2003 with no documented instances of failing to meet expectations, Ms. Sweeting had several documented performance deficiencies in 2002 and 2003 (see Attachment No. 5). Most notably, her primary objective for both 2002 and 2003 was to improve the delivery and evaluation of a data-driven worksite wellness program and in both years she received a rating of "Does Not Meet Expectations." Ms. Silberman did not choose Mr. Ward because he was a younger male; she chose Mr. Ward because he was better qualified to fill the position of Worksite Consultant than Ms. Sweeting and eliminated the position of HealthPLACE Administrator because it no longer filled the needs of the reorganized division.

For these reasons, Highmark respectfully asks the Commission to dismiss Ms. Sweeting's charge of discrimination.

Sincerely,

Cynthia Mori
Human Resources Consultant

CM/cms
Enclosures

EEOC PITTSBURGH, PA
AREA OFFICE

04 JUL 26 PM 2: 15

RECEIVED

| **JOB DESCRIPTION** | | **AUDITED BY**<br>Sandra Slaughter | **DATE**<br>March 24, 2004 |
| --- | --- | --- | --- |
| **JOB TITLE**<br>Community Site Consultant | **DEPARTMENTAL NAME**<br>Preventive Health Services | **SALARY PLAN/GRADE**<br>S04 | **JOB CODE**<br>936840 |
| **FIRST LEVEL APPROVAL**<br>Managing Director,<br>Preventive Health Services<br>Network | **SECOND LEVEL APPROVAL**<br>Vice President,<br>Preventive Health Services | **DIRECT REPORTS**<br>Nonexempt:<br>Exempt:<br>Total: | **INDIRECT REPORTS**<br>Nonexempt:<br>Exempt:<br>Total: |
| | | **NUMBER OF INCUMBENTS** | **EXEMPTION STATUS**<br>Exempt |

## JOB SUMMARY

Direct responsibility for overseeing all aspects of Preventive Health Services program delivery at selected community health partner sites in Western and Central Pennsylvania including clinical, operational, and financial issues. The incumbent is responsible for developing and managing relationships with key Highmark departments to support these community-based programs. The incumbent is charged with ensuring that all network partners are delivering the Programs as specified and returning solid clinical outcomes, including biometric risk factor improvements. In addition, the position is responsible for monitoring and evaluating key marketing, operational, and financial variables identified as critical to Program viability and success. Timely and concise communications to senior management, including the Managing Director, Preventive Health Services Network, related to site issues along with suggested strategies/resolutions are of utmost importance.

With respect to site support activities this position:

- Is responsible that sites open on time, have full programs and the staff is prepared to implement the Programs.
- Ensures that standards of care and issues related to patient safety are maintained.
- Evaluates site compliance with licensing standards.
- Participates in the development and implementation of customized site marketing and advertising strategies.
- Advocates for fiscal responsibility at the designated sites.
- Designs and develops management reports to track program outcomes once site has commenced programming.
- Supports site team development by providing guidance and experience to site's program directors/administrators and coaching to team personnel.
- Is responsible for the execution of programs in accordance with standardized protocols, including data collection and reporting.
- Is responsible for site training, enrollment, outcomes and at least six site visits per year.

The person who fills this position needs to build a collegial relationship with each administrator so that the consultant is viewed as a resource to the site's success.



This position advises the Managing Director, Preventive Health Services Network, on the development, implementation and evaluation of strategies that will lead to increased clinical and cost effectiveness. Completes administrative responsibilities as assigned.

## MINIMUM QUALIFICATIONS

A Bachelors Degree in or equivalent training in Clinical Practice, Liberal Arts or Business Administration is required and Clinical Practice/Business Administration is preferred. A Masters Degree in Business, Health Administration and/or Health Promotion is preferred. One (1) to three (3) years of experience in Clinical Practice, Hospital Administration or Ornish Program implementation is preferred. Five (5) to seven (7) years of experience in a health care field is required.

Other qualifications, experience, and skills include:

Successful experience in health care management to include managing budgets. Substantial experience working within a team approach and/or a flat hierarchical management system is preferred. An entrepreneurial nature and the ability to motivate people are essential.

Public speaking experience and experience mentoring, supervising and/or teaching health professionals are required. Extensive travel and flexibility are required.

## PROBLEM SOLVING/LATITUDE

A substantial percentage of the responsibilities of this job is problem solving at multiple levels. There are the complex issues that arise from implementing and managing a program that holds the values of the Preventive Health Services Division where cost effectiveness and financial viability are primary. It is a constant challenge to keep clinical teams working together cooperatively. The focus on relationships, critical components of the healing process, requires maturity, healthy individual boundaries and creative flexibility. These characteristics are modeled by the individual who fills this position.

This position is responsible for a total operating budget of 200,000, premium generated indirect and revenues of 500,000.

