IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOY SWEETING, | ) | Civil Action No. 04-368 - Erie |
|     Plaintiff, | ) | |
| | ) | The Hon. Sean J. McLaughlin |
| v. | ) | |
| | ) | |
| HIGHMARK, INC., | ) | ELECTRONIC FILING |
| | ) | |
|     Defendant. | ) | |

**SUPPLEMENTAL APPENDIX IN SUPPORT OF HIGHMARK'S
MOTION FOR SUMMARY JUDGMENT**

Martha Hartle Munsch
PA ID No. 18176
mmunsch@reedsmith.com
Shweta Gupta
PA ID No. 84388
sgupta@reedsmith.com
REED SMITH LLP
435 Sixth Avenue
Pittsburgh, PA  15219
412-288-4118/4054

Counsel for Defendant
Highmark Inc.

## **TABLE OF CONTENTS**

| **TAB** | **DOCUMENT** |
|---|---|
| A | Pages from Palaggo-Toy Deposition Transcript |
| B | Pages from Swick Deposition Transcript |

# TAB A

Case 1:04-cv-00368-SJM   Document 32   Filed 02/02/2006   Page 4 of 14

66

1  Q.   Yes, was that one of the things you thought
2       about?  It's not a trick question in any way.
3  A.   I don't remember.
4  Q.   Okay.  Did you consider the various experience
5       of the two individuals, for example, what jobs
6       they had performed and how that might play into
7       the new organization when you gave that answer?
8  A.   You know, I may have.  Again, it was emotional
9       my reaction, it was my relationships.  I had
10      worked with Joy longer and very deeply.
11              MR. SANSONE:  We'll take five
12      minutes.
13                    - - - -
14      (There was a brief pause in the proceedings.)
15                    - - - -
16              MR. SANSONE:  We don't have anything
17      else.
18              MS. MUNSCH:  I just have one or two
19      questions, then we'll let Carl hit the road to
20      Baltimore.  He's got to drive to Baltimore
21      tonight.
22                    - - - -
23      (There was a discussion off the record.)
24                    - - - -
25                  EXAMINATION

QUALITY
Bethel Park, PA    COURT REPORTING    412-833-3434

```
 1                       - - -
 2   BY MS. MUNSCH:
 3   Q.   Tina, in addition to the one -- I think there's
 4        one written complaint in your file that came in
 5        about Ms. Sweeting, did you receive any oral
 6        complaints over the years about Ms. Sweeting,
 7        specifically about how she interacted with
 8        others?
 9   A.   Yes, there were times that I received
10        complaints.
11   Q.   Okay.
12   A.   And it was more from the perspective of they
13        didn't like how she talked to them or it was
14        just how she chose her words or whatever, but we
15        always talked about it.
16   Q.   I was going to say did you coach Ms. Sweeting
17        about that, meet with her and talk to her about
18        that?
19   A.   If I knew about it, yeah.
20   Q.   Okay.
21   A.   And -- yeah.
22   Q.   But am I correct that you did not record that
23        anywhere in her performance reviews or elsewhere
24        in writing in the file?
25   A.   No.
```

1  Q.    You dealt with it in person with her through
2        coaching?
3  A.    Correct.
4              MS. MUNSCH:  I have nothing further.
5              MR. SANSONE:  I'll just follow up on
6        that a little bit.
7                         - - - -
8                      RE-EXAMINATION
9                         - - - -
10 BY MR. SANSONE:
11 Q.    How long do you recall having received these
12       complaints about my client's interaction with
13       individuals?
14 A.    Like how long ago or how long --
15 Q.    Over what period of time during the ten years
16       that you interacted with my client, was it a
17       problem from the beginning, did it develop late,
18       was it something you remember for many years or
19       what?
20 A.    It was periodic through the whole time.  I mean
21       I don't remember -- I mean I can't give you a
22       specific answer to that, but we would always
23       talk about it, and it often was around just
24       choice of words.  She's direct.
25 Q.    Did you consider this a significant performance

| | | |
|---|---|---|
| 1 | | problem on my client's part? |
| 2 | A. | Whenever we would talk, you know what, she always understood why someone perceived it the way they did. I didn't feel I needed to put it in a performance appraisal or anything like that, just talking about it, maybe talking about different choices of words based on how people perceive things. |
| 9 | Q. | I'm sorry, but my question was just a tiny bit different. |
| 11 | A. | Okay. |
| 12 | Q. | Did you perceive this as a significant performance problem on my client's part? |
| 14 | A. | Not significant, certainly, you know, one of her areas that she needed to be focused on. |
| 16 | Q. | Okay. Did you have any sense that this problem was getting worse as the years went on or was it pretty much the same level of problem if it was a problem? |
| 20 | A. | The same level. |
| 21 | Q. | It wasn't like toward the end there were just all kinds of new complaints and higher levels of complaints or something like that? |
| 24 | A. | No. |
| 25 | Q. | Were HealthPLACE administrators frequently the |

1    subject of complaints by customers of the
2    HealthPLACEs?
3  A.  No, not frequently, no.
4  Q.  So the level of complaints that were against Joy
5    in this regard might have been unusual by
6    comparison to others in the same position?
7  A.  There were more.
8  Q.  Okay.
9  A.  Again, Joy's direct, and they all have different
10    personalities
11         MR. SANSONE: That's all I have.
12         MS. MUNSCH: We'll read and sign.
13            - - - -
14  (The proceedings were concluded at 4:28 p.m.)
15            - - - -

# TAB B

*** CONFIDENTIAL ***

MR. SANSONE: That's all I have.