Other Pertinent Dimensions:

- Clinical Outcomes
- Utilization Reduction
- Site Retention

## ESSENTIAL JOB FUNCTIONS (each more than 10% of time)

1. Coordinate and supervise community site Program training, implementation and outcomes. (85%)

2. Projects as assigned. (15%)

# MAJOR CONTACTS

## INTERNAL

| Contact | Purpose | Frequency |
|---|---|---|
| VP Product Development | Product integration | Weekly |
| VP Marketing/Communications | Account communication | Weekly |
| VP Provider Affairs | Network development | Weekly |
| VP/Director of Corporate Communications | Media/public relations | Weekly |
| VP's Marketing | Account management | Weekly |
| Chief Medical Officer | Clinical issues/interaction w/other Plans | Weekly |
| Human Resources Representatives | Staffing | Weekly |
| Medical Informatics Staff | Utilization data | Weekly |
| Legal | Contract execution | Weekly |
| Quality Improvement | Compliance | Monthly |

## EXTERNAL

| Contact | Purpose | Frequency |
|---|---|---|
| CEO's of hospitals and executive directors of community-based agencies | Preventive health/Ornish network development/monitoring | Weekly |
| Blue Plan officials | Ornish Program delivery | Weekly |

## ENVIRONMENT

This position reports to the Managing Director, Preventive Health Services Network, along with the following positions and number of incumbents:

| Position Titles | Number of Incumbents |
|---|---|
| Hospital-Based Site Consultants | 6 |
| Community-Based Site Consultants | 5 |
| Program Assistants | 2 |
| Clinical Supervisor | |

This department is responsible for all issues related to implementation, training, supervising clinical services, operational materials development, data collection, analysis and dissemination, quality monitoring, and the successful operation of the Preventive Health Services Network.

ADDITIONAL INFORMATION

This position requires the clinical and operational resourcing and application of the greater community as needed.

THIS JOB REQUIRES THE WILLINGNESS AND ABILITY TO REPORT TO WORK ON A REGULAR AND TIMELY BASIS AND MAY REQUIRE WORKING IRREGULAR HOURS, HOLIDAY AND/OR WEEKENDS.

| Job Title | Name | Sex | Date of Birth |
|---|---|---|---|
| Secretary IV | Susan L. Boyle | F | 1-7-56 |
| Director of Worksite Preventive Health Services | Tina Palaggo-Toy | F | 9-27-58 |
| Worksite-Based Site Consultant | Vickers E. Ward | M | 10-28-61 |
| Worksite-Based Site Consultant | Lisa A. Holden | F | 8-30-58 |
| Worksite-Based Site Consultant | Patrick McCauley | M | 5-10-70 |
| Worksite-Based Site Consultant | Richard A. Saar | M | 4-8-71 |
| Worksite-Based Site Consultant | Mark E. Winters | M | 3-6-72 |
| Bus Admin. (Central PA) | Chris M. Klobetanz | F | 3-11-56 |
| Bus Driver (Central PA) | Glenn Franklin Campbell | M | 6-10-45 |
| Data Collection Specialist | Jason A. LaGamba | M | 12-24-75 |
| Access and Enrollment Strategist | Cathy R. Gold | F | 5-12-60 |
| Promotion and Recruitment Specialist (Part-Time) | Emily L. Burkhart | F | 6-21-73 |
| Program Development and Implementation Strategist | Anne Marie Kuchera | F | 3-16-73 |
| Managing Director, Preventive Health Services Network | Bryce C. Williams | M | 1-24-67 |
| Hospital-Based Site Consultant | Janet P. Banasak | F | 10-21-46 |
| Hospital-Based Site Consultant | Jennifer A. Grana | F | 9-18-70 |
| Hospital-Based Site Consultant | Marlene F. Janco | F | 10-28-62 |
| Hospital-Based Site Consultant | Joli A. Studley | F | 11-20-69 |
| Hospital-Based Site Consultant | Wendy Vida | F | 4-8-73 |
| Community-Based Site Consultant | Rebecca K. Swick | F | 11-29-71 |
| Community-Based Site Consultant | Leigh Ann Courtney | F | 7-10-69 |



PLAINTIFF'S EXHIBIT

K

PENGAD 800-631-6989

D-1358

| Job Title | Name | Sex | Date of Birth |
|---|---|---|---|
| Community-Based Site Consultant | Jill Ann Sodini | F | 5-19-79 |
| Community-Based Site Consultant | Gerald L. DeNucci | M | 7-10-72 |
| Clinical Supervisor (Part-Time) | Terri Merritt-Worden | F | 11-16-62 |
| Program Assistant | Nina R. Knauer | F | 12-2-74 |
| Program Assistant | Beverly Jo Lankes | F | 6-21-54 |
| Program Assistant | Judith M. O'Connor | F | 11-1-44 |
| Program Assistant | Carol J. Tremontin | F | 9-20-43 |
| Medical Director Corp. Community & Wellness | William Bradley Pifalo | M | 8/14/51 |
| Wellness Center Manager | Kevin L. Nauer | M | 9/1/62 |
| Secretary II | Alvera Prokich | F | 9/17/35 |

D-1358a