MS. MUNSCH: I just have a few questions for Ms. Swick.

- - - -

EXAMINATION

- - - -

BY MS. MUNSCH:

Q. Ms. Swick, in your current job as community site consultant do you have any mentoring of health professionals as part of that job currently?

A. No, and I know that -- I was reading that as part of the description. No, I don't know what they mean by that actually.

Q. Now, going back to when you were working with Ms. Sweeting in HealthPLACE, you testified earlier that you observed that Ms. Sweeting -- you observed her interactions with others, and I believe you characterized those interactions as -- you observed that she was rude and short with people?

A. At times.

Q. Can you recall an example of a specific instance where Ms. Sweeting was rude or abrupt with let's say a customer or patron of HealthPLACE that would illustrate what you meant by that

*** CONFIDENTIAL ***

1       characterization?
2  A.   Yeah.  In particular -- this was pretty much
3       near the closing of HealthPLACE, and actually I
4       kind of remember this as kind of what -- I don't
5       know, what cut it for me.  Our offices were
6       right next to each other in the lobby of
7       HealthPLACE, and there was a gentleman that came
8       in to see our dietitian, and he said -- I think
9       it was 1 o'clock, and he said I'm here for my
10      appointment, and I checked the book, and I said,
11      I'm sorry, sir, your appointment was at
12      10 o'clock.  He was hobbling, he had just had
13      surgery.  He said, oh, geeze, I just got off the
14      bus, can I sit down, is there any way you can
15      fit me in.  And I said, we're booked up for the
16      rest of the afternoon.  You know, you can have a
17      seat, I can check with the dietitian, I can't
18      promise you anything, we may or may not be able
19      to fit you in, but have a seat, we'll see what
20      we can do for you.  So I went back in my office,
21      I talked to the dietitian, I let her know that
22      there was a gentleman, that if she could
23      possibly fit in, and I was sitting there.
24      Obviously Joy must have heard what was going on.
25      I hear her walk out to this man and chastise him

1   because he missed his appointment.  Your
2   appointment was at 10 o'clock, we don't have
3   time to fit you in, we don't have time to fit
4   you in.  He said, well, that lady said that I
5   could wait and maybe you could fit me in.  No,
6   absolutely not, we go by appointments, blah,
7   blah, blah, told him basically he had to leave
8   the lobby area.  I was at this point just fuming
9   listening to this.  She came into my office, and
10  I said, don't ever do that to me.  I never, ever
11  talked back to her, and I talked back to her
12  that day, and I said, do not undermine me like
13  that, I let this gentleman know he could sit
14  there, there was no reason you had to kick him
15  out of here, and she did it anyway.  And that
16  cut it for me.  And at that point my patience
17  had pretty much run out.  That was the big one
18  for me.
19 Q. In terms of the individual, you say he was
20  hobbling I believe?
21 A. I think he had a cane.
22 Q. Did you observe in terms of his age, was he a
23  young man, an older man?
24 A. He was later middle-aged to older, an
25  African-American gentleman.  Like I said, I

|     |     |     |
| --- | --- | --- |
| 1   |     | believe he had a cane. I thought that he had |
| 2   |     | foot surgery was what he said. |
| 3   | Q.  | A patron of HealthPLACE, a customer? |
| 4   | A.  | Yeah. Well, he was there to see the dietitian, |
| 5   |     | and he had misjudged his appointment. |
| 6   | Q.  | There was also some testimony earlier about the |
| 7   |     | matter of flexibility. Ms. Swick, would you -- |
| 8   |     | based upon your observations and interactions |
| 9   |     | with Ms. Sweeting over the years, would you |
| 10  |     | characterize Ms. Sweeting as someone who was |
| 11  |     | flexible or on the other hand someone who was |
| 12  |     | rigid? |
| 13  | A.  | To work with, very rigid. She liked things -- |
| 14  |     | you know, people like things the way they like |
| 15  |     | things, she likes things the way that she likes |
| 16  |     | things. |
| 17  | Q.  | Did you observe that same characteristic with |
| 18  |     | respect to how she dealt with the customers and |
| 19  |     | patrons that came to HealthPLACE, would you |
| 20  |     | characterize her as being flexible or rigid? |
| 21  | A.  | She would frequently get into arguments with |
| 22  |     | people. |
| 23  | Q.  | Customers? |
| 24  | A.  | Customers, people that would come to our health |
| 25  |     | screenings, arguing whether or not they had an |

**CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of February, 2006, the foregoing Supplemental Appendix In Support Of Highmark's Motion For Summary Judgment was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

/ s / Martha Hartle Munsch
Martha Hartle Munsch, Esq.
(PA ID No. 18176)
mhmunsch@reedsmith.com
ReedSmithLLP
435 Sixth Avenue
Pittsburgh, PA  15219
Ph: 412.288.4118
Fax: 412.288.3063
Counsel for Defendant